UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re POLARIS INDUSTRIES, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 0:16-cv-03108-PAM-SER |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS. | ) ) | |

CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................ 1

II.    JURISDICTION & VENUE ....................................................................... 3

III.   PARTIES .................................................................................................... 4

IV.   BACKGROUND TO OVERVIEW OF POLARIS' MISLEADING
COURSE OF CONDUCT DURING THE CLASS PERIOD ................................. 6

     A.    All-Terrain Vehicles, Particularly the Side-by-Side RZR and
RANGER Off-Road Vehicles, Are Critical to Polaris' Financial
Success ....................................................................................... 7

     B.    Polaris Rushed Its Defective ORVs to Market ............................. 12

     C.    Polaris Knew About the Fire Dangers of Its Products Long Before It
Recalled Its ORVs ....................................................................... 15

     D.    Polaris Repeatedly Recalls Defective ORVs that Catch on Fire,
While Downplaying the Risks to Its Customers and Investors ................. 18

          1.    Polaris Quietly Recalls Its Youth RZR ORV Just Before Its
2015 Investor & Analyst Meeting and Dealer Show Where
the Defective RZR XP Turbo Is Introduced ................................... 22

          2.    Polaris Recalls 2015 RZR 900s and 1000s Due to Fire Risks,
but Downplays the Dangers and Say Relatively Few Vehicles
Need to Be Fixed ............................................................................ 23

          3.    Polaris Announces a Small Recall of the RZR XP Turbo and
a Big Reduction in Its Guidance, Which It Blames on Other
Circumstances ............................................................................... 24

          4.    Polaris Recalls All RZR 900s and RZR 1000s Built Since
2013 Due to Fire Dangers, and Falsely Tells Investors that It
Has Fully Investigated and Knows How to Fix the Problems ......... 26

          5.    Polaris Recalls Its 2015 RANGER ORVs, Then Conceals the
Impact that Recalls Have Had on Its Business ............................... 29

          6.    Polaris Announces a Stop-Ride/Stop-Sale Advisory Pending
Recall of the 2016 RZR XP Turbo and Falsely Claims that the
Anticipated Recall Costs are Already Reflected in Its
Guidance ....................................................................................... 31

          7.    Polaris Recalls the XP Turbo ....................................................... 34

     E.    Polaris Finally Admits the Significant Impact of the Fire Defects on
Its Sales and Financial Condition ................................................. 35

- i -

**Page**

F.    Polaris' Warranty Reserves Were Misleading ............................................. 40

V.    MATERIALLY FALSE AND MISLEADING STATEMENTS & OMISSIONS DURING THE CLASS PERIOD ...................................................... 42

    A.    FY14 Annual Report ........................................................................ 42

    B.    1Q15 Quarterly Report ..................................................................... 45

    C.    2Q15 Earnings Report ...................................................................... 47

    D.    2015 Investor & Analyst Meeting and Dealer Show .................................. 52

    E.    October 5, 2015 Recall Announcement .................................................. 57

    F.    3Q15 Earnings Report ...................................................................... 60

    G.    FY15 Earnings Report ...................................................................... 66

    H.    April 19, 2016 Recall Announcement .................................................... 72

    I.    1Q16 Earnings Report ...................................................................... 75

    J.    2Q16 Earnings Report ...................................................................... 83

    K.    2016 Analyst Day and Dealer Show ..................................................... 94

VI.    ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY, LOSS CAUSATION & DAMAGES ........................................................................ 100

    A.    Presumption of Reliance (Fraud on the Market Allegations) .................. 100

    B.    Theory of Loss Causation and Damages ................................................ 102

VII.    CLASS ACTION ALLEGATIONS.................................................................. 107

VIII.    CLAIMS FOR RELIEF.................................................................................. 108

IX.    JURY DEMAND.......................................................................................... 114

1243585_1

## I.    INTRODUCTION

1.     This is a securities class action on behalf of purchasers of the publicly-traded securities of Polaris Industries Inc. ("Polaris," "PII" or the "Company") during the period from February 20, 2015 to September 11, 2016 (the "Class Period") against Polaris and six of its current and former officers (CEO Scott W. Wine, CFO Michael T. Speetzen, ORV President Matthew J. Homan and EVP Kenneth J. Pucel, President & COO Bennett Morgan and ORV President David Longren) for violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 promulgated thereunder.

2.     This case arises from false and misleading statements and omissions made by Polaris during the Class Period regarding the existence, nature and magnitude of the risks to the Company resulting from defects in its Off-Road Vehicles ("ORV") that caused those vehicles to unexpectedly burst into flames, killing or maiming their occupants.  Throughout the Class Period, Polaris engaged in a misleading course of business that concealed or deliberately understated the impact of the defects and related recalls on sales and demand for its products, and overstated the Company's investigation into and understanding of the defects and its ability to protect and expand its market share based on sales of new ORV models with the same or similar defects.

3.     During the Class Period, Polaris recalled more than 200,000 ORVs that had been manufactured from 2012 through 2016.  The recalls affected Polaris' most significant ORV models, including the high-powered RZR 900, RZR 1000 and RZR XP Turbo models that were the cornerstone of the Company's plans to grow ORV sales and revenues and blunt competition from foreign manufacturers.  The defects arose from a common set of problems and conditions, all of which caused Polaris' ORVs to suddenly catch on fire due to faulty heat shields, leaking fuel or oil, and overheated engines.  The defects were caused by bad designs that Polaris had not properly vetted before rushing the products to market, and

- 1 -

exacerbated by poor manufacturing practices and quality control procedures that did not exist or were not being followed.

4. Prior to and during the Class Period, Polaris received repeated notices of fire dangers affecting their products through warranty claims, lawsuits, and close monitoring of social media and other channels where incidents were being reported. Polaris conducted detailed investigations of the causes of the fire-related incidents, and admitted to having repeated notice of defects in its products long before recalls were formally announced. Shockingly, despite the repeated reports of fires affecting its products, Polaris never warned investors of the risks to its business arising from those events. Throughout the Class Period Polaris instead repeated the same generic warning about recall risks that it had used for years before the events giving rise to this action, including by repeatedly telling investors that there had been "no material change" in those risks even as more fires were reported and more recalls were imminent.

5. When recalls were announced, defendants falsely asserted that Polaris understood the cause of and how to fix the defects, that relatively few vehicles would actually need repairs, and that the recalls had not and would not harm sales or earnings. Defendants told investors and customers that they had conducted a detailed review and analysis of the designs of and manufacturing practices for recalled vehicles, when they had not. And defendants repeatedly boasted about the Company's purported commitment to safety and the purported strength of its manufacturing and quality control practices.

6. Defendants deliberately timed Polaris' recall announcements to coincide with earnings or new product announcements, and then used those events as forums in which they could downplay and conceal the risks that the recalls presented to the Company's business. Defendants blamed sales declines on market forces or competition rather than admitting the extent to which sales and demand had declined as a result of the recalls, or apprising

investors of the risk of future recalls.  To bolster these false assertions, defendants raised or maintained Polaris' sales and earnings guidance, or reduced it, while falsely telling investors the reduction was due to other circumstances.  Defendants assured investors that all the reasonably anticipated recall-related impacts had been identified and were accounted for in that guidance and reflected in the Company's warranty reserves, when they were not.

7.     The misleading statements and course of conduct complained of herein caused investors to suffer millions of dollars in economic harm when the concealed risks manifested, revealing the true financial impact of the defects affecting Polaris' products and the recalls that had resulted from those defects.  Polaris cut its guidance nearly in half, finally admitting that the reduction was due to lost sales and weak demand caused by the recalls, leading to millions of dollars in increased costs for warranty and product liability claims, for investigations and safety and quality programs that defendants told investors had already been done and already existed, and for increased promotional spending including extended warranties, generous rebates and return policies, and heavy marketing campaigns designed to restore consumer confidence that Polaris' vehicles were safe to drive.

## II.    JURISDICTION & VENUE

8.     Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa because the claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

9.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Polaris' corporate headquarters are located in Medina, Minnesota, within this District, where the day-to-day operations of the Company are directed and managed.  Many of the false and misleading statements were made in or issued from this District and many of

the acts and practices complained of herein occurred or were directed in substantial part in this District.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the Internet, interstate telephone communications and the facilities of the national securities markets.

## III.   PARTIES

11.     Lead Plaintiff City of Atlanta Police Officers' Pension Fund (the "Pension Fund" or "Lead Plaintiff") is a defined benefit pension plan providing benefits to police officers of the City of Atlanta and their family members.  The Pension Fund purchased 47,333 shares of Polaris common stock during the Class Period, as set forth in the certification attached as Exhibit 1.

12.     Named Plaintiffs Seepersaud Surooj, Kowsilla Surooj and Trevor Orr each purchased the publicly-traded securities of Polaris during the Class Period at prices that were inflated by fraud, as alleged in the certifications attached to the complaints they filed in this consolidated proceeding.

13.     Defendant Polaris is a Minnesota corporation, whose principal business is the design, manufacture and sale of ORVs, snowmobiles and motorcycles, as well as related parts, accessories, and garments.  By the outset of the Class Period, Polaris had issued more than 64 million shares of common stock which was publicly traded on the New York Stock Exchange ("NYSE") under the ticker symbol "PII."  The Company regularly communicated with investors through periodic filings with the SEC, press releases, conference calls and investor and analyst presentations.  In addition, the Company has established and regularly publicizes the availability of a website at www.polaris.com, on which it maintains links to an Investor Relations website where SEC filings, financial information, press releases,

- 4 -

conference call transcripts, corporate profiles, descriptions of its business and other information about the Company is made available to investors.

14.     Defendant Scott W. Wine is the Chairman and Chief Executive Officer of Polaris. Prior to becoming the CEO of Polaris, he was the President of Fire Safety Americas, the Fire & Security division of United Technologies Corp. As the Company's CEO and Chairman during the Class Period, Wine was regularly quoted in Polaris' press releases, regularly spoke on Polaris' quarterly conference calls with Wall Street analysts and investors and regularly made live presentations at analyst-sponsored investor conferences and the Company's annual analyst and investor meetings.

15.     Defendant Michael T. Speetzen is Polaris' Chief Financial Officer. As the Company's CFO during the Class Period, Speetzen also regularly spoke on Polaris' quarterly conference calls and made live presentations at analyst-sponsored investor conferences and the Company's annual analyst and investor meetings.

16.     Defendant Kenneth J. Pucel is Polaris's Executive Vice President of Operations, Engineering, and Lean. As the Company's EVP during the Class Period, Pucel regularly spoke on Polaris' quarterly conference calls and made live presentations at analyst-sponsored investor conferences and the Company's annual analyst and investor meetings.

17.     Defendant Matthew J. Homan is Polaris' President of Off-Road Vehicles. Homan has been President of ORV since January 2016. Prior to his role as President of ORV, Homan was President of Global Adjacent Market from September 2015 to January 2016 and Vice President of Global Adjacent Market from July 2014 to September 2015. As the Company's President of ORV during the Class Period, Homan regularly made live presentations at analyst-sponsored investor conferences and the Company's annual analyst and investor meetings.

18.     Defendant Bennett J. Morgan was Polaris' President and Chief Operating Officer from 2005 until he abruptly left the Company in May 2016.  As the Company's President and COO during the Class Period, Morgan regularly spoke on Polaris' quarterly conference calls and made live presentations at analyst-sponsored investor conferences and the Company's annual analyst and investor meetings.

19.     Defendant David C. Longren was Polaris' Senior Vice President of Enterprise Cost from January 2016 until September 6, 2016.  Prior to that role, Longren was President of ORV and ORV Engineering from September 2015 to January 2016, when he was replaced by Homan.  Longren was Vice President of ORV and ORV Engineering from August 2011 until September 2015.  As the Company's Senior Vice President of Enterprise Cost, President of ORV and ORV Engineering, and Vice President of ORV and ORV Engineering during the Class Period, Longren made live presentations at analyst-sponsored investor conferences and the Company's annual analyst and investor meetings.

20.     The individuals named as defendants in ¶¶14-19 are referred to herein as the "Individual Defendants."

## IV.     BACKGROUND TO OVERVIEW OF POLARIS' MISLEADING COURSE OF CONDUCT DURING THE CLASS PERIOD

21.     Plaintiffs' allegations are based upon the investigation of plaintiffs' counsel, including information contained on Polaris' website or in its SEC filings and other regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases, conference call transcripts and other public statements issued by the Company, as well as media reports and other sources of information about the Company, including information obtained from former employees of Polaris.[1]

---

[1]    Former employees who are identified herein are each referred to as a "CW," which stands for "confidential witness."  The CWs names have been kept confidential herein to protect them from possible inconvenience, embarrassment, harassment, retaliation, intimidation or diminished employment prospects should their identities become known to the general

A.  **All-Terrain Vehicles, Particularly the Side-by-Side RZR and RANGER Off-Road Vehicles, Are Critical to Polaris' Financial Success**

22.     Polaris began as a snowmobile designer and manufacturer in the early 1950s. In the decades since, Polaris vastly expanded its business, primarily through the design and manufacture of ORVs. ORVs are four-wheeled vehicles designed for off-road use and traversing rough terrain, such as forests, sand dunes, swamps and marshland. ORVs are used for recreation in sports such as fishing and hunting and for trail and dune riding, and for utility purposes on farms, ranches, and construction and industrial sites. One common type of ORV is the side-by-side, a multi-passenger off-road, all-terrain vehicle that can carry up to six passengers in two rows of seats, as well as cargo and gear. The Company has a worldwide presence, selling its products through dealers and distributors located in the United States, Canada, Western Europe, Australia and Mexico. However, the largest percentage of its sales comes from North America, which accounted for 85% of its reported FY14 sales revenues (75% from the U.S. and 10% from Canada).

23.     According to Polaris' FY14 annual report issued at the outset of the Class Period, ORVs accounted for 67% of its annual sales, as compared with snowmobiles (8%), motorcycles (8%), other small vehicles (3%) and parts, garments and accessories (16% combined). Over the last two decades ORVs, including Polaris' popular RANGER and RZR models, have become the source of over two-thirds of Polaris' revenue:

---

public or their current, former or prospective employers. *See Beaver Cty. Emps. Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1053 n.9 (D. Minn. 2015) (recognizing appropriateness of using confidential witnesses to support allegations of fraud under the federal securities laws).

- 7 -



24.     Polaris manufactures several side-by-side ORVs, including the RANGER, RZR and GENERAL vehicles.  The Company offers each of these models in two-seat and four-seat configurations and with different features and amounts of engine power.  RANGER and RZR alone make up nearly half of Polaris' annual revenue.  As Wine described to analysts and investors at a March 8, 2016 investor conference: "Our off-road vehicle business is obviously our largest part of our portfolio. . . .  Ranger is our largest single-product line – well over $1 billion.  RZR is second; that's also over $1 billion."

25.     Polaris introduces its new model year products every summer at an annual dealer show held a week or two after its 2Q earnings report.  The event is highly-anticipated, and regularly attended by Wall Street analysts and investors, as well as Polaris' dealers and other industry observers.  Because of the attention generated by and the attendance at the dealer show, Polaris also holds its annual investor and analyst meeting during the event.

- 8 -

This generates additional coverage, usually positive, through numerous analyst and media reports published ahead of, during and after the show.

26.     As the number one player in the ORV market, Polaris enjoyed, among other benefits, stable pricing and positive brand perception among consumers.  As analysts at Morningstar noted in a December 18, 2015 report:

> Holding leading market share positions in all of the categories it operates . . . has ensured the company's brand remains relevant.  We believe when consumers replace (or think about purchasing) products in the snowmobile and off-road categories they tend to want the best products with the newest technology, which is what Polaris provides, yielding them stability in pricing and positive brand perception.

27.     Leading into the Class Period, Polaris' industry-leading position and brand name recognition provided it with a significant competitive advantage in the market, as its vehicles had a long track record of superior design and performance.  Maintaining this reputation was critical to Polaris' ability to maintain market share, particularly in the face of increasing competition from foreign manufacturers including Honda, Yamaha, Kawasaki and Canada-based Bombardier Recreational Products ("BRP"), makers of Can-Am ORVs ("Can-Am").

28.     Polaris has historically benefitted from its reputation for quality and innovation.  According to the Morningstar report:

> Polaris is one of the most respected and innovative brands in power sports.  The firm started with snowmobiles in 1954 and entered all-terrain on-road vehicles, and more recently global adjacent products afterward.  In our opinion, the firm's brands, innovative products, and Lean manufacturing yield Polaris a wide economic moat.  The company stands to capitalize on its R&D strategy, reputation for quality, operational excellence, and acquisition strategy, which have allowed it to take share from its competitors and improve profitability.  However, there are no switching costs from Polaris' well-regarded brands when the consumer replaces its products, which makes the continued production of quality, innovative products imperative.

29.     However, because there are no costs for consumers who switch brands, the Company's ability to maintain its reputation for quality and innovation was critical to

- 9 -

Polaris' continued success.  In particular, recalls, product liability lawsuits and other events calling the safety or reliability of its products into question had the potential to devastate Polaris' ORV market share.  For example, Yamaha was a major competitor with Polaris in side-by-side vehicles until 2009, when the recall of several of its Rhino model side-by-side vehicles caused it to lose significant market share.  As a Wunderlich analyst noted on August 17, 2015: "Yamaha was once a close second behind Polaris in SxS vehicles, but dropped off quickly following a disastrous product recall in April 2009."

30.     Polaris' management repeatedly assured investors that through new product introductions and other actions the Company was succeeding in retaining and expanding its critical ORV market share, including in the following statements and presentations to investors:

> (a)     "We expect RZRs and RANGERs to again gain market share on the back of product innovations and Polaris' most engaged dealers and most passionate customers."  Wine, 1/27/15 Earnings Call;
>
> (b)     "[W]e've gained more share than anybody else in the industry the last five years, and with our – we've often talked about an armada of products that's been the key to our success in off-road vehicles."  Wine, 3/3/15 Raymond James Institutional Investors Conference;
>
> (c)     "[W]e think, we will start to accelerate the share growth in ORVs in the second half."  Morgan, 7/28/15 Investor & Analyst Meeting;
>
> (d)     "Our metal is certainly being tested but we responded well, once again gaining side-by-side and ATV market share."  Wine, 10/21/15 Earnings Call; and
>
> (e)     "Well, I think what we said is overall in Powersports, including all aspects, we expect to gain share.  ORV's going to be extremely competitive.  We know that.  We've factored that in.  We saw it in the fourth quarter.  And we're modeling that we're going to hold share."  Wine, 1/26/16 Earnings Call.

31.     Still, before and during the Class Period, Polaris' market share was at risk. BRP, Honda, Yamaha and Kawasaki all launched vehicles designed to compete with Polaris'

- 10 -

successful RANGER and RZR ORVs.   As multiple analysts highlighted, Polaris faced greater threats to its number one position during the Class Period than it had in years:

(a)   "With the competition stepping up its game in a sizable fashion, we feel PII is at risk of losing ORV market share for the first time in years. More detail is below, but essentially, Honda and Can-Am are attacking RANGER and Yamaha (along with Can-AM) has a real answer to the RZR for the first time."  Stephens Inc. Report, 11/2/15; and

(b)   "[W]e believe ORV (58% of sales) share could be a challenge.  Not only did PII's share slip slightly in 4Q, but it now faces an even more competitive product environment in 2016.  Put simply, while PII has executed well through competitive pressures over the past 2-3 years, there is now greater legitimacy investor concerns."  SunTrust Robinson Humphrey Report, 1/26/16.

32.    In 2014, Polaris introduced 31 new ORV models for 2015.  In 2015, it followed with fewer new models, but the 16 products it introduced were specifically targeted at product lines where it was most at risk from competition.  In July 2015, Polaris launched the RZR XP Turbo to directly respond to Can-Am's new turbo-powered side-by-side.

33.    The announcement of the XP Turbo was viewed with favor by market analysts. As Wedbush reported on October 15, 2015:

**New MY2016 ORVs Positioned to Plug Holes in Lineup and Prevent Share Losses**

When it comes to Polaris' industry-leading ORVs, the MY2016 is largely unchanged from MY2015, but introduces a handful of new models that strategically fill major gaps in the existing offering.

\*        \*        \*

This year, the number of new ORVs was a much more moderate 16, with only about half of these featured during the dealer show.  Unlike last year, this year's new product haul clearly has a centerpiece from which to market around in the form of the new RZR XP Turbo.  Although we are now two years removed from the game changing announcement of the RZR XP 1000, which set the bar in an increasingly competitive high-end sport side-by-

- 11 -

side segment, the XP Turbo announcement was generally considered to be a surprising development. [2]

34.     Wine and Morgan acknowledged on each earnings call from January 2016 through January 2017, that for the first time since rising to its dominant position – Polaris had lost market share in the side-by-side market beginning in the 4Q15 and continuing through 2016.  Polaris told investors that these losses were caused by a weak market and tough competition, and it could and would blunt these competitive inroads through the introduction of new and more powerful products, including the RZR 900 and RZR 1000 models, and the RZR XP Turbo.  In fact, Polaris' declining demand and reduced market share had resulted from defects in these and other Polaris products that would cause them to catch on fire, killing or maiming their occupants and destroying demand for the products.

### B.     Polaris Rushed Its Defective ORVs to Market

35.     To keep the competition at bay and increase its share of the ORV market, Polaris employed a "speed-to-market" strategy and aggressively introduced new products to its "armada" of vehicles:

    (a)     "[W]e've often talked about an armada of products that's been the key to our success in off-road vehicles."  Wine, 3/3/15 Raymond James Institutional Investors Conference; and

    (b)     "Our scale and speed to market remain competitive advantages, and we expect to add further to our armada over the next quarter.  So stay tuned."  Morgan, 10/21/15 Earnings Call.

---

[2]     Other analysts echoed this report.  *See, e.g.*, Northcoast Research Report, 10/12/15 ("[T]he company revealed the RZR XP TURBO EPS at its recent dealer meeting.  Despite carrying a hefty MSRP of $24,999, our dealer contacts are excited about the new model, as they feel that the 144hp turbo engine reinforces Polaris' position at the top of the recreational SxS market, and distances the company's offerings from the CAN-AM Maverick."); Stephens Inc. Report, 7/30/15 ("The new products are targeted to address the increasingly competitive ORV market. . . .  The RZR XP Turbo is now the biggest and baddest SxS on the market and for the time being Polaris is again a step ahead of the competition." ); Feltl & Co. Report, 7/28/15 ("The biggest announcement of the night, in our opinion, was the new RZR XP Turbo.  This new vehicle ups the game on horsepower with 144 HP versus the RZR XP 1000 which has 110 HP.").

36.     As analysts recognized, Polaris ORV market share was built on continuously

having new product offerings and its speed-to-market approach:

(a)     "We expect significant new products in both on and off-road vehicles
        and think PII will continue to take market share due to innovative new
        products and a larger armada than competitors."  Feltl & Co. Report,
        07/22/15;

(b)     "[C]onsistently adding innovative new units to the product 'armada' is
        clearly the single most important factor driving strong financial
        results."  Northcoast Research Report, 10/12/15;

(c)     "[W]e expect PII's unmatched R&D and speed-to-market process to
        lead to ongoing share gains, keeping the company in the top spot for
        years to come."  CL King & Associates Report, 7/1/15; and

(d)     "Polaris has gone from a strong position to the dominant market leader.
        . . . [O]ver the past six years Polaris' share has increased meaningfully
        (~45% share vs ~30% in '09) on the back of aggressive product
        introductions."  Northcoast Research Report, 12/16/15.

37.     Several former Polaris employees, including CW1[3], CW2[4], CW3[5] and others,

confirmed that, due to the competitive nature of the powersports industry, the Company was

intently focused on being first to market with new designs or more powerful products. CW2,

for example, said that Polaris' management had "very high expectations for deadlines."  For

example, CW2 said that developing the XP Turbo, especially the power train, was "way

---

[3]   CW1 was a Buyer and Analyst at Polaris throughout and for more than two years before
the Class Period.  CW1 was directly involved in obtaining repair parts for products recalled
during the Class Period.

[4]   CW2 was a Project Engineer at Polaris prior to and during the Class Period until May
2016.  CW2 helped coordinate the design and development of, and obtain parts for, the RZR
XP Turbo.

[5]   CW3 started working at Polaris several years before the Class Period, and was employed
at the Company in a variety of engineering and supply roles until January 2016, including as
a quality engineer.  Prior to working at Polaris, CW3 had several decades of experience at
other vehicle manufacturers, where he developed an expertise in manufacturing and quality
control procedures.

- 13 -

more involved" than originally anticipated because of the significant increase in power from the Turbo engine but the original project deadlines and timeline did not change.

38.     CW1 and CW3 said that Polaris' speed-to-market strategy had resulted in products being introduced on rushed deadlines with inadequate attention paid to quality or safety, requiring newly-introduced products to be repaired or redesigned after they were introduced to the market.   CW1 said that the rush to introduce products to meet competitive demands had resulted in products being introduced before Polaris had properly vetted their quality or assured that they were safe to sell.   The Company culture described by these employees was one of ship first, and correct the problems later.

39.     Another manifestation of Polaris' singular focus on production speed was the Company's failure to follow its internal Production Part Approval Process ("PPAP"), which required parts to be reviewed for compliance with Polaris' design specifications before they were shipped by suppliers.   CW3 said that PPAP was not regularly followed and many employees objected to using it because it delayed shipments and production, and made it difficult to meet the tight deadlines imposed by management for designing, developing, and introducing new products to the market.   CW3 said that Polaris' software system for managing parts would reflect the lack of PPAP approval, and anyone with access to the system could tell that very few PPAP approvals had been received.

40.     As a result of the time needed to comply with the PPAP, CW3 said that it was routinely ignored and parts were allowed to ship "like crazy" without PPAP approval from Polaris.   CW3 also said that Polaris' purchasing department was "very aggressive" in getting suppliers to ship parts on tight deadlines.   CW3 estimated that up to 80% of the parts supplied to Polaris were shipped before or without PPAP approval ever being received, including parts incorporated in the recalled RZR and RANGER products.   CW3 said that shipment of non-conforming or defective parts could cause problems with parts that did not

- 14 -

fit, leading to assembly errors or other problems that required designs or parts to be reworked. CW3 said that many of the Company's products – including the RZR XP Turbo, Slingshot and other products that had already been released – had to be reworked due to the use of parts that did not meet design specifications.

### C. Polaris Knew About the Fire Dangers of Its Products Long Before It Recalled Its ORVs

41.     Because a recall will not occur until after problems have been reported to the Company – through social media, warranty claims, litigation demands, lawsuits, the CPMC, or other channels – Polaris' management knew of product recalls in advance of when they were formally announced. CW1 said that recalls were triggered after a certain number of claims had been asserted or filed. CW5 said that he had learned of the April recall at least two weeks before it was publicly announced. It can be inferred that the problems which led one to the recall and the recall itself were known to those working directly on the recall, including members of the Company's management, much earlier. CW1 said that Polaris' management should have known of the recall at least a quarter before it took place.

42.     Polaris' aggressively used social media to market its products – and to be alert to safety and other problems after they were sold. CW4[6] and CW6[7] both said that Polaris monitored social media posts about its products and tracked and responded to complaints about its products. CW6 said that when social media posts concerned safety issues that presented a risk of injury, Polaris closely examined the information to determine the cause of the problem and whether the vehicle was stock or had been modified in a way that caused or contributed to the incident. Both CW1 and CW6 said that Polaris also did extensive testing on products in response to problems before recalls were formally announced. CW1 said that

---

[6]     CW4 was a Customer Experience manager at Polaris from 2013 until the fall of 2015.

[7]     CW6 worked as a quality engineer at Polaris from mid-2015 until after the end of the Class Period.

before the recalls were announced Polaris' research and development team had inspected many charred frames of vehicles involved in fire-related incidents at its Wyoming, Minnesota testing facility, and was also testing new vehicles to attempt to replicate the conditions that had caused those vehicles to catch on fire.

43.    As part of its monitoring of social media sites, Polaris was aware of the many videos posted to YouTube showing RZRs on fire, including videos uploaded on November 1, 2012 (https://tinyurl.com/hgm74b2); January 17, 2013 (https://tinyurl.com/gsv9uhc); December 1, 2013 (https://tinyurl.com/jozcypc); May 4, 2014 (https://tinyurl.com/z23p3uu); September 11, 2015 (https://tinyurl.com/zvom5te); and February 15, 2016 (https://tinyurl.com/hftqc66).

44.    Polaris also learned of the fire risks through warranty claims and lawsuits.  For example:

> (a)    On March 16, 2012, a Polaris customer and his wife were riding in their new 2012 RZR XP 900 when the vehicle caught fire above the engine and exhaust.  The owner of the RZR described the incident in a letter to Polaris in late March 2012 and on www.saferproducts.gov, a website run by the CPSC in April 2012.  Polaris denied liability and denied that the "RZR contains any defect which could create a substantial product hazard or does create an unreasonable risk of death or serious injury."[8]

> (b)    On September 27, 2012, the owner of a 2012 Polaris RZR 800 filed a report on SaferProducts.gov stating that the vehicle's exhaust was melting the plastic cargo bed and that the bed was too hot to touch.[9] On October 19, 2012, Polaris responded to the report and stated that it had spoken with the customer and directed him to take the RZR to a dealer.  Polaris stated that it had received similar complaints of melting plastic.

---

[8]    SaferProducts.gov (Apr. 14, 2012), https://tinyurl.com/hbey5gf.

[9]    SaferProducts.gov (Sept. 27, 2012), https://tinyurl.com/jpcnvej.

(c)     On November 1, 2012, a Polaris RZR XP 900 owner was driving his vehicle in sand dunes in Sothern California when the RZR caught fire and burned to the ground.   He reported the incident on www.saferproducts.gov on November 3, 2012 and a few weeks later, Polaris posted a response.[10]  Polaris sated that it had "conducted an on-site investigation concerning this issue," but that the "root cause of the issue could not be determined at this preliminary investigation."[11] Polaris also noted that the RZR was being returned to the Company for further investigation and that it was continuing its discussions with the owner.[12]

(d)     On June 3, 2013, the owner of a 2012 Polaris RZR4 800 with less than 500 miles was driving the vehicle when he discovered that the rear cargo bed of the vehicle, which is positioned above the engine and exhaust, had melted.   The owner reported the incident on SaferProducts.gov and to Polaris in October 2013 and noted that Polaris had agreed to provide a replacement cargo bed.[13]   On November 5, 2013, Polaris responded to the customer's report on saferproducts.gov, stating that it had agreed to replace the melted cargo bed.

(e)     On July 19, 2013, the owner of a Polaris RANGER 800 reported on saferproducts.gov that the seat of her Polaris becomes so hot that she has to stop riding to avoid being burned.[14]  She noted that she had red marks on her back from where she was sitting on the hot seat.  On August 5, 2013, Polaris responded to the report and stated that there was nothing abnormal going on and that to avoid the problem, the rider just had to wear appropriate clothing.

(f)     In November 2013, a young boy was riding in the back seat of a RZR 1000 in Southern California when the engine suddenly caught fire, engulfing the vehicle in flames and burning the child before he was able to escape.  The boy's parents filed a lawsuit against Polaris in July 2015 alleging that the RZR 1000 was improperly designed in a way that allowed it to suddenly and unexpectedly catch fire.

---

[10]   SaferProducts.gov (Nov. 3, 2012), https://tinyurl.com/jgf9kgg.

[11]   *Id.*

[12]   *Id.*

[13]   SaferProducts.gov (Oct. 22, 2013), https://tinyurl.com/j7beome.

[14]   SaferProducts.gov (July 19, 2013), https://tinyurl.com/zcsnhhs.

- 17 -

(g)     In April 2015, the parents of an 11-year-old girl sued Polaris for injuries caused by a gap in the fuel tank vent line of the RANGER ORV that caused a fire after the vehicle flipped over in July 2014, severely burning their daughter.  The parents sued Polaris in the U.S. District Court for the Northern District of Texas, alleging that Polaris had improperly designed the gasoline tank vent tube in a way that allowed gasoline to pour from tank on to the hot engine in the event of a rollover.  Polaris quietly settled the case in late 2016 after the Court granted the plaintiffs' motion to compel a Rule 30(b)(6) deposition of a Polaris representative.

(h)     On July 4, 2015, a 15-year-old passenger in a Polaris RZR 900 was severely burned when the vehicle rolled over and caught fire, much like the one Polaris had been sued for in April.  On August 27, 2015, Polaris acknowledged that it "'[wa]s actively investigating what happened in this terrible incident.'"[15]  The victim of the RZR fire died of her injuries several months later in November 2015.[16]

## D.     Polaris Repeatedly Recalls Defective ORVs that Catch on Fire, While Downplaying the Risks to Its Customers and Investors

45.     Polaris recalled more than 200,000 vehicles during the Class Period for a related series of problems that caused its vehicles to catch on fire, sometimes with fatal consequences.  The problems affected Polaris' most powerful and most important products, including the RZR Turbo and other high horsepower vehicles it had rushed to market to blunt competitive inroads from Can-Am and other manufacturers.  As Wine acknowledged on the Company's July 20, 2016 conference call, the fire-related defects and recalls were caused by "gaps in [Polaris'] design, development, and manufacturing processes."

46.     The fires all resulted from similar problems: leaky fuel pumps, misrouted fuel tank vent lines, loose turbo oil drain tubes, ineffective heat shields and malfunctioning engine control units and voltage regulators that caused gasoline or other flammable

---

[15]   Caroline Connolly, *Attorney for family of teen girl severely burned in crash says Polaris should consider vehicle recall*, FOX 13 Salt Lake City (Aug. 27, 2015, 9:25 PM), https://tinyurl.com/zcsphxb.

[16]   Jessica Miller, *Provo teen taken off life support months after fiery crash*, The Salt Lake Tribune Nov. 17, 2015, 11:00 AM), https://tinyurl.com/hvohxwm.

- 18 -

substances to come in contact with overheated engine parts, whereupon the flammable substance would burst into flame – often with dramatic consequences, as reflected in this screenshot from a YouTube video posted by one frightened Polaris user on November 1, 2012:[17]



47.     The fire risks were particularly significant for Polaris' newest and most competitively-important ORVs – high-horsepower vehicles like the RZR Turbo, RZR 1000 and RZR 900 that run fast and hot, creating ideal conditions for spontaneous combustion caused by leaking fuel or oil.

48.     The design and manufacturing defects, and the fires they caused, led to a series of recalls by Polaris during and after the Class Period that affected more than 200,000 vehicles, as summarized in the following chart and described in more detail below:

---

[17]   Michael Mallow, *2012 rzr xp fire*, YouTube (Nov. 1, 2012), https://tinyurl.com/hgm74b2.

| Date Announced | Models | No. Vehicles Recalled |
|---|---|---|
| 7/23/15 | 2015 Youth RZR | 4,300 |
| 10/5/15 | 2015 RZR 1000/RZR 900 | 53,000 |
| 12/10/15 | 2016 RZR XP Turbo | 2,230 |
| 4/19/16 | 2013-2016 RZR 1000/RZR 900 | 160,000 |
| 6/28/16 | 2015-2016 RANGER 570 | 43,000 |
| 7/25/16 | 2016 RZR XP Turbo (Stop Ride/Stop Sale advisory) | undisclosed |
| 9/1/16 | 2016 RZR XP Turbo (Recall) | 13,000 |
| 9/15/16 | 2014 RANGER 900 | 42,500 |
| 3/2/17 | 2016-2017 RZR 900/1000/XP Turbo; GENERAL 1000 | 13,500 |

49.     Despite the consistent pattern of fires, lawsuits and fire hazard recalls related to its revenue-driving RZR and RANGER ORVs, Polaris and the Individual Defendants repeatedly downplayed the risk of the recalls to Polaris' profitability and market dominance, falsely assuring investors and customers that the problems were limited, the Company had a firm grasp on their causes and likely impact, and that the issues did not present any significant or unusual risks to its business.   Analysts and investors believed these misrepresentations because, leading up to the Class Period, Polaris appeared to have had a long history of developing superior and innovative products that were free from significant problems or defects.

50.     Throughout the Class Period, a pattern emerged in which Polaris would announce a recall, assure investors that the impact was limited, and then, weeks later, surprise the market with poor financial reports and/or reduced guidance.   In each of these circumstances, defendants would tell investors that the weak performance or lowered expectations was due to macro-economic conditions or weakening industry demand, when in fact the events reflected the increased expenses and reduced sales caused by the previously announced recalls as well as ongoing investigations that would lead to later recall announcements, as previously alleged.   In some instances, Polaris would simply time its

- 20 -

recall announcement to coincide with expected positive announcements, such as the introduction of new products, so that the negative impact of the news would be substantially reduced or eliminated.

51.     Contrary to the Company's public representations, the repeated recalls made it more difficult to sell Polaris products, both because products were not available to be sold while they were awaiting repairs (including awaiting parts needed to complete those repairs), and due to the negative impact that recalls had on Polaris' reputation for safety, causing customers to switch to other products.  CW5[18] said that the recalls had contributed to layoffs at the Company in both February 2016 and July 2016.

52.     Most of the recalls of Polaris' products were announced jointly with the U.S. Consumer Product Safety Commission ("CPSC").  Although Polaris' recalls were considered "voluntary" recalls, they all resulted from statutory requirements for manufacturers to provide notice to the CPSC of defects that created an unreasonable risk of serious injury or death to consumers.

53.     Under §15 of the Consumer Product Safety Act, manufacturers, importers, distributors and retailers of consumer products, including ORVs, are subject to certain reporting requirements when products may contain a dangerous defect.  When a company subject to §15 obtains information that reasonably supports the conclusion that a product in commerce contains a defect which could create a substantial product hazard or creates an unreasonable risk of serious injury or death, the company must immediately notify the CPSC.  According to the CPSC's Recall Handbook, reporting "immediately" means reporting product safety related information within 24 hours of receiving that information.[19]

---

[18]   CW5 was a director of sales operations at Polaris throughout most of, and for more than two years before, the Class Period, departing the Company in July 2016.  Prior to that, CW5 was a manager in the internal audit department.

[19]   CPSC, *Recall Handbook* (Mar. 2012), https://tinyurl.com/h6lqxbu.

The CPSC considers a company to have received reportable information "when that information is received by an employee or official of the firm who may reasonably be expected to be capable of appreciating the significance of that information." *Id*. Once that employee or official received that information, "five working days is the maximum reasonable time for that information to reach the chief executive officer or the official assigned responsibility for complying with the reporting requirements." *Id*.

54.     For several years leading up to the Class Period, in response to customer reports of sudden ORV fires, Polaris consistently denied that the customer reports were reportable incidents of defects that could create a substantial product hazard or unreasonable risk of death or serious injury.  That would trigger a duty to recall the product.  For example in response to a 2012 customer report of a RZR XP 900 that suddenly caught on fire, Polaris responded that "[t]he consumer's report does not reasonably support a conclusion that the RZR contains any defect which could create a substantial product hazard or does create an unreasonable risk of death or serious injury."[20]  Polaris similarly responded to a customer's 2014 report that his RANGER caught fire: "Polaris' investigation into the allegation does not reveal any evidence to suggest the product contained a defect which could create a substantial product hazard or created an unreasonable risk of serious injury or death."[21]

### 1.    Polaris Quietly Recalls Its Youth RZR ORV Just Before Its 2015 Investor & Analyst Meeting and Dealer Show Where the Defective RZR XP Turbo Is Introduced

55.     On July 23, 2015, Polaris and the CPSC jointly announced a recall of 4,300 2015 Youth RZR models because of a fire hazard.  According to the CPSC and the Company, the vehicles were at risk of catching fire due to a potentially faulty fuel pump retaining ring that could lead to fuel leaks.  The Company did not issue a press release to

---

[20]   SaferProducts.gov (Apr. 14, 2012), https://tinyurl.com/hbey5gf.

[21]   SaferProducts.gov (Jan. 10, 2014), https://tinyurl.com/z82vymt.

announce the recall or discuss the recall in its 2Q15 earnings release or on its 2Q15 conference call.

> **2.** **Polaris Recalls 2015 RZR 900s and 1000s Due to Fire Risks, but Downplays the Dangers and Say Relatively Few Vehicles Need to Be Fixed**

56.     On October 5, 2015, Polaris and the CPSC jointly announced the recall of approximately 53,000 2015 RZR 900 and 1000 models.  Polaris and the CPSC explained that the fire hazard involved the fuel tank which could pressurize and leak fuel because of a misrouted vent line.  The recall notice published by the CPSC noted that Polaris had received reports of 29 fuel leaks and two fires before the recall.  There was no explanation as to why the recall was limited to model year 2015 vehicles, which were designed on the same platform as earlier model years.  In fact, on July 30, 2015 (just one week after the Youth RZR recall), a lawsuit was filed against Polaris in Los Angeles Superior Court arising out of an incident in which a 13-year-old boy was severely burned when the 2013 RZR 1000 in which he was riding suddenly caught fire in November 2013.

57.     Defendants nevertheless downplayed the significance of this recall, assuring investors and customers that relatively few of the recalled products would actually have to be repaired, and omitting to disclose the risk of fires due to similar defects on other products. Polaris's press release stated that "'Polaris is committed to the safety and quality of its products and is swiftly addressing the potential problem and has taken the appropriate steps to prevent any future occurrences.'"

58.     Based on those assurances, investors and others, including Polaris' dealers and customers, did not believe the recall to be a serious issue.  For example, on October 15, 2015 Wedbush published a report noting:

> Polaris has stated that very few units are believed to be affected by this, but that all units should be checked for this issue. While customers are naturally upset about this inconvenience, none of our dealer contacts believed that it

- 23 -

would be a major issue. The general feeling is that they will be able to check for the issue fairly easily and will have to repair very few units.

59.     On October 21, 2015, Polaris reported its 3Q15 financial results.  Those results reflected slowing growth in ORV sales, deteriorating gross margins, and higher-than-expected dealer inventory levels.  The Company omitted to disclose the impact that the July and October recalls had on Polaris' results.  Instead, defendants claimed the slowing growth and disappointing numbers were a result of weakening macroeconomic conditions, sluggish oil and agricultural markets, capacity constraints and increasing competition.

60.     Defendants then further reassured investors that neither the recalls nor the gross margin deterioration presented significant risks to Polaris' business by ***raising*** the Company's FY15 sales guidance to the range of $7.37-$7.42 per share, an increase of $0.05 per share at the bottom of the range and $0.03/share at the midpoint.

> **3.     Polaris Announces a Small Recall of the RZR XP Turbo and a Big Reduction in Its Guidance, Which It Blames on Other Circumstances**

61.     On December 10, 2015 – less than six months after launching its flagship 2016 RZR XP Turbo – Polaris recalled 2,230 of the vehicles due to a fire hazard.  Polaris and the CPSC explained that the recall was necessary because the XP Turbo's engine could overheat and the turbo system's drain tube could loosen, posing a fire hazard.  Prior to the recall, Polaris had received two reports of RZR XP Turbos with oil leaks and two reports of the vehicles catching on fire.

62.     Just a week later, on December 17, 2015, and just weeks before the end of the fiscal year, Polaris unexpectedly slashed its FY15 full-year sales and earnings guidance by more than half, lowering its sales growth projections to a range of 4%-5% and cutting its earnings growth projection to 1%-2% versus its prior guidance of 11%-12%.  The Company blamed the reduction on weaker than expected North American ORV sales, and also warned that it had reduced shipments of high margin side-by-side ORVs to reduce dealer inventory

- 24 -

levels.  However, the Company again omitted to disclose the impact that the recall had on Polaris' declining sales or reduced guidance, or on the continued high levels of inventory at its dealers.

63.     After the Class Period ended, analysts recognized that Polaris had lost significant market share and sales due to the repeated fire-related recalls and dangers plaguing its products, and the lost consumer confidence and damage to Polaris' brand and reputation that had resulted from those problems.[22]  However, at the time Polaris' FY15 guidance was reduced, investors remained unaware of the true source of the Company's problems, even though they had already suffered significant economic losses and damage as a result of them.

64.     The concealment of the impact of the recall on the Company's reported and projected earnings continued into the next fiscal year, when Polaris established its FY16 earnings guidance of $6.20-$6.80 per share.  Defendants again attributed their low expectations on a difficult market, and omitted to disclose the impact of the recalls as the risk of future recalls from defects that still remained concealed.  On Polaris' FY15 earnings call on January 26, 2016, Polaris' President and Chief Operating Officer Bennett Morgan, (who would suddenly "retire" in May 2016), said that the financial effects of the RZR recalls in October 2015 were all in the past:

> [W]e had a recall due to some quality issues with vent lines on our RZR product in October, and October was our weakest performing month of the quarter.  We think that had some impact as well.  That's shame on us.  But we seem to have powered through that as we go forward.

---

[22]   For example, BMO Capital Markets wrote in an October 25, 2016 research report that "the recall affected not only the company's ability to sell at the onset of the riding season, but also its ability to clear prior-year models, resulting in aggressive discounting."  As such, "the recent string of SxS recalls will have an adverse impact on the brand and future sales" permitting "increasingly higher-quality competitors" to "erod[e] PII's market share." Similarly, Wells Fargo Securities wrote in an October 21, 2016 report that "[m]ost dealers are seeing a shift in ORV market share away from Polaris in response to the recall issues."

- 25 -

In fact, the problems had not been addressed, and there were many more recalls to come.

    **4.**    **Polaris Recalls All RZR 900s and RZR 1000s Built Since 2013 Due to Fire Dangers, and Falsely Tells Investors that It Has Fully Investigated and Knows How to Fix the Problems**

65.    On April 19, 2016, Polaris and the CPSC jointly announced that in the United States it was recalling a staggering 133,000 RZR 900 and 1000 models manufactured from 2013 to 2016. Polaris recalled an additional 27,000 models worldwide. The reason given by Polaris and the CPSC for the recall was that the vehicles may catch fire while consumers are driving, posing fire and burn hazards to drivers and passengers. To repair the vehicles, Polaris had to replace the heat shields and the voltage regulators. Prior to the recall, Polaris had received ***more than 160 reports*** of RZR fires, resulting in one death of a 15 year old passenger from a rollover that resulted in a fire and 19 reports of injuries, including first, second and third degree burns.

66.    Despite the size of the recall and the number of fires that had occurred, defendants downplayed the significance of the recall and assured investors of the depth of the Company's investigation and its commitment to safety. For example, in Polaris's April 19, 2016 press release announcing the recall of the 160,000 RZRs, Wine stated:

> "One of our foremost guiding principles is Safety and Ethics Always . . . . We know that the foundation of a good ride is a safe ride, and we have been proactive, aggressive and thorough in putting forth a plan to get our vehicles repaired and give us – and our customers – confidence in the safety of our RZR vehicles."

*    *    *

> "We are working day and night to inform our customers and dealers and to obtain the parts needed for the repairs we identified in our comprehensive analysis . . . . We apologize for the inconvenience to our customers as we work to ensure all the systemic thermal risks we identified are eliminated from our vehicles."

67.    In the April 19, 2016 press release, Polaris assured customers and investors that it had "conducted a thorough investigation to pinpoint the root causes and put forward a

- 26 -

comprehensive solution to address them," and that as of April 19, 2016, it had "already begun implementation of its Corrective Action Plan and has made manufacturing updates in new-production vehicles."

68.     On April 21, 2016, during Polaris' 1Q16 earnings call, Wine said that the Company had conducted an extensive investigation, identified the root problems and was addressing the issues:

> This week, we announced a major recall of more than 160,000 RZR vehicles to address fire and other thermal risks in our global RZR business. The recall was the culmination of an extensive investigation that ultimately isolated several disparate and difficult to discern root causes.

> We spared no resource or cost and worked closely with Consumer Product Safety Commission to ensure that we had identified and addressed all of the systematic root causes of these thermal issues.  We regret the inconvenience this recall has on our customers, but the safety of our products and our riders must always take precedent.  Our final guiding principle is customer loyalty, and it is earned not only by the performance and features of our vehicles, but also by our performance when our customers need us.

> Over the past eight years, our industry-leading RZRs have garnered amazing customer loyalty, and we are committed to delivering the parts support and experience through this recall to maintain that.  Polaris customers expect us to build products that are fun and safe to operate, and we are taking this necessary step toward that goal.

69.     On the same call, and in response to an analyst's request for more detail into the problems precipitating the April recall, Wine assured investors that the Company had "literally looked at the entire system of the vehicle" and addressed any problems:

> The RZR recall specifically is a little bit different beast than we've had in the past.  Instead of going after one specific issue, we've literally looked at the entire system of the vehicle and tried to determine if there's anything in there that could cause a thermal risk and then going after it.

> So this is a different way of looking at it than we have in the past, and I think we'll be a better Company for it.  But I don't think it's – because of a bit of an apples and oranges comparison to how we've done things historically, it's not really right to look and say it's dramatically worse than we've ever been.

70.     Wine also stressed on the 1Q16 earnings call that the recall was an aberrant, unfortunate event, but was not an indicator of any larger systematic issues at Polaris:

> We are taking this seriously.  We are learning from it.  I'm extremely confident in what Ken's driving in the manufacturing and quality initiatives. This is an extremely unfortunate event and we are in the process of getting better.  But I wouldn't read into it that there's a systematic, fundamental problem other than what we've been talking about for a long time of trying to get the fundamentals right of building a lean enterprise to be able to build in quality, reduce rework, reduce warranty consistently over time.

71.     To further reassure investors that the recall would not have a significant impact on Polaris' sales or market share, Speetzen said on the 1Q16 call that the Company's FY16 guidance remained intact:

> [T]here were some unanticipated costs in the first quarter related to product liability and warranty.  While these items were not contemplated in our previously issued guidance, we were able to cover these additional costs in the first quarter and report earnings in line with our previous expectations.

72.     Wine then responded to an analyst's question about recall cost per recalled RZR by asserting that the financial impact was built into 2016 guidance, which remained unchanged from the 1Q16 call: "We're not going to give the specific cost, but we covered a good bit of it in the first quarter, and then the rest of it is included in our guidance."

73.     Contrary to the representations made in the 1Q16 earnings release and conference call, CW5 said that internal concern over lost sales from the recalls significantly increased as a result of the April recall of all 2013 through 2016 RZR models due to fire risks.  CW5 said that by this time it had become "evident" that the Company's sales would be affected by the recalls, and Polaris' sales team was expressing concerns over the lack of products to sell and their ability to meet sales targets.  CW1 also said that internal concern over the impact of the recalls was heightened by the time of the April recalls, and was much higher than described in the Company's public statements.  CW5 said that Polaris cut its 2Q16 sales forecast after the April recall was announced.  CW5 said that Polaris would not change its internal sales forecasts until after a recall was publicly announced.

- 28 -

74.     CW1 said that as he and other employees listened to the April 21, 2016 conference call, they were communicating over the Company's instant messaging system about how the Company's executives were attempting to cover up and minimize the significance of the recall-related problems.  CW1 said that he believed at the time that executives' statements on the April call about the costs of the recall and the risk of future recalls were false or misleading because, by that time, there were signs internally that the problems were more serious than represented and would result in additional costs and recalls beyond those described on the call.  CW1 said that shortly after the April call, employees were instructed not to use Company emails or its internal messaging system to discuss the recalls.  CW1 inferred that this was because the Company was concerned over the contents of such messages being used in lawsuits against the Company.

### 5.     Polaris Recalls Its 2015 RANGER ORVs, Then Conceals the Impact that Recalls Have Had on Its Business

75.     On June 28, 2016, Polaris and the CPSC jointly announced the recall of approximately 43,000 2015 and 2016 RANGER 570 ORVs because the vehicles could overheat during heavy engine loading, slow-speed intermittent use or high outdoor temperatures and catch fire.  Polaris said it had received seven reports of RANGER 570s overheating and catching on fire prior to the recall.  To repair the defect, Polaris had to again replace the ineffective heat shields.

76.     On the July 20, 2016 earning call, Wine and Pucel again downplayed the recall by overstating Polaris' grasp of the problems underlying the recalls and its progress on addressing those problems and assuring investors of its commitment to safety:

> [WINE:] The extensive and ongoing product recalls related to fire risks on our vehicles impact every Polaris stakeholder in some way, but our primary focus is on our customers, keeping them safe, completing their safety bulletins so they can ride, and rebuilding their trust and confidence in Polaris.  As we work aggressively to accomplish these goals, we have become much smarter about the thermal risks across our product lines, which drove additional recalls in the second quarter.

- 29 -

We have discovered gaps in our design, development, and manufacturing processes, and are urgently addressing these gaps, while also working to improve our post-sale surveillance process to increase our speed of response when issues occur.  We have more work to do and we will move forward with urgency to continue to mitigate safety issues for our customers.

\*       \*       \*

[PUCEL:] We did an internal diagnostic on the root causes of the recalls and we traced them back to the quality system elements and the design control elements and we're putting systemic fixes in place to address those.  We are also increasing our spend and our investment in safety and design capabilities in those areas.  So you're going to see some systemic fixes that come across our engineering capabilities as a result of that.

77.     Wine and Speetzen told investors that the Company had incurred $25 million in recall related costs in 2Q16, and was lowering its FY16 earnings guidance to a range of $6.00-$6.30 per share, a reduction of $0.35/share at the midpoint from its prior guidance range.  Wine and Speetzen each told investors that Polaris had now factored in all "probable and estimatable" recall-related costs into the reduced guidance:

[WINE:] If you listened to my accounting speak during my prepared remarks, I did say that we had all of our probable and estimatable costs included in the guidance that we just issued, or the second-quarter results.  I will tell you that the work that Ken and his team are doing to go through our products and ensure that there is not fire risk in our vehicles, it's a massive project.  I don't think it's – as I said in my remarks, there is still more work to do, but we don't foresee things that are drastically different from what's been included in our results in our forward-looking guidance.

\*       \*       \*

[SPEETZEN:] I'm not going to get into a lot of details behind the cost for obvious reason.  But Scott's point around saying they are probable and estimatable is that we have included everything in what we've reported so far in terms of forward guidance.  Other than any promotional activity that we are required to reserve for given the shipments we have made, that we think we'd have to do in terms of simulating demand, there would not be any additional cost that we would have built in, in the forward guidance.

78.     On the same call, Wine also steered concern away from the recalls' impact on sales and slumping market share, explaining that market share loss was not a result of the recall, but rather from the Company's less competitive non-RZR and RANGER products:

I would say that most of the share loss was not related to the recall. It was very, very inconvenient, but I don't know that, specifically around RAZR, that people bought competitive products during that period of time. We got after it pretty quickly so we could have product in the dealerships. The bigger issue was on value ATVs and the utility side of the business and I'm encouraged and comfortable with the plan that Matt has, as I've said a couple of times.

*     *     *

It's more related to our product line-up than anything else. We put ourselves at a product disadvantage, and as I said, it's more in the value ATV segment and the utility segment, that was difficult to defend. It drove our promotion costs higher, as we tried to compete with not our best products.

**6.     Polaris Announces a Stop-Ride/Stop-Sale Advisory Pending Recall of the 2016 RZR XP Turbo and Falsely Claims that the Anticipated Recall Costs are Already Reflected in Its Guidance**

79.     Just five days after the 2Q16 call, at the outset of Polaris' annual dealer show in Nashville on July 25, 2016, Wine stunned dealers and analysts by announcing that the Company was issuing a "stop-ride/stop-sale advisory, pending a formal recall, for MY2016 RZR Turbo off-road vehicles, due to a potential fire hazard."

80.     The stop sale/stop ride advisory included the 2,230 RZR Turbo models that Polaris had recalled for the same potential fire hazard seven months earlier in December 2015. Defendants timed the announcement to coincide with their introduction of Polaris' MY2016 ORVs at its annual Investor & Analyst Meeting and dealer show. Wine told analysts at the meeting that the Company had known about the issues and expected the recall at the time of its 2Q16 earnings call, and that the potential impact of the recall had already been addressed in the 2016 guidance provided on that call. Management downplayed the risks of the recall, and falsely assured investors that all the anticipated costs of that and the earlier April recalls had already been baked into the Company's earnings forecast.

81.     Based on these false assurances, analysts believed that Polaris had a good handle on the recall. For example, Northcoast Research noted in a July 26, 2016 report:

- 31 -

"[W]e think that any impact will be minimal and there should not be a guidance revision during the company's analyst meeting this morning (this amounts to <15k units)."   A July 27, 2016 report from RBC Capital Markets echoed this sentiment, noting: "We believe [the Turbo recall] was mostly considered when PII revised guidance last week.  The costs could be a little larger but should still be mostly manageable given the size (we believe ~14k vehicles) and complexity of the fix (sounds like could be simpler than larger RZR recall)."

82.     On July 24, 2016, the day before Polaris' stop-ride/stop-sale advisory a family was riding in their RZR XP Turbo when, suddenly, the vehicle caught fire, trapping a six-year-old child in the ORV's back seat.  The child was able to escape alive, but suffered severe burns and the burning vehicle caused a 15-acre wildfire in American Fork Canyon, Utah, where the family had been riding.[23]

83.     Through its dedicated social media correspondence and customer experience team, Polaris was well aware of growing consumer dissatisfaction with its ORV products that were likely to affect sales, as confirmed by a sample of Facebook posts, each responded to by Polaris: [24]

---

[23]   Tiffany Demasters, *Fire in American Fork Canyon now 85% contained*, FOX 13 Salt Lake City (July 25, 2016, 6:26 PM), https://tinyurl.com/zfedxro.

[24]   Polaris Industries – Facebook page, Facebook.com, https://tinyurl.com/hphavdu (last visited Mar. 13, 2017).



**Gregory Rachel II** So glad I just paid cash for a $21000 paper weight 1 ride and 30 days ago. Maybe instead of making little maps to play hide and go seek, you guys could keep people from being burned alive.

Like · Reply · 🔘 15 · July 25, 2016 at 10:45pm

 **Polaris RZR** ✓ Hello Gregory, could you please message us via the message button located under the cover photo? We would like to assist you further, but need to get more information from you such as VIN and email. We ask for the message to ensure you don't have to share this information with the entire Polaris RZR Facebook community.

Like · Reply · July 26, 2016 at 5:31am



**Shaun Gillette** Ride command? How about a fire suppression system? That's probably a good idea. #bytheExwifeaRZR

Like · Reply · 🔘 21 · July 25, 2016 at 11:01pm

 **Polaris RZR** ✓ Hello Shaun, if you are experiencing issues with your machine, please message us via the message button located under the cover photo. We would be happy to assist you further.

Like · Reply · 🔘 2 · July 26, 2016 at 5:32am

↪ · View more replies



**Jim Bozo Bozarth** No riding for me. My Turbo 1000 has been recalled with no fix in sight. Im beginning to think Artic Cat looks pretty good and ive been a Polaris customer for 30 years.

Like · Reply · 🔘 8 · August 8, 2016 at 11:26am

 **Polaris RZR** ✓ Hello Jim, could you please message us via the message button located under the cover photo? We would like to help you further, but need a bit more information.

Like · Reply · August 8, 2016 at 12:38pm

↪ · View more replies



**Brent Lapraim** i have a 2016 rzr turbo that i now cant ride!!! I also two weeks ago talked my little brother into buying one also!! You cant tell me that polaris didnt know about this before my brother paid 25.k for this pos!! He wanted to buy a yamaha but i talked him into this!! my brother is having a 40th birthday party at the dunes on the 20th and we cant ride our cars!! I have a pretty big payment not to be able to ride!!

Like · Reply · August 9, 2016 at 8:35pm

 **Polaris Industries** ✓ Hello Brent, we have replied to your message on Polaris RZR in efforts to help you further.

Like · Reply · August 10, 2016 at 1:03pm

- 33 -

### 7.    Polaris Recalls the XP Turbo

84.    On September 1, 2016, Polaris announced the "formal recall" of the 2016 RZR XP Turbo that was subject to its earlier stop-ride/stop-sale advisory. The recall affected 13,000 vehicles. Prior to the recall, Polaris received 19 reports of XP Turbos catching on fire, with six resulting in burn injuries. One of the reported fires was in Utah's American Fork Canyon that burned a young child and caused a forest fire. Polaris explained the recall as follows:

> The engine control unit may allow the engine to continue to run in an extreme overheat condition, which could result in damage to the head or head gasket, which in turn may allow a release of coolant or engine oil. In addition, the fasteners used to attach the oil drain tube to the turbo system may have been assembled by the supplier with inadequate torque or subsequently become inadequately torqued, allowing a release of engine oil. The release of engine oil or coolant onto hot surfaces can create a fire hazard.

85.    Additionally, analysts at Northcoast reported on September 2, 2016, that dealers had also been advised to check the recalled Turbos' heat shields, parts that had been a consistent source of fire-related problems on tens of thousands of RZRs and RANGERs.

86.    The next day – the day after the recall – on September 2, 2016, two women died when the Polaris RANGER they were riding flipped over and caught fire in Moab, Utah.

87.    Analysts believed defendants' assurances that the recall was still under control, as shown in a September 2, 2016 Northcoast Research report noting the Turbo recall issues were in the "rear-view mirror":

> While demand in the recreational SxS market has been choppy of late, it appears PII's dealers have significantly underperformed the broader market in large part due to the disruptions caused by the RZR recall. In our view, the RZR Turbo stop-ride/stop-sale has contributed to this weakness even though it is much smaller in scope than the previous recalls, due to what seems to be a growing sense of frustration/mistrust among consumers (especially with the lack of visibility). With this in the rear-view mirror, hopefully things can return to business as usual for the ORV giant.

*        *        *

- 34 -

The end of the RZR Turbo uncertainty is positive thing for the business overall and will allow the company to begin the process of repairing its reputation in the eyes of Off-Road enthusiasts

88.     The market also believed that all costs had been factored in to its earlier revised guidance, as noted in a September 1, 2016 *Star Tribune* article: "Estimates now factor in all costs necessary to address all vehicle repairs and warranty issues."

### E.     Polaris Finally Admits the Significant Impact of the Fire Defects on Its Sales and Financial Condition

89.     On September 12, 2016, Polaris stunned investors by slashing 2016 guidance by a whopping 43% – to $3.30 to $3.80 per share – because "thermal-related issues" in the RZR model were severely affecting sales.   Despite defendants' earlier assurances, the Company admitted in a press release that it did ***not*** have a solution for the problems causing the RZR fires, and that the repeated recalls had damaged Polaris' brand and reputation and resulted in significantly reduced sales and earnings:

> The Company now expects full-year 2016 earnings to be in the range of $3.30 to $3.80 per diluted share, $2.50 to $2.70 per diluted share lower than previously expected of which approximately two-thirds is expected to be incurred in the third quarter.   Polaris also expects total Company sales for the full-year 2016 to be down in the mid to high-single digit percent range compared to previously issued guidance of flat to down two percent.

> Since Polaris last updated its full year guidance and hosted its investor day in July, the Company has experienced additional RZR thermal-related issues and was unable to sufficiently validate the initially identified RZR Turbo recall repair, necessitating a more complex and expensive repair solution.   As a result, the voluntary stop ride/stop sale notification issued on July 25, 2016 remained in place significantly longer than originally anticipated, delaying any sales of the highly-requested RZR Turbo vehicle. Also, given the additional RZR thermal issues, the Company revalidated many of its recently introduced model year 2017 ORV products, causing a delay in shipments of those vehicles.   The Company believes its model year 2017 products and the more aggressive programs it has planned for the second half of 2016 will have a positive impact on Off-Road Vehicle ('ORV') sales. However, given the delayed model year 2017 shipments and additional recall activity, the expected positive impact will be deferred later than the Company had originally estimated.

> The earnings revision of $2.50 to $2.70 per diluted share can be summarized as follows: approximately half is related to the margin impact

- 35 -

from delayed model year 2017 shipments, including the high margin RZR Turbo vehicles, as the Company revalidated its new model line-up and protects dealer inventory levels, along with correspondingly lower sales of the Company's high-margin Parts, Garments and Accessories ('PG&A') business; and about 25 percent is the result of higher promotional and customer appreciation costs to rebuild confidence and credibility with RZR owners. The remaining 25 percent is primarily related to expediting the product recall repairs, including the recently announced RZR Turbo recall which, when combined with the one-time warranty, legal and acquisition related costs recorded in the first half of 2016, totals approximately $120 million, or about $1.20 per diluted share of costs that should be considered non-recurring in 2017.

"Our number one priority is to get our loyal owners back to riding safely," stated Scott Wine, Polaris' Chairman and Chief Executive Officer. "We share the frustration of our customers and dealers and we are working diligently to expedite the completion of the recall repairs and significantly improve the quality and safety of our products. We are providing increased support to our dealers and RZR owners so they can complete the necessary repairs with minimal disruption. We have engaged outside engineering experts to help accelerate the remediation process, we are sending additional repair technicians into the field to assist our dealers, and we have created a new independent safety and quality function reporting directly to me. Additionally, we are pleased that the vast majority of our model year 2017 products have begun shipping, after undergoing a thorough internal and external review to identify and address any potential safety risks. While we are disappointed with our recent performance, our team is aggressively driving improvements that will make Polaris a better and stronger company."

90.     When Polaris conducted its 3Q16 earnings call on October 25, 2016, Wine acknowledged that the string of recalls was not over, as Polaris' historical review had revealed many more defects in its products, further demonstrating the falsity of defendants' earlier representations about the thoroughness of its review and the depth of its understanding of the defects affecting its products:

[T]here will be an abatement of the significant spike in recalls that we have had. But by no means is it something that's going to go dwindle down to nothing. The big ones are there. There's a couple – there's more work to be done.

The team's done a really nice job, as I said, with this historical review and we know what's coming. But certainly we are not done with recalls.

91.     Wine also acknowledged the severe financial impact that the recall had caused the Company:

Third-quarter sales were down 19%, to $1.18 billion as we prioritized recall execution and quality validation and delayed the launch of many of our model-year 2017 off-road vehicles. Results were in line with our revised guidance but that does not make them any more acceptable.

We lost market share in a weak power sports industry and incurred approximately $65 million of recall and related legal costs. The resulting lower volume and higher expenses weighed heavily on our earnings per share of $0.50, down nearly 80% from the prior-year period. Overall, North American retail sales for the third quarter were down 9%, our worst performance since 2009.

92.    In response to questioning from analysts on the call, Wine admitted (contrary to what defendants said on the April and July earnings calls) that Polaris had expected sales of RZR and other side-by-side products to be difficult following the recall, and they were: "I will tell you that we were not at all pleased with how July and August went for Side-By-Sides in general but RZR specifically. It was – we knew it was going to be difficult and it was very difficult." In response to a follow-up question from a Northcoast Research analyst regarding the impact of the recall on 2Q16 sales, Wine dodged the question, while admitting that the decline in July and August sales had been "precipitous":

I think – not I think – the word that I used to drop the RZR impact in Q3 was, precipitously dropped. The July and August decreases were hard to look at and it really had two factors.

One is that there was just not products available for sale and we had a stop ride, stop sale on Turbo for almost the entire month of August and part of September. So it was dramatic.

93.    The repeated recalls and Polaris' inability to address the underlying problems caused significant harm to the Company's reputation, dented sales and led to a loss of market share. To offset the damage caused by the recalls, the Company mounted an aggressive promotional campaign that included $1,000 customer loyalty discounts, 12-month warranty extensions for certain models and $250 accessory vouchers for out-of-warranty vehicles.

94.    The additional promotional spending further cut into Polaris' margins, as Speetzen acknowledged on the 3Q16 earnings call:

Margins were down 655 basis points, reflecting lower volume and additional warranty and customer loyalty cost taken during the quarter, as we indicated previously.  The additional 490 basis points of warranty expense taken during the quarter includes the safety and service recall bulletins we've publicly announced as well as expenses that are probable and estimable for quality issues being evaluated.  Additionally, gross margins were negatively impacted by higher promotional and customer appreciation cost to bolster confidence and credibility with our off-road vehicle owners, which is expected to be a multi-quarter activity.

As Scott indicated, we're spending what is required to get the recall repairs completed effectively along with putting processes and systems in place to improve the quality and safety of our vehicles going forward.  Despite these headwinds, we continued to make strong progress in our VIP cost improvement initiatives which helped offset a portion of these cost increases.  For the full-year 2016, gross margins are now expected to be down 380 basis points to 390 basis points, compared to 2015.

This reflects the significant volume reduction in our very profitable off-road vehicle business, approximately 200 basis points of impact from the added warranty-related costs we have incurred and approximately 100 basis points of negative foreign exchange impact for the full year.  Operating expenses are now expected to increase approximately 300 basis points as a percentage of sales given product liability, acquisition costs, legal and other recall-related costs incurred during the year.

95.     The October 25, 2016 call also revealed that defendants' prior representations about Polaris' commitment to quality and safety and the nature and sufficiency of, and level of spending on, its quality and safety programs had been false at the time they were made. Wine admitted, for example, that, as a result of the recalls, the Company had "to elevate our quality expectations and our financials reflect that."  Speetzen similarly acknowledged on the call that the Company would have to spend additional money on engineering as a result of the recall: "We will, however, spend more money in engineering resources aimed to continue quality and safety enhancements as well as ongoing innovation investments and expect that this will increase engineering costs mid-teens percent over 2016 levels."  In response to an analyst question as to why the fire-related defects had not been disclosed earlier ("And then also in the case of the 900s and 1000s, why did these problems arise last year and into this year and not three or four years ago?"), Wine admitted that "the reason that we didn't see it

- 38 -

in 2013 and 2014 is that we didn't have the processes and tools to get the information from the field as quickly as we could and manage the information flow and, ultimately, it took us a while to recognize the trend."

96.     Numerous analysts noted the damage that had been caused to Polaris' reputation and market share.  For example:

(a)     "[T]he recall of Polaris RZR 900, 1000, and turbo SxS models, accompanied by a do not ride/do not sell order had a significant negative impact on both retail sales and wholesale shipments in the quarter," BMO Capital Markets wrote in an October 25, 2016 research report.  "We think the recall affected not only the company's ability to sell at the onset of the riding season, but also its ability to clear prior-year models, resulting in aggressive discounting," the report stated, adding that it expected that "the recent string of SxS recalls will have an adverse impact on the brand and future sales" permitting "increasingly higher-quality competitors" to "erod[e] PII's market share."

(b)     "[T]he fact that the recalls have all been similar in nature – a fire hazard risk resulting from poor craftsmanship – and have spread across virtually all its product lines indicates a troubling lapse in management," *the Motley Fool* wrote in a January 6, 2017 research report, adding that the recalls demonstrated an "inability to contain the recalls and get a handle on quality control."

(c)     After surveying their contacts at PII dealerships, Wells Fargo Securities wrote in an October 21, 2016 report that: "[T]he recalls led some customers to delay their Polaris purchases while others looked to alternative OEMs" and "[m]ost dealers are seeing a shift in ORV market share away from Polaris in response to the recall issues."

(d)     "Moreover, plagued by ORV recalls and delayed shipments for model year 2017, we think it will take some time for Polaris to rebuild brand goodwill and pricing power in the ORV segment weighing on growth potential," Morningstar wrote in an October 12, 2016 analyst report.

### F.     Polaris' Warranty Reserves Were Misleading

97.     Polaris warranted its ORVs for a period of six months.  ORV warranties required the Company to repair or replace defective products at no cost to the consumer only within the warranty period.

98.     Polaris told investors in its reports on Forms 10-Q and 10-K during the Class Period that it established and regularly re-evaluated its warranty reserves according to the following policy:

> The warranty reserve is established at the time of sale to the dealer or distributor based on management's best estimate using historical rates and trends.  Adjustments to the warranty reserve are made from time to time as actual claims become known in order to properly estimate the amounts necessary to settle future and existing claims on products sold as of the balance sheet date.  Factors that could have an impact on the warranty accrual in any given period include the following: improved manufacturing quality, shifts in product mix, changes in warranty coverage periods, snowfall and its impact on snowmobile usage, product recalls and any significant changes in sales volume.

99.     Throughout the Class Period, Polaris also failed to timely adjust its warranty reserve balances in accordance with its stated policies.  This concealed from investors the true impact of and financial risks resulting from the repeated recalls of its products.  It was not until the end of the Class Period that Polaris adjusted its warranty reserves in a manner that reflected the true magnitude of the risks arising from the recalls:



100.   On the 3Q16 earnings call, Speetzen admitted that Polaris had booked "additional warranty expense related to the execution of recalls, as well as additional legal costs, totaling approximately $65 million," bringing total "warranty, legal and acquisition-related costs" to "approximately $120 million" for the year, which was virtually all related to the recalls alleged herein.[25]  The $120 million in costs related to recalls was a dramatic increase from the previously disclosed $9 million spent during the first quarter and the $25 million spent during the second quarter of 2016.

101.   The assertion that $120 million in additional expenses had caught Polaris' management entirely by surprise is not credible in light of their magnitude, the short period of time in which they were purportedly incurred, and defendants' earlier assertions regarding the nature and extent of their investigations into, and their understanding of, the root cause of the fire related problems plaguing Polaris' products.

---

[25]  Speetzen did not break out the total "acquisition costs" included in that amount. However, on an October 12, 2016 call to discuss Polaris' acquisition of Transamerican Auto Parts, Speetzen told investors that "the acquisition cost component is actually quite small, to almost zero."  The only other acquisition Polaris had made to that point in FY16 was its January acquisition of 509, a small privately-held apparel manufacturer, which was immaterial as a whole.

- 41 -

102.   Wine said on the 3Q16 call that RZR recalls "have now passed the 50%
penetration rate for both the 900/1000 recall and the more recent Turbo recall." This further
reflects that the costs incurred in the 3Q16 were not unanticipated earlier, including in April
when Wine had said that the Company was then targeting at least a 50% penetration rate
(and acknowledged that CPSC was pushing for 80%). As a SunTrust Robinson Humphrey
analyst wrote in a September 12, 2016 report: "Weren't recall/warranty costs already baked
in? – PII previously indicated that it had incorporated costs related to several recalls into its
2016 outlook back in July . . . ." Even if defendants were taken at their word, the magnitude
of those expenses alone would demonstrate that they had no basis for their earlier assertions
regarding the nature and extent of their investigations into the fire-related problems, or the
guidance Polaris had provided to investors.

## V.   MATERIALLY FALSE AND MISLEADING STATEMENTS & OMISSIONS DURING THE CLASS PERIOD

### A.   FY14 Annual Report

103.   On February 20, 2015, Polaris filed its annual report with the SEC on
Form 10-K, describing its FY14 results of operations. The Company reported $2.9 billion in
ORV sales, and touted its long track record of ORV sales growth:

> In 2014, we had record sales and net income, with our fifth straight year
> of double digit growth in both sales and net income. This growth is fueled by
> award-winning innovative new products leading to continued market share
> leadership in side-by-side vehicles and ATVs. In 2014, we also experienced
> growth in our snowmobiles, motorcycles, international and small vehicles
> businesses. The overall North American powersports industry continued its
> positive trend with mid-single digit percentage growth in 2014. Our North
> America retail sales to consumers increased 12 percent in 2014, helping to
> drive total full year Company sales up 19 percent to a record $4.48 billion.

104.   The FY14 Form 10-K report provided the following warning with respect to
product recalls and defects:

> ***Significant product repair and/or replacement due to product warranty
> claims or product recalls could have a material adverse impact on our
> results of operations***.

- 42 -

We provide a limited warranty for ORVs for a period of six months, for a period of one year for our snowmobiles, for a period of one or two years for our motorcycles depending on brand and model year, and for a two year period for SVs. We may provide longer warranties related to certain promotional programs, as well as longer warranties in certain geographical markets as determined by local regulations and market conditions. We also provide a limited emission warranty for certain emission-related parts in our ORVs, snowmobiles, and motorcycles as required by the EPA and CARB. Although we employ quality control procedures, sometimes a product is distributed that needs repair or replacement. Our standard warranties require us or our dealers to repair or replace defective products during such warranty periods at no cost to the consumer. Historically, product recalls have been administered through our dealers and distributors. The repair and replacement costs we could incur in connection with a recall could adversely affect our business. In addition, product recalls could harm our reputation and cause us to lose customers, particularly if recalls cause consumers to question the safety or reliability of our products.

105. The foregoing warning was identical to the warning Polaris had included in every annual and quarterly report it had issued going back to FY11.

106. The foregoing statements were materially false and misleading because they omitted to disclose the fact that Polaris' reported growth in ORV sales had been achieved by the sale of (purportedly innovative) products that had significant design and manufacturing defects, including defects that had already caused fires and other injuries to Polaris' customers. The warning that Polaris' operating results could suffer if products had to be recalled was both misleading and ineffective, because it portrayed that risk as uncertain and contingent while omitting to disclose the defects in products that the Company had already shipped, or to describe the claims for fire-related problems that had been asserted. The risk warning was also misleading because it failed to disclose the deficiencies in Polaris' "quality control procedures," including that products were often rushed to market without sufficient testing and/or with parts that had not passed the Company's own quality-control standards. The statements were misleading because Polaris omitted to disclose the nature or existence of those defects, or the risks they posed to its customers, its reputation, and its financial condition and success, including the increased lawsuits and warranty expenses and reduced

- 43 -

sales resulting from accidents caused by those defects and/or the lawsuits and negative publicity that could result.

107. Based on the facts and circumstances alleged herein, it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

(a) For several years preceding February 2015, Polaris customers notified the Company of numerous similar incidents in which RZR and RANGER vehicles suddenly caught fire or became so hot that plastic components melted. Polaris acknowledged these reports of what it later euphemistically called "thermal issues," and in several instances informed customers that it had investigated their reports, including returning a burned-out RZR to Polaris' facilities for a more detailed investigation;

(b) The incidents leading to two product liability lawsuits against Polaris, including one involving the 2013 RZR 1000 model that was later recalled, occurred in November 2013 and July 2014, well before the February 20 statements. The lawsuits were filed in April 2015 and July 2015 and demand letters were likely sent to Polaris in advance of filing. Despite the ORV fires and customer complaints about them, Polaris' FY14 Form 10-K risk warning remained unchanged from those in the Forms 10-K for the previous three years;

(c) Through its dedicated team of employees tasked with reviewing social media for posts regarding Polaris, particularly posts regarding safety issues, Polaris was aware of the YouTube videos of RZRs on fire posted before February 2015; and

(d) ORVs, including the RZR and RANGER, with persistent design and manufacturing defects causing fires and eventual recalls were a central element of Polaris' revenue in FY14 – 67% – and defendants recognized their importance to the Company's success.

- 44 -

### B.   1Q15 Quarterly Report

108.   On April 30, 2015, the Company filed its 1Q15 report for the period ending on

March 31, 2015. The Company reported quarterly ORV sales of $645.4 million and told

investors that:

> Our gross profit of $293.7 million increased 14 percent from $258.4 million in
> the comparable prior year period. The increase in gross profit resulted
> primarily from higher volume, increased selling prices and continued product
> cost reduction efforts, partially offset by negative currency impacts and
> unfavorable mix.

109.   The 1Q15 Report on Form 10-Q made the following risk factor disclosure:

ITEM 1A – RISK FACTORS

> There have been no material changes or additions to our risk factors
> discussed in our fiscal 2014 Annual Report filed on Form 10-K. Please
> consider the factors discussed in "Part I, Item 1A. Risk Factors" in such report,
> which could materially affect the Company's business, financial condition, or
> future results.

110.   The earnings report was materially false and misleading because it omitted to

disclose that the higher volume and increased selling prices that led to Polaris' reported

growth in gross profit had been achieved through the sale of products like the RZR 900 and

RZR 1000 that had significant design and manufacturing defects, including defects that had

already caused fires and other injuries to Polaris' customers.

111.   Both of the foregoing statements were also misleading because Polaris omitted

to disclose the nature or existence of defects affecting its products, or the risks they posed to

its customers, its reputation, and its financial condition and success, including the increased

lawsuits and warranty expenses and reduced sales resulting from accidents caused by those

defects and/or the lawsuits and negative publicity that could result. The assertion that there

had been no material changes in or additions to Polaris' risk factors was misleading because

the risks of product recalls had increased due to continued incidents of fires involving RZR

and other products, the increasing number of defective products that had been sold, and the

- 45 -

impending recall of the Youth RZR and other products.  The warning in Polaris' FY14 report on Form 10-K that was incorporated into the 1Q15 quarterly report continued to be misleading and ineffective for the reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent, omitted to disclose the defects or describe the fire-related incidents that had occurred, and falsely assured investors that Polaris had an adequate quality control procedures in place.

112.   Based on the facts and circumstances alleged herein, it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

(a)   In addition to the numerous customer reports of fires and heat-damaged RZRs and RANGERs that Polaris received through the CPSC's website, on April 23, 2015, proof of service was filed in the product liability case arising out the July 2014 Polaris RANGER fire that burned a young girl;

(b)   Through its dedicated team of employees tasked with reviewing social media for posts regarding Polaris, particularly posts regarding safety issues, Polaris was aware of the YouTube videos of RZRs on fire posted before February 2015;

(c)   ORVs, including the RZR and RANGER, with persistent design and manufacturing defects causing fires and eventual recalls were a central element of Polaris' revenue in 1Q15 – 63% – and defendants recognized their importance to the Company's success; and

(d)   Polaris' employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that.  In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred.  Because the Ranger recall took place just 8 weeks after the statements alleged above, it may be inferred that Wine and other

- 46 -

executives were aware of the need for recall and the events giving rise to the recall at the time of those statements; and Polaris employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that. In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred. Because the Youth RZR recall took place just 3 months after the statements alleged above, it may be inferred that Wine and other executives were aware of the need for recall and the events giving rise to the recall at the time of those statements.

### C.      2Q15 Earnings Report

113.    On July 22, 2015, Polaris issued a press release announcing its financial results for 2Q15, the period ending June 30, 2015. The press release was initially disseminated to the market by *Business Wire* and thereafter its contents were widely disseminated by other news organizations, financial analysts, investment websites, internet search engines and other media outlets, such that the information contained therein became available to, and was acted upon by, investors in Polaris' securities.

114.    The press release reported record second quarter sales and earnings, including net income of $100.9 million and EPS of $1.49 per diluted share for the quarter, and told investors that despite continued difficulties with the motorcycle paint system, the Company was confident that it would maintain and extend its market leadership in powersports:

> "Innovation remains a cornerstone of Polaris' success, and at our dealer show next week we will introduce our model year 2016 powersports lineup that will further extend our market leadership. In spite of the short-term headwinds we are facing, both external and of our own making, I am confident this strong and talented Polaris team can continue to deliver industry-leading returns for our shareholders."

- 47 -

115.    The 2Q15 press release also provided the following guidance to investors, which increased forecast EPS by $0.02 at the midpoint from the Company's 1Q15 guidance and $0.05 from the beginning of the year:[26]

**2015 Business Outlook**

For the full year 2015, the Company is narrowing its earnings guidance range to $7.32 to $7.42 per diluted share, an increase of 10 to 12 percent over full year 2014 earnings of $6.65 per diluted share.  Full year 2015 sales are now expected to grow in the range of 10 to 12 percent when compared to 2014, narrowed slightly from previously issued sales guidance.

116.    On July 22, 2015, Polaris held a conference call to discuss its 2Q15 results of operations with investors and analysts.  Defendants Wine, Morgan and Pucel each participated on the call, as did other PII officers.  None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein. Analysts representing at least 11 Wall Street firms also attended and participated in the call. The call had been publicized by PII in advance, and a recording of the call was made available thereafter through a link on Polaris' "Investor Relations" website.   Written transcripts of the call were also published and disseminated by third parties, including Thomson Reuters StreetEvents.  The contents of the call were widely reported in analyst reports and on internet websites frequented by investors, as well as by other news organizations and media outlets, such that the information discussed on the call became available to, and was acted upon by, investors in Polaris' securities.

117.    During the conference call, Morgan and Wine told investors that Polaris was poised to maintain and grow its number one market share position in ORV, particularly with its upcoming 2016 ORV product line release:

[MORGAN:] We gained share in ORVs in North America, gaining in both ATVs and side-by-sides and building upon our number one positions.  Polaris

---

[26]    Based on the 7.5 million shares outstanding as reflected in Polaris' FY16 report on Form 10-K, each penny of earnings represented approximately $675,000 in earnings.

- 48 -

ORV retail sales increased mid-single digits in an industry that increased slower but still grew mid-single digits. . . . We're less than a week away from our dealer meeting in Las Vegas when we will launch our 2016 model lineup, and we again have excellent product news across our entire ORV portfolio.

\*       \*       \*

[WINE:] [T]he product news that we will reveal next week is probably right in line with what I think our dealers want and our customers want, which certainly should give us momentum as we go through the second half.

\*       \*       \*

[O]bviously we feel very comfortable with our product pipeline and what you will see next week.

118.    The next day, on July 23, 2015, Polaris and the CPSC jointly announced a recall of 4,300 2015 Youth RZR models because the vehicles were at risk of catching fire due to a potentially faulty fuel pump retaining ring that could lead to fuel leaks.  The recall was not disclosed in the 2Q15 earnings announcement or discussed on the 2Q15 conference call.

119.    The statements in the 2Q15 earnings release and on the 2Q15 conference call were materially false and misleading because they omitted to disclose that Polaris' ORV sales had been achieved through shipping defective products before they had been properly tested and with parts that had not passed the Company's quality-control measures, that Polaris' new products about to be rolled out had been designed and manufactured using the same procedures and practices that had resulted in the defects on its existing products, and omitting to describe the defects that had resulted from these conditions or identify the fires that had already resulted in injuries to Polaris' customers and their children and claims against the Company.  Polaris' 2Q15 guidance added to the misleading import of the other contemporaneous statements alleged herein, and was misleading in its own right, because it failed to factor in or apprise investors of the risk of reduced sales and earnings and higher costs that were reasonably expected to result from the recall, repair or reduced demand

- 49 -

caused by those defects and the reputational harm they had already caused to Polaris' brand and reputation.

120.    On July 24, 2015, Polaris filed its 2Q15 Report on Form 10-Q with the SEC. The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been re-evaluated to take into account changes in manufacturing quality, product recalls and other factors.  The report disclosed that the Company had a warranty reserve balance of $45.1 million as of the end of 2Q15, which reflected a declining trend in warranty liability exposure from the amounts reported at the end of FY14 ($53.1 million) and 1Q15 ($48.6 million).

121.    The warranty reserve disclosures were materially false and misleading because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual to reflect the Company's exposure due to the product defects, declining manufacturing quality, product recalls, and the expenses to repair products whose warranties had already expired.

122.    The 2Q15 report on Form 10-Q made the following risk factor disclosure:

ITEM 1A – RISK FACTORS

There have been no material changes or additions to our risk factors discussed in our fiscal 2014 Annual Report filed on Form 10-K. Please consider the factors discussed in "Part I, Item 1A. Risk Factors" in such report, which could materially affect the Company's business, financial condition, or future results.

123.    The assertion that there had been no material changes in or additions to Polaris' risk factors was misleading and ineffective because the risks of product recalls had materially increased due to continued incidents of fires involving RZR and other products, the increasing number of defective products that had been sold, and the impending recall of the Youth RZR and other products.  The warning in Polaris' FY14 report on Form 10-K that was

- 50 -

incorporated into the 1Q15 quarterly report continued to be misleading and ineffective for the reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent when Polaris had already suffered recall-related financial and reputational harm that had negatively impacted its business beyond what had been disclosed to investors, omitted to disclose the defects or describe the fire-related incidents that had occurred, and falsely assured investors that Polaris had adequate quality control procedures in place.

124.   Based on the facts and circumstances alleged herein, it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

(a)   The fact that Polaris' recall-related risk warning had not changed in over four years, along with the fact that Polaris had reported in every quarter during the Class Period that there had been "no material change" in recall-related risks even as the number and nature of recalls was increasing, supports the inference that defendants ignored their obligations under the securities laws and recklessly disregarded that the use of the same risk warning would be, and was, materially misleading to investors;

(b)   Defendants knew the Youth RZR recall was imminent when they issued the July 22 press release and earnings, but specifically did not mention the recall, instead issuing it just days before the July 28, 2015 dealer and investor meeting, where they knew the new product launch – particularly the anxiously-awaited RZR Turbo – would overshadow the negative news of the recall;

(c)   In addition to the ongoing product liability litigation arising out the July 2014 Polaris RANGER fire that burned a young girl and the numerous customer reports of fires and heat-damaged RZRs and RANGERs, another young girl was burned on July 4, 2015 in a RZR 900 fire. Polaris admitted in late August that it was "'actively investigating what happened in this terrible incident'" in a comment to a news article reporting on the accident;

(d)   The RZR and RANGER ORVs with persistent design and manufacturing defects causing fires and eventual recalls were a central

- 51 -

element of Polaris' revenue in 2Q15 – 61% – and defendants recognized their importance to the Company's success; and

(e)     Polaris' employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that.  In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred.  Because the Youth RZR recall took place just 1 day after the statements alleged above, it may be inferred that Wine and other executives were aware of the need for recall and the events giving rise to the recall at the time of those statements.

**D.     2015 Investor & Analyst Meeting and Dealer Show**

125.    On July 28, 2015, five days after the 2Q15 earnings release, Polaris held its annual dealer show and Investor & Analyst Meeting in Las Vegas, at which it introduced 16 new ORVs.  The star of the show was the surprise announcement of the RZR XP Turbo, a powerful update to the RZR XP 1000 boasting industry-leading 144 horsepower engine with the fastest acceleration, fastest top speed, and flattest torque curve of any ORV on the market.

126.    The RZR XP Turbo was viewed with favor by Polaris' dealers and investment analysts, as it reflected a strategic shift from the prior year, when Polaris had flooded the market with 31 new ORV models, as the centerpiece of a slimmer product offering focused directly on competition.  *See, e.g*., Wedbush Report, 7/28/15 ("there is little doubt that the RZR XP Turbo will have across-the board bragging rights in this critical performance segment, besting not only PII's RZR XP 1000 but the Maverick Turbo from Can-Am (released last year with a HP of 131)"); Wells Fargo Securities Report, 7/28/15 ("Two most important MY2016 products RZR Turbo, RANGER 570 given dollar volume and competitive positioning."); RBC Capital Markets Report, 7/29/15 ("even though optically

- 52 -

this year's launch seems less 'exciting', it does appear to be what the dealers want in order to better compete in the marketplace").

127.   At Polaris' annual analyst and investor meeting, Company executives continued to tout the purported competitive advantages of the product.   Longren told participants:

> As guys come into this marketplace whether it's BRP or Arctic Cat or other guys want to play, they now have to contend with a high performance vehicle at a value price point.  That's going to cause some troubles for some competitors as we go forward.  And then the undisputed king that we launched last night, the XP Turbo, which was a completely redesigned vehicle, the super high performance, kind of industry leading performance that anybody's ever seen and will see.

128.   Longren also told investors that the product was "ready to go":

> So Turbo, we announced that last night. First units are ready to ship today, okay.  So across the board, all of our model year 2016 line-up is ready to go as we're introducing the product to be able to support the demand that we've created.  Our products are in great shape, and it's about making sure we continue to grow our brands.

129.   Unbeknownst to investors, the RZR XP Turbo and other new product introductions had been rushed to market without adequate testing.  As a result, the RZR XP Turbo and at least one other new offering, the RZR S1000 EPS, were being shipped with defects that, like the defective Youth RZR that had just been recalled, could cause the vehicles to suddenly catch on fire during normal operation, presenting substantial risks of harm to Polaris' customers and jeopardizing the Company's financial condition and its ability to compete in the marketplace.  Those risks were even more significant with high horsepower models like the RZR Turbo and RZR 1000, which ran much hotter and much faster than the Youth RZR, and therefore were at even greater risk of fires that could destroy the vehicles and injure their occupants.

130.   Nevertheless, during Polaris' presentations, Pucel specifically touted the Company's "world class safety levels" "particularly ORVs," telling attendees:

- 53 -

Year-to-date safety is the thing we talk about first, fantastic world-class safety levels. Quality, we're a little bit above the warranty, as a percent of sales goal but we've got six months in a row, where we dropped our warranty cost. And at the end of July, fully anticipate we'll be on plan there. We continue to build like crazy and ramp up, particularly ORVs gone smoother than we've seen in the long time.

\* \* \*

Over five years I really believe we're going to continue to be at world class safety levels.

131. Pucel told investors that: "Over five years I really believe we're going to continue to be at world class safety levels," and then said that Polaris was overspending on safety and quality issues:

Costs, I think that I would be disappointed if I over the five years didn't deliver 500 basis points of whole good cost improvement in that five-year period. That's the kind of opportunity that we see. We've been over indexed on safety – well, I shouldn't say over, we've been indexed on safety, quality, and delivery and we haven't taken advantage of our scale. We don't have a Polaris manufacturing production system that we're going to be developing with lean and there's 500 basis points of what I believe is in the plant network and also in supply chain and logistics.

When asked by analysts to clarify the Company's cost reduction plans, Pucel explained "how we model the different buckets that are contributing to the 500 basis points," and said:

Some of it is coming off this bias for capacity quality and safety and adding on a continuous improvement element and that's training people to think, adding the right resources, reorganizing around the opportunities, creating capabilities in the organization to go get it and then my experience has been and the benchmarks that I look at and everybody that I've been involved with, they can accelerate over time.

132. Wine also touted the Company's purported commitment to safety in his prepared remarks:

Our guiding principles over on the right of the chart really drive what we do. It's all about having the right people, being highly ethical, putting our employees and the safety of our customers at the highest priority, and ultimately, building customer loyalty.

133. Wine and Longren bolstered Purcel's statements by assuring investors that, despite the recent recall of the Youth RZR, sales of the RZR product line were strong:

- 54 -

[LONGREN:] RZR.  RZR is on fire.  Okay. Whether it's retail revenue, everything about it, RZR is great.  Industry is in good shape.  As we look forward, it's going to have a very good second half of the year and a good start into 2016 as I'm looking forward on there.

*      *      *

[WINE:] We're not having a problem with RZR sales. RZR sales are really good.  And I expect they're going to be really good going forward.

134.   The foregoing statements were materially false and misleading because they omitted to disclose the risks of injuries, reputational harm, declining sales and market share, rising warranty costs, and other negative consequences arising from the defects in Polaris' products, including by omitting to disclose that: (i) the risk of fires from design and manufacturing defects was not limited to the Youth RZR, but was also present on all of Polaris' other RZR products, and on many other ORV products it was selling, including the new model year products that had just been announced; (ii) Polaris' products had been rushed to market as a result of competitive pressures, without being thoroughly vetted or tested, and with substandard parts that had not complied with PII's own quality standards and requirements; and (iii) warranty cost trends were negative, not positive as represented, due to the existence of product defects, and the accidents and lawsuits that had already occurred and were highly likely to increase in the future.

135.   Based on the facts and circumstances alleged herein, it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

      (a)    The fact that Polaris' recall-related risk warning had not changed in over four years, along with the fact that Polaris had reported in every quarter during the Class Period that there had been "no material change" in recall-related risks even as the number and nature of recalls was increasing, supports the inference that defendants ignored their obligations under  the securities laws and recklessly disregarded that

- 55 -

the use of the same risk warning would be, and was, materially misleading to investors;

(b)     Defendants announced the Youth RZR recall just days before the July 28, 2015 dealer and investor meeting, where they knew the new product launch – particularly the anxiously-awaited RZR Turbo – would overshadow the negative news of the recall;

(c)     In addition to the ongoing product liability litigation arising out the July 2014 Polaris RANGER fire that burned a young girl and the numerous customer reports of fires and heat-damaged RZRs and RANGERs, another young girl was burned on July 4, 2015 in a RZR 900 fire.  Polaris admitted in late August that it was "'actively investigating what happened in this terrible incident'" in a comment to a news article reporting on the accident;

(d)     ORVs, including the RZR and RANGER, with persistent design and manufacturing defects causing fires and eventual recalls were a central element of Polaris' revenue in 2Q15 – 61% – and defendants recognized their importance to the Company's success;

(e)     Polaris' employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that.  In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred.  Because the RZR 900 and 1000 recall took place nine weeks after the statements alleged above, it may be inferred that Wine and other executives were aware of the need for recall and the events giving rise to the recall at the time of those statements;

(f)     Polaris' "speed-to-market" strategy to keep competitors at bay, and its practice of shipping products without proper vetting of safety, as described by CW1 & CW3, supports the inference that defendants deliberately ignored the issues affecting the safety of its vehicles;

(g)     Based on the numerous customer reports from 2012 through 2015 of burned ORVs and melted parts near the RZR's and RANGER's engines posted on the CPSC's website (to which Polaris responded), the fact that the RZR Turbo engines creates even more heat than its smaller and non-turbo counterparts, and the rushed way in which the

- 56 -

XP Turbo was developed and tested, defendants were aware of the much greater risks of fires with the newly announced RZR Turbo; and

(h)     Polaris' "speed-to-market" strategy led the Company to ship products quickly and without proper vetting of safety, supporting the inference that defendants recklessly disregarding the issues affecting the safety of its vehicles.

**E.     October 5, 2015 Recall Announcement**

136.    On October 5, 2015, Polaris issued the following press release announcing the

recall of Model Year 2015 RZR 900 and 1000 ORVs:

Polaris® Industries, in cooperation with the U.S. Consumer Product Safety Commission and Transport Canada, is issuing a voluntary recall on model year 2015 Polaris RZR 900 and 1000 vehicles due to reports of pinched fuel tank vent lines. The recall is related to the vehicle's fuel tank vent line potentially being incorrectly installed during manufacturing, causing it to become pinched, which may cause the fuel tank to pressurize and leak fuel, posing a potential fire hazard.  Polaris estimates that the assembly error occurred in very few vehicles; however, Polaris is issuing a voluntary recall so that all these vehicles could be inspected and any affected vent lines fixed prior to further use.

Polaris is taking this action after confirming that, in some reports, a vent line had been pinched during assembly. In those cases, Polaris has also received reports of the driveline contacting a pressurized and expanded fuel tank, resulting in a fuel leak and a fire hazard. Polaris also received two reports of small fires, but could not confirm whether the vent line was obstructed during assembly or during subsequent accessory installation or whether the pinched vent line was the cause of the fires.

"Polaris is committed to the safety and quality of its products and is swiftly addressing the potential problem and has taken the appropriate steps to prevent any future occurrences," said Michael Erickson, Polaris' General Manager, RZR.

Polaris is sending a recall letter directly to each registered owner of a vehicle within the scope of this recall. All 2015 Polaris RZR 900 and 1000 vehicle owners will be asked to contact a dealer starting Oct. 5 to schedule a service appointment. There will be no cost to customers or dealers for this product inspection and fix.

Additionally, the company will provide information on the issue at Polaris Camp RZR in Glamis, Calif., Oct. 30 - 31, 2015.

137.    The press release was initially disseminated to the market by *Business Wire*.

The CPSC issued a press release announcing the recall the same day.  Polaris' recall

- 57 -

announcement was widely reported by news organizations, financial analysts, investment websites, internet search engines and other media outlets, such that the information contained therein became available to, and was acted upon by, investors in Polaris' securities.[27]

138. Thereafter, Company representatives assured Polaris' dealers, and Wall Street analysts and investors, that the problems leading to the recall had been resolved and did not present significant risks to the Company. For example, a Wedbush report issued on October 15, 2015 noted that, despite the number of vehicles to be recalled for inspection, only a "very few" would require repairs:

> The recall is due to a potential pinched fuel tank vent line, due to incorrect installation, that could pose a fire hazard. Polaris has stated that very few units are believed to be affected by this, but that all units should be checked for this issue. While customers are naturally upset about this inconvenience, none of our dealer contacts believed that it would be a major issue. The general feeling is that they will be able to check for the issue fairly easily and will have to repair very few units.

139. The press release was materially false and misleading because the problems were not limited to "very few vehicles" as asserted in the press release and repeated to Polaris dealers and analysts, nor were the problems caused by isolated "assembly error[s]" in the vehicles. As Polaris later admitted, the problems arose from defects in the design of the Polaris ORV and systemic problems in Polaris' manufacturing operations, affected numerous vehicles, and required repairs for which neither parts nor an effective fix were available. Thus, Polaris was not "swiftly addressing" the problem nor had it identified what was needed, much less "taken the appropriate steps," to correct it. Neither was Polaris "'committed to the safety and quality of its products'"; it was instead committed to rushing new products to market as quickly as possible, before required safety or quality checks had

---

[27] *See, e.g.*, *Polaris Recalls RZR Recreational Off-Highway Vehicles Due to Potential Fire Hazard*, Motor Sports Newswire (Oct. 5, 2015), https://tinyurl.com/z87jy7j; Dee DePass, *Polaris recalls 53,000 2015 ATV models due to fire risk*, Star Tribune (Oct. 5, 2015), https://tinyurl.com/gwtyr42.

been performed.  The press release was also materially false and misleading because it omitted to disclose similar defects affecting other products and other model years, or to warn of the risks of injuries, reputational harm, declining sales and market share, rising warranty costs, and other negative consequences arising from the defects in Polaris' products.

140.    Based on the facts and circumstances alleged herein, it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

(a)    ORVs, including the RZR and RANGER, with persistent design and manufacturing defects causing fires and eventual recalls were a central element of Polaris' revenue in the first three quarters of 2015, representing 60% of Polaris' revenue, and defendants recognized their importance to the Company's success;

(b)    Numerous subsequent injuries, deaths, fires and recalls, demonstrated the total lack of reasonable basis for Polaris' statement in the press release that the Company "'had taken the appropriate steps to prevent any future occurrences'" of problems affecting the safety of its vehicles; clearly defendants had not done so;

(c)    Polaris' employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that.  In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred.  Because the RAZR Turbo recall took place just 2 months  after the statements alleged above, it may be inferred that Wine and other executives were aware of the need for recall and the events giving rise to the recall at the time of those statements;

(d)    Polaris' "speed-to-market" strategy led the Company to ship products quickly and without proper vetting of safety, supporting the inference that defendants recklessly disregarding the issues affecting the safety of its vehicles;

- 59 -

(e) In addition to the ongoing product liability litigation arising out the July 2014 Polaris RANGER fire that burned a young girl and the numerous customer reports of fires and heat-damaged RZRs and RANGERs, the product liability suit arising out of a sudden fire that burned a 2013 RZR 900 – a vehicle eventually recalled – and its young passenger was filed in Southern California on July 30, 2015;

(f) Polaris routinely ignored its own standards for quality and safety by waiving the PPAP approvals so products could be brought to market more quickly.   According to CW3, anyone with access to Polaris' internal software system for managing parts could determine whether a PPAP was approved and would have seen that very few were approved; and

(g) Warranty costs were steadily increasing and the upcoming known recall of the RZR Turbo, the Company's high-margin flagship product, caused warranty costs to increase significantly.

**F.    3Q15 Earnings Report**

141.   On October 21, 2015, Polaris issued a press release announcing its financial results for 3Q15, for the period ending September 30, 2015.  The press release was initially disseminated to the market by *Business Wire*, and thereafter its contents were widely disseminated by other news organizations, financial analysts, investment websites, internet search engines and other media outlets, such that the information contained therein became available to, and was acted upon by, investors in Polaris' securities.  Polaris reported earnings of $155.2 million ($2.30/share) for the quarter in the release, and raised its FY15 earnings guidance to a range of $7.37 to $7.42, an increase of $0.05 at the low end and $0.03 at the midpoint from its prior guidance.

142.   The 3Q15 press release touted Polaris' market position and product lineup, and its purported success in the face of increased competition and difficult economic conditions:

"Our record third quarter results continue to reflect the efficacy of our long-term strategy and the resiliency of the Polaris organization, as motorcycle growth accelerated, ORV share gains continued and our developing adjacencies built momentum.   We accomplished this in a difficult environment, with the combination of weakening currencies and softening economies adding to the pressure we face from the sluggish oil and agriculture

- 60 -

markets, all in the midst of the most competitive powersports landscape we have seen in nearly a decade. It is encouraging to see our Polaris team use these challenging times to get better and stronger, while displaying renewed determination to win across all our markets," stated Scott Wine, Polaris' Chairman and Chief Executive Officer. "After our people, arguably our strongest asset is our innovative culture, which spurred the delivery of 15 new vehicles to our unsurpassed ORV armada and drove the introduction of hundreds of new PG&A items. We remain committed to being the leading innovator in our space."

143.    The 3Q15 press release also provided the following guidance to investors, which represented an increase in projected annual EPS of $0.03/share at the midpoint from the guidance provided on the 2Q15 call:

**2015 Business Outlook**

For the full year 2015, the Company is narrowing its earnings guidance range to $7.32 to $7.42 per diluted share, an increase of 11 to 12 percent over full year 2014 earnings of $6.65 per diluted share. Full year 2015 sales are now expected to grow in the range of 11 to 12 percent when compared to 2014.

144.    Polaris also held an earnings call on October 21, 2015, to discuss the 3Q15 results of operations with investors and analysts. Defendants Wine, Morgan, Speetzen, and Pucel each participated on the call, as did other PII officers. None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein. Analysts representing at least 13 Wall Street firms also attended and participated in the call. The call had been publicized by PII in advance, and a recording of the call was made available thereafter through a link on Polaris' "Investor Relations" website. Written transcripts of the call were also published and disseminated by third parties, including Thomson Reuters StreetEvents. The contents of the call were widely reported in analyst reports and on internet websites frequented by investors, as well as by other news organizations and media outlets, such that the information discussed on the call became available to, and was acted upon by, investors in Polaris' securities.

- 61 -

145.   During the call, Morgan reiterated the purported strength of Polaris' ORV sales and market share and its growing "armada" of ORVs:

> Year-to-date ORV revenue is up 5%. Q3 Polaris North American ORV retail sales increased to low single digits.  We again gained share in both ATVs and side-by-sides, adding further to our number one positions.  Polaris ATV retail sales increased low single digits in an industry that declined slightly, while Polaris side-by-side retail sales grew low single digits in an industry that also grew but at a slightly slower pace than Polaris.

> New product introductions from Polaris and our competitors are fueling the intensely competitive atmosphere, including our recent announcement of four more new model year 2016 vehicles earlier this month.  These, including the much-anticipated RZR XP 4 Turbo, are bolstering our broad and growing ORV armada.  Our scale and speed to market remain competitive advantages, and we expect to add further to our armada over the next quarter.  So stay tuned.

146.   In response to questioning from analysts, Morgan and Wine told investors there were no different or changed risks to its guidance, or reason to be concerned with its ability to accelerate sales in 4Q15:

> [ANALYST:] It seems that your off-road sales guidance for the year hasn't changed, but maybe came in a little bit light in Q3.  So with no change for the year should we just be thinking of the similar in the existing range?

> *       *       *

> [MORGAN:] Again, I would tell you we feel very comfortable we'll be able to land our ORV guidance and deliver the dealer inventory levels, and are confident in our ability to gain share in the retail.  So while it might be a little bit lighter than you expected, I think it was right within our expectations, the way we were looking at what we expected from that business in the third quarter.

> [ANALYST:] And you're expecting kind of an acceleration in Q4 in off-road?

> [MORGAN:] Yes.  I guess that would say the implied guidance.  Yes, it would be up slightly.

> [WINE:] Yes, mid-single digits.

147.   The foregoing statements were materially false and misleading because they omitted to disclose the extent to which reported sales and market share growth had been achieved through the sale of defective products, or to adequately warn of the true magnitude

- 62 -

and extent of risks of injuries, reputational harm, declining sales and market share, rising warranty costs, and other negative consequences arising from the defects in Polaris' products.  Nor did the statements fairly or accurately characterize the current risks to Polaris' from competition, or the extent to which sales and earnings had been impacted by the product recalls and related expenses.  Polaris' 3Q15 guidance added to the misleading import of the other contemporaneous statements alleged herein, and was misleading in its own right, because it failed to factor in or apprise investors of the risk of reduced sales and earnings and higher costs that were reasonably expected to result from the recall, repair or reduced demand caused by those defects and the reputational harm they had already caused to Polaris' brand and reputation.

148.    On October 27, 2015, Polaris filed its 3Q15 Report on Form 10-Q with the SEC.  The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been re-evaluated to take into account changes in manufacturing quality, product recalls and other factors.  The report disclosed that the Company had a warranty reserve balance of $55.1 million as of the end of 3Q15.

149.    The warranty reserve disclosures were materially false and misleading because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual in light of the July and October recalls of the MY2015 Youth RZR, RZR 1000 and RZR 900 products or the reasonably expected warranty expenses arising from claims, repairs and recalls of other Polaris products affected by the same or similar design and manufacturing defects, including the 2013 through 2016 RZR 900s and RZR 1000s and the 2016 RZR Turbo.

150.    The 3Q15 Report on Form 10-Q made the following risk factor disclosure:

- 63 -

ITEM 1A – RISK FACTORS

> There have been no material changes or additions to our risk factors discussed in our fiscal 2014 Annual Report filed on Form 10-K.  Please consider the factors discussed in "Part I, Item 1A.  Risk Factors" in such report, which could materially affect the Company's business, financial condition, or future results.

151.   The assertion that there had been no material changes in or additions to Polaris' risk factors was misleading and ineffective because the risks of product recalls had materially increased and already manifested due to continued incidents of fires involving RZR and other products, the increasing number of defective products that had been sold, the recalls of the 2015 RZR 1000, RZR 900 and Youth RZR, the impending recall of the 2016 RZR XP Turbo, and the risk of recalls on other similarly-designed-and-manufactured products, including other model year RZR 1000s and RZR 900s and RANGER products, and the reputational harm, reduced demand, and increased expenses that had resulted from those conditions.  The warning in Polaris' FY14 report on Form 10-K that was incorporated into the 1Q15 quarterly report continued to be misleading and ineffective for the reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent when Polaris had already suffered recall-related financial and reputational harm that had negatively impacted its business beyond what had been disclosed to investors, omitted to disclose the defects or describe the fire-related incidents that had occurred, and falsely assured investors that Polaris had an adequate quality control procedures in place.

152.   Based on the facts and circumstances alleged herein, it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

> (a)   The fact that Polaris' recall-related risk warning had not changed in over four years, along with the fact that Polaris had reported in every quarter during the Class Period that there had been "no material

- 64 -

change" in recall-related risks even as the number and nature of recalls was increasing, supports the inference that defendants ignored their obligations under  the securities laws and recklessly disregarded that the use of the same risk warning would be, and was, materially misleading to investors;

(b)     As Morgan admitted just a few months later on the January 26, 2016 conference call, sales in October, the same month in which tens of thousands of RZRs were recalled, were the lowest of 4Q15;

(c)     ORVs, including the RZR and RANGER, with persistent design and manufacturing defects causing fires and eventual recalls were a central element of Polaris' revenue in the first three quarters of 2015, representing 60% of Polaris' revenue, and defendants recognized their importance to the Company's success;

(d)     Polaris' employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that.  In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred.  Because the RZR Turbo recall took place just 6 weeks after the statements alleged above, it may be inferred that Wine and other executives were aware of the need for recall and the events giving rise to the recall at the time of those statements;

(e)     By virtue of social media posts, lawsuits, warranty claims, communications with the CPMC and the recalls of other products with similar defects, as well as its in-depth investigations into fire-related incidents, and the number and nature of those incidents, defendants knew or recklessly disregarded that the defects were more widespread and more difficult to fix than represented at the conference;

(f)     In addition to the ongoing product liability litigation arising out the July 2014 Polaris RANGER fire that burned a young girl and the numerous customer reports of fires and heat-damaged RZRs and RANGERs, the product liability suit arising out of a sudden fire that burned a 2013 RZR 900 – a vehicle eventually recalled – and its young passenger was filed in Southern California on July 30, 2015; and

- 65 -

(g)    Warranty costs were steadily increasing and the upcoming known recall of the RZR Turbo, the Company's high-margin flagship product, caused warranty costs to increase significantly.

## G.    FY15 Earnings Report

153.    On January 26, 2016, Polaris issued a press release announcing its financial results for 4Q15 and FY15, for the period ending December 31, 2015.  The press release was initially disseminated to the market by *Business Wire*, and thereafter its contents were widely disseminated by other news organizations, financial analysts, investment websites, internet search engines and other media outlets, such that the information contained therein became available to, and was acted upon by, investors in Polaris' securities.

154.    The FY15 earnings release reported net income of $110.7 million ($1.66/share) for the quarter and $455.4 million ($6.75/share) for FY15, which was in line with the Company's recently reduced guidance.  The earnings release then provided the following guidance for FY16:

### 2016 Business Outlook

Given the anticipated ongoing weak industry trends in North America, particularly in the oil and gas regions and continued volatility in the currency markets, the Company expects full year 2016 net income to be in the range of $6.20 to $6.80 per diluted share, compared to the $6.75 per diluted share reported in 2015.  Full year 2016 sales are anticipated to be in the range of down two percent to up three percent over full year 2015 sales.  Ongoing currency volatility and industry retail sales uncertainty are the major reasons for the wider guidance range for sales and earnings per share for 2016.

155.    Later the same day, Polaris held a conference call to discuss its FY15 results with investors and analysts.  Defendants Wine, Morgan, Pucel, and Speetzen each participated on the call, as did other PII officers.  None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein. Analysts representing at least 15 Wall Street firms also attended and participated in the call. The call had been publicized by PII in advance, and a recording of the call was made

- 66 -

available thereafter through a link on Polaris' "Investor Relations" website. Written transcripts of the call were also published and disseminated by third parties, including Thomson Reuters StreetEvents. The contents of the call were widely reported in analyst reports and on internet websites frequented by investors, as well as by other news organizations and media outlets, such that the information discussed on the call also became available to, and was acted upon by, investors in Polaris' securities.

156.   During his opening remarks on the earnings call, Wine admitted that the Company had lost share in the side-by-side ORV market, but pinned the loss on weather and macroeconomic conditions, and assured investors the loss was not significant or due to Company-specific problems:

> We cited broad-based demand weakness when we dramatically cut shipments and revised our guidance in mid-December. And saw only modest improvement in the final weeks of the year. Overall, Polaris retail sales were down mid-single digits for the quarter, as poor snow conditions and continued region-specific weakness resulted in slow dealer traffic.

> Despite solid demand for the new General and improving interest in the RZR Turbo, we experienced a slight side-by-side market share loss in the fourth quarter, hurting our pride more than our P&L.

157.   In response to a follow up question from a Stephens Inc. analyst, Morgan and Wine admitted that the October RZR recall had hurt sales and contributed to the lost market share, but claimed that was a unique, one-time event that had not factored into the weak FY16 guidance and did not present risks going forward:

**Trey Grooms** - Stephens Inc. – Analyst

Question is on the side-by-side share. You guys lost some share in the 4Q in side-by-sides, and that's the first time we've seen that, that I can remember. Is this mostly coming from the more performance side, RZR, or is this on the Ranger side? And what has changed? What was causing the market share losses specifically in 4Q, because I think from your guidance it implies that you guys are – that, that's no longer going to be the case and you'll hold onto share. Is there something unique in the quarter?

**Scott Wine** - Polaris Industries Inc. - Chairman & CEO

- 67 -

Trey, Bill could provide really good color on this.  But let's, as we talk about share in side-by-sides, let's make sure we're grounded in where our position is.  You realize that we are three times combined the share of the next three players.  So we're coming from a pretty good position.  And the amount of share loss that we're talking about, I don't want to call miniscule, immaterial, not a very large amount.  We're not going to over react, although we are very focused on maintaining and gaining share. But let's not – we are not panicked over that and we feel very good about how we'll deal with it going forward.

**Bennett Morgan** - Polaris Industries Inc. - President & COO

Let me just add on.  Again, I think you get sometimes in quarters, as Scott's alluding to, there can be a little bit of timing.  What was unique in the fourth quarter I think are a couple elements.  As everybody well knows, there was a number of new competitive introductions that frankly started shipping and had probably some initial pent-up retail sales that we saw in the fourth quarter for the first time coming off of zero comparables.  The industry was weak.  So the industry was less able frankly to handle that.

The other thing we had is we had a recall due to some quality issues with vent lines on our RZR product in October, and October was our weakest performing month of the quarter.  We think that had some impact as well.  That's shame on us.  But we seem to have powered through that as we go forward.  Then again, the other thing I said in my remarks is we were coming off some really sporty comparables in the fourth quarter where we were up double digits percent, which again I don't think we see frankly in the 2016 model.  We don't have those kind of comps that we're going up against. I do think there is some unique aspects about the fourth quarter.  But as Scott said, it will be a competitive environment.  And we're going to have to be at our very best, and we're going to have to be better than we were in 2015 if we're going to hold and ultimately do what we expect to do, which is gain some share.

158.   The foregoing statements were materially false and misleading because the product defects and manufacturing practices that had led to the October recall had not been corrected, affected more vehicles and more model years than had been disclosed, had resulted in significantly increased warranty and legal expenses which were likely to continue, presented significant and undisclosed risks to FY16 sales and earnings.  By blaming FY15 results and reduced FY16 expectations on other, primarily non-Company-specific, circumstances, and downplaying the market share loss in the side-by-side vehicle segment, the foregoing statements concealed the true nature and magnitude of the risks to the Company from the product defects and recalls, and the reduced consumer confidence, higher

- 68 -

warranty and legal expenses, increased recall risks, and other negative conditions that had resulted from those circumstances. Polaris' FY16 guidance added to the misleading import of the other contemporaneous statements alleged herein, and was misleading in its own right, because it failed to factor in or apprise investors of the risk of reduced sales and earnings and higher costs that were reasonably expected to result from the recall, repair or reduced demand caused by those defects and the reputational harm they had already caused to Polaris' brand and reputation.

159.    On February 19, 2016, Polaris filed its FY15 Annual Report on Form 10-K with the SEC. The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been re-evaluated to take into account changes in manufacturing quality, product recalls and other factors. The report disclosed that the Company had a warranty reserve balance of $56.5 million as of the end of FY15.

160.    The warranty reserve disclosures were materially false and misleading because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual in light of the July and October recalls of the MY2015 Youth RZR, RZR 1000 and RZR 900 products and the MY2016 RZR XP Turbo product, or the reasonably expected warranty expenses arising from claims, repairs and recalls of other Polaris products affected by the same or similar design and manufacturing defects, including the 2013 through 2016 RZR 900s and RZR 1000s and additional 2016 RZR Turbo products.

161.    The FY15 Form 10-K report provided the same warning with respect to product recalls and defects that had been provided in the FY14 Form 10-K:

> ***Significant product repair and/or replacement due to product warranty claims or product recalls could have a material adverse impact on our results of operations***.
>
> We provide a limited warranty for ORVs for a period of six months, for a period of one year for our snowmobiles, for a period of one or two years for

our motorcycles depending on brand and model year, and for a two year period for GEM, Goupil and Aixam vehicles. We may provide longer warranties related to certain promotional programs, as well as longer warranties in certain geographical markets as determined by local regulations and market conditions. We also provide a limited emission warranty for certain emission-related parts in our ORVs, snowmobiles, and motorcycles as required by the EPA and CARB. Although we employ quality control procedures, sometimes a product is distributed that needs repair or replacement. Our standard warranties require us or our dealers to repair or replace defective products during such warranty periods at no cost to the consumer. Historically, product recalls have been administered through our dealers and distributors. The repair and replacement costs we could incur in connection with a recall could adversely affect our business. In addition, product recalls could harm our reputation and cause us to lose customers, particularly if recalls cause consumers to question the safety or reliability of our products.

162.   By using the same risk warning in the FY15 report that it had used in its FY14 report, Polaris was telling investors that there had been no material changes in or additions to Polaris' recall-related risks during FY15, which was not true. The warning that Polaris' operating results could suffer if products had to be recalled was both misleading and ineffective, because it portrayed that risk as uncertain and contingent while omitting to disclose that Polaris' business and reputation had already been materially affected by the recalls, and had and would continue to result in increased warranty and product liability expenses, decreased sales and demand for Polaris products, as a result of recalls that had already been announced and as the result of existing defects in and ongoing claims on products that had not yet been formally recalled, including defects in the MY2013 through 2016 RZR 900s and RZR 1000s. Like the FY14 warning, the FY15 risk warning was also misleading because it failed to disclose the deficiencies in Polaris' "quality control procedures," including that products were often rushed to market without sufficient testing and/or with parts that had not passed the Company's own quality-control standards.

163.   Based on the facts and circumstances alleged herein, it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading

- 70 -

statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

(a)     The fact that Polaris' recall-related risk warning had not changed in over four years, along with the fact that Polaris had reported in every quarter during the Class Period that there had been "no material change" in recall-related risks even as the number and nature of recalls was increasing, supports the inference that defendants ignored their obligations under  the securities laws and recklessly disregarded that the use of the same risk warning would be, and was, materially misleading to investors;

(b)     In addition to the ongoing product liability litigation and the numerous reports of fires and melted parts from consumers on the CPSC website, Polaris received more than 160 reports of fires involving 2013 through 2016 RZR 900 and 1000, including, according to the CPSC, the report that the girl injured in the RZR 900 fire on July 4, 2015, died of her injuries in November 2015.  Presumably, defendants received many of the more than 160 reports before January 26, 2016, including the product liability lawsuit arising out of the 2013 RZR 900 fire;

(c)     Polaris' employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that.  In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred.  Because the Ranger recall took place just 8 weeks after the statements alleged above, it may be inferred that Wine and other executives were aware of the need for recall and the events giving rise to the recall at the time of those statements;

(d)     The Company had just had to recall its flagship product, the RZR Turbo, in December 2015, just six months after launching the high-margin ORV that was central to Polaris' continued market share strength;

(e)     ORVs, including the RZR and RANGER, with persistent design and manufacturing defects causing fires and eventual recalls were a central element of Polaris' revenue in FY15 – 78% – and defendants recognized their importance to the Company's success;

- 71 -

(f)     By virtue of social media posts, lawsuits, warranty claims, communications with the CPMC and the recalls of other products with similar defects, as well as its in-depth investigations into fire-related incidents, and the number and nature of those incidents, defendants knew or recklessly disregarded that the defects were more widespread and more difficult to fix than represented at the conference;

(g)     Polaris routinely ignored its own standards for quality and safety by waiving the PPAP approvals so products could be brought to market more quickly.  According to CW3, anyone with access to Polaris' internal software system for managing parts could determine whether a PPAP was approved and would have seen that very few were approved;

(h)     Warranty costs were steadily increasing and the upcoming known recall of more than 160,000 RZR 900 and 1000s caused warranty costs to increase even higher; and

(i)     Given the ongoing and recurring defects leading to fires and recalls, and therefore increased warranty, legal and promotional costs, defendants had no reasonable basis for their 2016 – or the same risk they had been issuing for years when these myriad problems did not exist.

## H.     April 19, 2016 Recall Announcement

164.    On April 19, 2016, Polaris issued a press release announcing that all RZR 900 and 1000 vehicles from model year 2013 forward would be recalled due to the risk of fires from defects in the products.  Approximately 160,000 vehicles, including vehicles outside the U.S., were subject to the recall, which was also announced by the CPSC the same day. The recall was widely reported by news organizations and other media outlets, discussed in analyst reports and on investor websites and other sources of information for investors, such that the information contained therein became available to, and was acted upon by, investors in Polaris' securities.

165.    In the April 19 press release, Polaris touted the Company's purported safety record and falsely assured consumers and investors that a "thorough investigation" had

"pinpoint[ed] the root cause" of the fires affecting the products, and the company had identified a "comprehensive solution" to address the problems:

> Polaris Industries jointly announced with the U.S. Consumer Product Safety Commission, today, that the company is voluntarily recalling certain RZR 900 and 1000 off-road vehicles manufactured since model year 2013 due to reports of thermal-related incidents, including fires.  Detailed information about the recall is available at www.polaris.com/rzr-recall.

> Polaris conducted a thorough investigation to pinpoint the root causes and put forward a comprehensive solution to address them.

> "One of our foremost guiding principles is Safety and Ethics Always," said Scott W. Wine, Chairman and CEO, Polaris.  "We know that the foundation of a good ride is a safe ride, and we have been proactive, aggressive and thorough in putting forth a plan to get our vehicles repaired and give us – and our customers – confidence in the safety of our RZR vehicles."

> All affected vehicle owners will be asked to contact a dealer to schedule a complimentary service appointment, which should take approximately one hour.  Polaris is working quickly to source the necessary parts – and is allocating parts daily to dealers as they become available.  Dealers will schedule appointments subject to parts availability.

> "We are working day and night to inform our customers and dealers and to obtain the parts needed for the repairs we identified in our comprehensive analysis," said Wine.  "We apologize for the inconvenience to our customers as we work to ensure all the systemic thermal risks we identified are eliminated from our vehicles."

> Polaris has already begun implementation of its Corrective Action Plan and has made manufacturing updates in new-production vehicles.  Polaris also plans to include a warning on new-production vehicles instructing riders not to carry fuel and other flammable liquids in their vehicles, and cautions against carrying flammable liquids in previously produced models.

166.   The recall press release was materially false and misleading to investors because the Company had not conducted a thorough investigation of the problems affecting the recalled products, had not pinpointed the cause of the fires, and did not have a comprehensive solution to address the risks.  Neither had Polaris been proactive, aggressive and thorough in addressing the problems, or in designing and manufacturing the products in a manner intended to make safety a priority.  Instead, Polaris had rushed the products to market to meet competitive pressures, before they were fully tested, and had repeatedly been

- 73 -

slow to react to the defects, and had consistently understated the extent of the defects, the risks of injuries to customers and the financial consequences to the Company, and overstated the Company's understanding of and ability to correct the problems leading to the fires.

167. Based on the facts and circumstances alleged herein, it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

(a) The fact that Polaris' recall-related risk warning had not changed in over four years, along with the fact that Polaris had reported in every quarter during the Class Period that there had been "no material change" in recall-related risks even as the number and nature of recalls was increasing, supports the inference that defendants ignored their obligations under the securities laws and recklessly disregarded that the use of the same risk warning would be, and was, materially misleading to investors;

(b) Numerous subsequent injuries, deaths, fires and recalls, demonstrated the total lack of reasonable basis for Polaris' statement in the press release that the Company had conducted a "thorough investigation" and "pinpoint[ed] the root cause[]" of the fires affecting the safety of its vehicles;

(c) Polaris' "speed-to-market" strategy led the Company to ship products quickly and without proper vetting of safety, supporting the inference that defendants recklessly disregarding the issues affecting the safety of its vehicles;

(d) Polaris' employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that. In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred. Because the Ranger recall took place just 8 weeks after the statements alleged above, it may be inferred that Wine and other

- 74 -

executives were aware of the need for recall and the events giving rise to the recall at the time of those statements; and

(e)     Warranty costs were steadily increasing and bound to increase even higher based on the recently announced recall of approximately 160,000 RZR 900 and 1000 vehicles and the upcoming known recall of more than 43,000 RANGERs in June 2016.

## I.     1Q16 Earnings Report

168.    On April 21, 2016, two days after the recall was announced, Polaris issued a press release to announce its financial results for 1Q16, the period ended March 31, 2016. The press release was initially disseminated to the market by *Business Wire* and thereafter its contents were widely disseminated by other news organizations, financial analysts, investment websites, internet search engines and other media outlets, such that the information contained therein became available to, and was acted upon by, investors in Polaris' securities. The press release reported net income for the quarter of $46.9 million ($0.71/share), and said the Company had incurred "expenses totaling approximately $30 million related to certain product liability settlements, ORV related warranty accruals, severance costs and acquisition related costs."

169.    In the press release, Wine assured investors that the product recall had not impacted the Company's sales or earnings. The Company bolstered those assertions by reaffirming its FY16 earnings guidance, while suggesting that it was being conservative in doing so, and there was significant upside to the forecast:

> "Our first quarter results were in line with our projections, in spite of increased expenses for warranty and product liability. Our Customer Excellence initiatives and new products drove a six percent increase in North American retail, and in conjunction with shipment reductions, better demand forecasting, and process control improvements, enabled us to continue reducing dealer inventory levels year-over-year. During the quarter, we improved shipment lead-times, met retail demand from our Spirit Lake motorcycle facility, and completing the acquisition of Taylor-Dunn. I still believe 2016 is likely to be another volatile year in powersports, but we are seeing pockets of strength. The North American ORV industry was up in the

- 75 -

first quarter, with March experiencing the strongest improvement," commented Scott Wine, Polaris' Chairman and Chief Executive Officer.

"We remain focused on an all-out assault on costs and rededicating the business to drive growth, not only for this year but as part of a renewed commitment to achieving our 2020 objectives. The entire Polaris team is united, and determined, to grow sales and expand margins."

### 2016 Business Outlook

While the powersports industry was slightly better than anticipated in the 2016 first quarter, the Company is keeping its guidance range unchanged for the full year 2016 with earnings expected to be in the range of $6.20 to $6.80 per diluted share with sales in the range of down two percent to up three percent over 2015 due to the persistent unpredictability around overall economic trends and more specifically powersports industry trends for the remainder of 2016.

170.    The earnings announcement was materially false and misleading because it:

(i) understated the risks to the Company from rising warranty and product liability expenses, and the significance of the impact of those expenses on reported and expected results, including as a result of the recent recall announcement; (ii) overstated the Company's ability to forecast demand or take advantage of the purported improvement in the ORV market, particularly in light of the recall announcements and reduced customer confidence; and (iii)  provided guidance for future sales that the Company had no reasonable expectation of meeting in light of the increased warranty and product liability expenses and reduced demand for its RZR side-by-side ORVs and other defective products.

171.    Also on April 21, 2016, Polaris held an earnings call to discuss its 1Q16 results of operations with investors and analysts.  Defendants Wine, Morgan, Pucel and Speetzen each participated on the call, as did other PII officers.  None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein. Analysts representing at least 16 Wall Street firms also attended and participated in the call. The call had been publicized by PII in advance, and a recording of the call was made available thereafter through a link on Polaris' "Investor Relations" website.  Written

- 76 -

transcripts of the call were also published and disseminated by third parties, including Thomson Reuters StreetEvents.  The contents of the call were widely reported in analyst reports and on internet websites frequented by investors, as well as by other news organizations and media outlets, such that the information discussed on the call became available to, and was acted upon by, investors in Polaris' securities.

172.  During the conference call, defendants once again assured investors that the thermal issues had been resolved after a careful and "extensive investigation."  In his opening remarks on the call, Wine asserted:

> This week, we announced a major recall of more than 160,000 RZR vehicles to address fire and other thermal risks in our global RZR business. The recall was the culmination of an extensive investigation that ultimately isolated several disparate and difficult to discern root causes.

> We spared no resource or cost and worked closely with Consumer Product Safety Commission to ensure that we had identified and addressed all of the systematic root causes of these thermal issues.  We regret the inconvenience this recall has on our customers, but the safety of our products and our riders must always take precedent.  Our final guiding principle is customer loyalty, and it is earned not only by the performance and features of our vehicles, but also by our performance when our customers need us.

> Over the past eight years, our industry-leading RZRs have garnered amazing customer loyalty, and we are committed to delivering the parts support and experience through this recall to maintain that.  Polaris customers expect us to build products that are fun and safe to operate, and we are taking this necessary step toward that goal.

173.  When SunTrust analyst Michael Core asked for "a little more color on . . . the genesis of all of these quality issues": ("Is it just the complexity of the product you're building?  Is it some of the capacity tightness that you've experienced?"), Wine again assured investors that a thorough investigation had been conducted, the Company understood the root causes and magnitude of the problems and how to fix them, and they were not the result of any systemic or fundamental problems that presented extraordinary risks to the business:

- 77 -

The RZR recall specifically is a little bit different beast than we've had in the past. Instead of going after one specific issue, we've literally looked at the entire system of the vehicle and tried to determine if there's anything in there that could cause a thermal risk and then going after it.

So this is a different way of looking at it than we have in the past, and I think we'll be a better Company for it. But I don't think it's – because of a bit of an apples and oranges comparison to how we've done things historically, it's not really right to look and say it's dramatically worse than we've ever been.

We are taking this seriously. We are learning from it. I'm extremely confident in what Ken's driving in the manufacturing and quality initiatives. This is an extremely unfortunate event and we are in the process of getting better. But I wouldn't read into it that there's a systematic fundamental problem other than what we've been talking about for a long time of trying to get the fundamentals right of building a lean enterprise to be able to build in quality, reduce rework, reduce warranty consistently over time.

174.    When Stephens analyst Trey Grooms asked for more details on the mechanics

of the recall and the cost and timing of the repairs, Wine and Speetzen responded as follows:

[WINE:] Yes, Trey, obviously this recall is of paramount importance to us, because we want to take care of our customers. And as Bennett said in his remarks, our first priority is to get our customers that own RZRs back to riding as quickly as we possibly can. We will start shipping the kits out on the 22nd, and be repairing vehicles in dealerships very, very rapidly from there on out. As Ken said, in his remarks, or Bennett, we expect to get through this all in the second quarter, and we're going to take every opportunity to expedite parts as quickly as we can. We're cutting them into production simultaneously with the shipment of the parts, so we will be able to get good products to our dealers and ultimately, work through what's on the floor in our dealerships, get those repaired. But the first priority is to get those customers that have vehicles back to riding as quickly as possible. We're not going to give the specific cost, but we covered a good bit of it in the first quarter, and then the rest of it is included in our guidance.

[SPEETZEN:] Yes, so Trey, we obviously booked it against cost-of-goods sold from a warranty standpoint. It's about a 120 basis point drag on gross margins in the quarter. And as Scott indicated, we don't want to get into a lot of detail, because obviously, the recall is complex and different for each RZR model, so the cost per unit is going to vary quite a bit based on that.

175.    The foregoing statements on Polaris' 1Q15 earnings call were materially false

and misleading to investors because: (i) they overstated the extent of the Company's

investigation into, understanding of, and ability to address the problems arising from the

- 78 -

RZR recalls, and understated the costs and expenses of doing so; (ii) misrepresented the nature, source and extent of the problems, including by falsely stating that they were not the result of systemic or fundamental problems in Polaris' operations, as defendants later admitted was, in fact, the case; (iii) misrepresented that the repairs could or would be completed "very, very rapidly" and finished by the end of the second quarter, and omitting the risks to doing so; and(iv) omitted to disclose the extent to which the repeated recall announcements had harmed Polaris' reputation, reduced customer loyalty, and reduced demand for its products.

176.    Polaris' 1Q16 guidance was materially false and misleading, because it failed to factor in or apprise investors of the risk of reduced sales and earnings and higher costs that were reasonably expected to result from the recall, repair or reduced demand caused by those defects and the reputational harm they had already caused to Polaris' brand and reputation. Instead of accounting for the significant harm to Polaris' reputation and the increased costs that were anticipated from the just-announced recall, the guidance, together with defendants' explanations as to how it had been set, falsely suggested to investors that the Company was being cautious in not raising guidance, and there were reasons to believe that performance could be even better than projected by the guidance.  This was not true, and there was no reasonable basis to believe that it was.  In addition, as with the prior guidance issued during the Class Period, the 1Q16 guidance contributed to the false and misleading nature of the other contemporaneous statements alleged herein, because it further assured investors that the recalls did not present significant or unusual risks to the Company's business or financial condition, and that Polaris had identified and was addressing all of the recall-related risks.

177.    The falsity of the representations in the recall notice, the 1Q15 earnings release, and on the 1Q15 conference call is further illustrated by reports of analysts following those statements:

(a)     Polaris "has isolated the cause of the problem and is taking steps to fix the issues and ensure the safety of its riders."  Sterne Agee Report, 4/21/16;

(b)     "[T]he worst of the RZR recall impact is in the rear-view mirror." Northcoast Research Report, 7/21/16; and

(c)     "[W]e still think the P&L impact of the recalls is limited, as the repairs . . . are minimal, and the company's full-year guid[ance] bakes in much weaker trends than we saw in 1Q16."  Northcoast Research Report, 5/27/16.

178.    On April 29, 2016, Polaris filed its 1Q16 report on Form 10-Q with the SEC. The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been re-evaluated to take into account changes in manufacturing quality, product recalls and other factors.  The report disclosed that the Company had a warranty reserve balance of $67.2 million as of the end of 1Q16.

179.    The warranty reserve disclosures were materially false and misleading because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual in light of the prior recalls, including the just-announced recall of the 2013 through 2016 RZR 1000 and RZR 900 products, or the reasonably expected warranty expenses arising from claims, repairs and additional recalls of 2016 RZR XP Turbo products that had not and could not be repaired, as well expenses and potential recalls of other Polaris products affected by the same or similar design and manufacturing defects.

180.    The 1Q16 report on Form 10-Q made the following risk factor disclosure:

ITEM 1A – RISK FACTORS

There have been no material changes or additions to our risk factors discussed in our fiscal 2015 Annual Report filed on Form 10-K. Please consider the factors discussed in "Part I, Item 1A.  Risk Factors" in such report, which could materially affect the Company's business, financial condition, or future results.

- 80 -

181.    The assertion that there had been no material changes in or additions to Polaris' risk factors was misleading and ineffective because the risks of product recalls had materially increased and already manifested due to continued incidents of fires involving RZR and other products, the increasing number of defective products that had been sold, the recalls of the RZR XP Turbo, RZR 1000, RZR 900 and other products, the inability of Polaris to effectively repair the products that had already been recalled and the unavailability of parts to do so, the risk of recalls on other similarly-designed-and-manufactured products, the reputational harm that had already reduced demand for Polaris' products, and the reduced sales and increased warranty, product liability and promotional expenses that had resulted from these conditions.   The warning in Polaris' FY15 report on Form 10-K that was incorporated into the 1Q16 quarterly report continued to be misleading and ineffective for the reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent when in fact Polaris had already suffered recall-related financial and reputational harm that had negatively impacted its business beyond what had been disclosed to investors, omitted to disclose the defects or describe the fire-related incidents and reputational harm that had already occurred, and falsely assured investors that Polaris had an adequate quality control procedures in place.

182.    Based on the facts and circumstances alleged herein it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

(a)    The fact that Polaris' recall-related risk warning had not changed in over four years, along with the fact that Polaris had reported in every quarter during the Class Period that there had been "no material change" in recall-related risks even as the number and nature of recalls was increasing, supports the inference that defendants ignored their obligations under  the securities laws and recklessly disregarded that

- 81 -

the use of the same risk warning would be, and was, materially misleading to investors;

(b)     The RZR and RANGER ORVs with persistent design and manufacturing defects causing fires and eventual recalls accounted for approximately two-thirds of Polaris' 1Q16 revenue, and were highly important to the Company's success;

(c)     As Wine admitted on the July 20 2016 conference call, the recall "was impactful because we didn't have products to sell" and, contrary to what was said on the call, Polaris' management had "anticipated" dismal sales in ORV in April;

(d)     As Pucel and Wine admitted just a few months later on the July 20, 2016 conference call, the Company discovered the issues were in fact "systematic" involving "the quality system elements and the design control elements" as well as "gaps" in the "design, development, and manufacturing processes," demonstrating that their review and investigation of the problems had not been completed, nor was it as thorough as they had claimed;

(e)     Polaris employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that.  In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred.  Because the RZR Turbo stop-ride/stop-sale took place just 5 days after the statements alleged above and the RZR Turbo recall was formally announced only a month after that, it may be inferred that Wine and other executives were aware of the need for recall and the events giving rise to the recall at the time of those statements;

(f)     Polaris' own employees with knowledge of the recalls did not believe Wine's assertions about the limited impact of the recalls as stated on the April call;

(g)     By virtue of social media posts, lawsuits, warranty claims, communications with the CPMC and the recalls of other products with similar defects, as well as its in-depth investigations into fire-related incidents, and the number and nature of those incidents, defendants

knew or recklessly disregarded that the defects were more widespread and more difficult to fix than represented at the conference;

(h)     Due to the nature and similarity of the problems affecting the products, and the temporal proximity of other impending recall announcements, including the recall of more than 43,000 RANGERs in June 2016 which, like the RZRs recalled on April 19th, had insufficient heat shields, it can be inferred that defendants recklessly disregarded that the risks were much greater than represented at the conference;

(i)     Defendants were aware of the number and nature of claims leading to increased warranty costs, and the relationship of actual and anticipated claims to the recently announced recall of approximately 160,000 RZR 900 and 1000 vehicles and the upcoming recall of more than 43,000 RANGERs in June 2016; and

(j)     Given the ongoing and recurring defects leading to fires and recalls, and therefore increased warranty, legal and promotional costs, defendants had no reasonable basis for their 2016 guidance.

## J.     2Q16 Earnings Report

183.   On July 20, 2016, the Company issued a press release announcing its financial results for 2Q16, the period ended June 30, 2016.   The press release was initially disseminated to the market by *Business Wire*, and thereafter its contents were widely disseminated by other news organizations, financial analysts, investment websites, internet search engines and other media outlets, such that the information contained therein became available to, and was acted upon by, investors in Polaris' securities.   The press release reported net income of $71.2 million ($1.09/share), after "expenses totaling approximately $25 million for increased warranty, legal and other costs associated with the product recalls." The Company also lowered its FY16 earnings guidance by approximately 5% to a range of $6.00 to $6.30 per share, following a reported decline in ORV sales due to purported softness in the market.

184.   The 2Q15 earnings release stated, in relevant part:

Polaris Industries Inc. today reported second quarter net income of $71.2 million, or $1.09 per diluted share, for the quarter ended June 30, 2016

- 83 -

compared to $100.9 million, or $1.49 per diluted share reported in the second quarter of 2015. Sales for the second quarter of 2016 totaled $1,130.8 million, up one percent from last year's second quarter sales of $1,124.3 million.

"Our team's diligent and methodical execution drove a modest increase in second quarter sales despite a strong year-over-year sales comparison, a weaker retail sales environment, and product recalls. Our all-out assault on costs continued to make progress during the quarter, generating earnings that finished in-line with our updated guidance. As we move into the second half of the year, and we are redoubling our commitment to providing our consumers with the safest and most reliable vehicles in the industry while building a platform to return to profitable growth," commented Scott Wine, Polaris' Chairman and Chief Executive Officer.

"I am proud of how our employees and dealers have dedicated themselves to working through the current difficult environment, from the recall announcements to weaker industry trends. Dealer inventories are in-line with expectations. Our new Huntsville, Alabama plant began producing RANGERS at the beginning of June and Slingshots in early July, and our growing lean capabilities are driving factory inventory reductions and increased cash flow, while our customer excellence initiatives are enhancing our capabilities to deliver world-class sales and service to our consumers," continued Wine.

"Commensurate with our commitment to industry-leading innovation, we have a number of model year 2017 products that will be introduced next week at our annual dealer meeting, which include vehicles that will significantly strengthen our line-up in areas where the competition has been the most intense."

\*       \*       \*

ORV wholegood sales decreased six percent to $645.4 million reflecting ongoing softness in retail sales in North American oil markets and tough comparables from the second quarter of last year. Polaris North American ORV unit retail sales were down low double-digits percent compared to the 2015 second quarter, with consumer purchases of side-by-side vehicles down high-single digits percent and ATV retail sales down mid-teens percent compared to the prior year. The North American ORV industry was down mid-single digits percent compared to the second quarter last year. ORV dealer inventory was down eight percent in the 2016 second quarter compared to the same period last year.

\*       \*       \*

## 2016 Business Outlook

For the full year 2016, the Company is revising its earnings guidance range to $6.00 to $6.30 per diluted share with sales expected in the range of down 2 percent to flat compared to 2015. Sales expectations by segment for the full year 2016 are as follows: ORV/Snowmobile sales expected down mid-

- 84 -

single digits percent; Motorcycle sales up double-digits percent; and Global Adjacent Market sales up mid-teens percent.

185.    Also on July 20, 2016, Polaris held an earnings call to discuss its 2Q16 results of operations with investors and analysts.  Defendants Wine, Speetzen and Pucel each participated on the call, as did other PII officers.  None of the Individual Defendants, or anyone else on the call, corrected the false and misleading statements alleged herein. Analysts representing at least 14 Wall Street firms also attended and participated in the call. The call had been publicized by PII in advance, and a recording of the call was made available thereafter through a link on Polaris' "Investor Relations" website.  Written transcripts of the call were also published and disseminated by third parties, including Thomson Reuters StreetEvents.  The contents of the call were widely reported in analyst reports and on internet websites frequented by investors, as well as by other news organizations and media outlets, such that the information discussed on the call became available to, and was acted upon by, investors in Polaris' securities.

186.    In his prepared remarks at the outset of the call, Wine again told investors that the Company had a firm understanding of, and a plan to address, the defects leading to the recalls:

> The extensive and ongoing product recalls related to fire risks on our vehicles impact every Polaris stakeholder in some way, but our primary focus is on our customers, keeping them safe, completing their safety bulletins so they can ride, and rebuilding their trust and confidence in Polaris.  As we work aggressively to accomplish these goals, we have become much smarter about the thermal risks across our product lines, which drove additional recalls in the second quarter.

> We have discovered gaps in our design, development, and manufacturing processes, and are urgently addressing these gaps, while also working to improve our post-sale surveillance process to increase our speed of response when issues occur.  We have more work to do and we will move forward with urgency to continue to mitigate safety issues for our customers.

> Mike Speetzen will discuss the impact on our financial results, which include our best understanding of future thermal-related costs that are both probable and estimatable.

- 85 -

187.    Speetzen said that the guidance reduction reflected the increased warranty and recall-related expenses in the quarter, but blamed lowered sales results and projects primarily on a purportedly weak market:

This morning, I will provide a brief update on each of our segments and review our updated guidance for the remainder of 2016.  First, as Scott mentioned, during the quarter we booked additional costs related to warranty and other recall-related expenses totaling approximately $25 million.

We're working aggressively to offset these expenses with additional cost-down efforts, as well as benefits from favorable currencies.  However, given these costs, as well as a weaker industry environment, we are revising the lower end of our EPS range to $6 and lowering the upper end of the EPS range to $6.30 for the full year 2016.

\*          \*          \*

On the segment reporting basis, sales expectations are revised as follows. ORV and snowmobile sales are expected to be down mid-single-digits versus previous guidance of sales down low to mid-single-digits. Motorcycle sales are anticipated to be up double-digits percent versus previous guidance of sales up high teens and global adjacent market sales are expected to be up mid-teens percent.

Now let me provide more details around our segments starting with ORV and snowmobiles.  ORV and snowmobiles segment sales were down 6% in Q2, driven primarily by weak industry trends and the impact from product recalls during the quarter.

Sales were also negatively impacted by currency, as well as a higher promotional spend environment as we fought a tough competitive environment.  For the full year 2016, our ORV and snowmobiles segment sales are expected to be down mid-single-digits percent, which implies second-half sales will be down in the low single-digit range.

\*          \*          \*

Moving on to gross margins.  Gross margin were down 325 basis points, reflecting additional warranty, as well as continued pressure from foreign exchange.  I'd also point out that the warranty costs incurred in Q2 reflect ongoing quality and safety issues, including a higher assumed completion rate for the RAZR 900 and 1000 recalls and associated costs to attain that higher completion rate.

We are maintaining our full-year 2016 gross margin guidance to be down 70 to 120 basis points.  This assumes foreign exchange will be an approximate 80-basis point headwind for the full year.  On a constant currency basis, gross margins would be up 10 basis points to down 40 basis points.  Our full-year gross margin guidance not only includes the additional warranty

- 86 -

costs mentioned earlier, but also reflects stronger than originally anticipated savings from our cost-down VIP initiatives.

*        *        *

Finally, given the one-time events that have occurred this year, as well as a weaker industry than expected, I'd like to make a few comments around our expectations for Q3. Given weaker industry trends and continued foreign exchange headwinds, we're expecting sales growth for our ORV and snowmobile segments in the third quarter to be down low double-digits over the prior year.

188.     Defendants did not disclose on the 2Q16 call that Polaris was going to issue a stop-ride/stop-sell for the RZR Turbo within a week due to fire-related defects.

189.     At the outset of the question and answer portion of the call, CL King & Associates analyst Scott Stember asked for an update on the progress of the recall and related expenses. Wine responded that the revised guidance accounted for all of the foreseeable costs:

[ANALYST:] Could You Maybe Talk About The Recalls? You Did Indicate That You have gone through a process of identifying future items and I think there was a recall for – on the RANGER side. Maybe just quantify the size of what you are looking for and whether you think that the majority of the recall charges and issues are behind you right now?

[WINE:] If you listened to my accounting speak during my prepared remarks, I did say that we had all of our probable and estimable costs included in the guidance that we just issued, or the second-quarter results. I will tell you that the work that Ken and his team are doing to go through our products and ensure that there is not fire risk in our vehicles, it's a massive project. I don't think it's – as I said in my remarks, there is still more work to do, but we don't foresee things that are drastically different from what's been included in our results in our forward-looking guidance.

190.     In response to a question from Wells Fargo analyst Tim Conder, Wine acknowledged on the call that the CPSC had targeted an 80% response rate on the recall, which was significantly higher than the normal response rate, and said the Company was working aggressively to meet that target:

[ANALYST:] I wanted to circle back on the recall, just to hopefully to put that thing to rest. The RZR response rate and the Consumer Product Safety Commission said on that they wanted a much higher response rate than they

- 87 -

normally do and were targeting close to 80%.  What is that response rate that you guys have had on that?

[WINE:]  30% to date.  We typically get about 50% in these efforts and we're tracking ahead of that right now.  We're going to redouble our efforts with the dealer and Mike talked about the fact that we're going to target a higher rate.  We really are stressing to our customers that there is potential for fire issues here and we want them to get these fixed.

But there are some of our customers that would just rather ride and they haven't had any issues and they don't want.  So we're really trying to work through that and partner with the CPSC to improve our communications and go back out to our dealers and encourage all of the people that have these products to bring it in.  We'll continue to drive this aggressively going forward.

191.   During the call, two analysts (SunTrust Robinson Humphrey analyst Michael Swartz and Feltl & Co. Analyst Mark Smith) asked whether Polaris had lost market share due to the recalls, and each time Wine responded unequivocally that it had not:

[SWARTZ:] Then Scott, you made the comment earlier in the call that you saw some select pockets of share erosion on specific product lines.  How much of that is related to the warranty, the recall environment versus what you are seeing from competitors?  Maybe you can just flesh that out for us a little bit?

[WINE:] I would say that most of the share loss was not related to the recall. It was very, very inconvenient, but I don't know that, specifically around RAZR, that people bought competitive products during that period of time.  We got after it pretty quickly so we could have product in the dealerships.  The bigger issue was on value ATVs and the utility side of the business and I'm encouraged and comfortable with the plan that Matt has, as I've said a couple of times.

*      *      *

[SMITH:] Then a follow-up question here, and it might be a bit broad, but if you look at off-road vehicles some losing share here recently, how much of this do you really feel is due to near-term negative impact from recalls versus low prices from competitors? . . .

[WINE:] It's more related to our product line-up than anything else. We put ourselves at a product disadvantage, and as I said, it's more in the value ATV segment and the utility segment, that was difficult to defend.  It drove our promotion costs higher, as we tried to compete with not our best products.

- 88 -

192.    The foregoing statements were materially false and misleading because:
(i) there was no basis for the assertion that Polaris' reduced guidance included all "probable
and estimatable" recall-related expenses, as reflected in part by the amount and nature of the
costs that were required to address the problems, all of which were apparent and foreseeable
at the time of the 2Q15 statements; (ii) the reported recall-related expenses of $25 million
did not fairly or accurately reflect the actual or anticipated cost of addressing the fire-related
recall issues, as characterized on the call; (iii) the statements omitted to disclose that Polaris
was then finalizing a recall of the RZR Turbo with the CPSC or fairly and accurately
disclose the actual and potential costs associated with that recall; (iv) defendants continued
to overstate the extent of the Company's investigation into, understanding of, and ability to
address the problems arising from the RZR recalls; (v) the statements misrepresented the
causes of lost market share and lower sales and demand by attributing them to macro-
economic conditions or competitive product introductions, and falsely asserting that any
recall-related impacts were negligible and had been corrected; and (vi) misrepresenting and
understating the harm to Polaris' reputation that had been caused by the recall, leading to
reduced customer loyalty, and reduced demand for its products.

193.    Polaris' 2Q16 guidance was materially false and misleading because it failed to
factor in or apprise investors of the risk of reduced sales and earnings and higher costs that
were reasonably expected to result from the recall, repair or reduced demand caused by those
defects and the reputational harm they had already caused to Polaris' brand and reputation.
Instead of accounting for the significant harm to Polaris' reputation and the increased costs
that were anticipated from the just-announced recall, the guidance update provided in the
2Q16 earnings release, and defendants' explanation as to how it had been set, was materially
false and misleading because it continued to falsely suggested to investors that the
Company's forecast was not at increased risk.  This was not true, and there was no

- 89 -

reasonable basis to believe that it was, given the significant costs that had been incurred as a result of the April recall, the stop-ride/stop-sale announcement on Polaris' hottest product, the RZR XP Turbo, and the Company's continuing inability to find a solution to or repair the product defects, and the significant harm that had been caused to Polaris' brand and reputation.  In addition, as with the prior guidance issued during the Class Period, the 2Q16 guidance contributed to the false and misleading nature of the other contemporaneous statements alleged herein, because it further assured investors that the recalls did not present significant or unusual risks to the Company's business or financial condition, and that Polaris had identified and was addressing all of the recall-related risks.

194.    The falsity of the representations in the recall notice, the 2Q15 earnings release, and on the 2Q15 earnings call is further illustrated by media and analyst reports following those statements, which uniformly described the recall-related problems as old events that had little impact on the Company's sales or market share, had been fully investigated, were rapidly being corrected, and would soon be completed at a cost that was already fully accounted for.  For example:

(a)    "[T]he worst of the RZR recall impact is in the rear-view mirror" and "the company will be able to recapture share with a strong product rollout next week."  Northcoast Research Report, 7/21/16;

(b)    "PII believes the market share loss is not as much recall related as it is due to not having competitive product in the utility segment in SSV and in the value ATV segment, suggesting we'll see both of those issues addressed at next week's dealer show and model year launch." UBS Report, 7/20/16;

(c)    "It would appear that much of the incremental costs associated with the current recall were already built into the guidance given following 2Q." Wedbush Report, 8/7/16; and

(d)     "Estimates now factor in all costs necessary to address all vehicle repairs and warranty issues." *Star Tribune*, 9/1/16.[28]

195.    On July 22, 2016, Polaris filed its 2Q16 Report on Form 10-Q with the SEC. The report repeated (without change) Polaris' warranty reserve policy, including that reserves had been re-evaluated to take into account changes in manufacturing quality, product recalls and other factors. The report disclosed that the Company had a warranty reserve balance of $76.9 million as of the end of 2Q16.

196.    The warranty reserve disclosures were materially false and misleading because they failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris' products, including by failing to timely or accurately adjust the warranty accrual in light of the prior recalls, or the reasonably expected warranty expenses arising from claims, repairs and additional recalls of 2016 RZR XP Turbo products that had not and could not be repaired, as well expenses and potential recalls of other Polaris products affected by the same or similar design and manufacturing defects.

197.    The 2Q16 Report on Form 10-Q made the following risk factor disclosure:

ITEM 1A – RISK FACTORS

There have been no material changes or additions to our risk factors discussed in our fiscal 2015 Annual Report filed on Form 10-K. Please consider the factors discussed in "Part I, Item 1A. Risk Factors" in such report, which could materially affect the Company's business, financial condition, or future results.

198.    The assertion that there had been no material changes in or additions to Polaris' risk factors was misleading and ineffective because the risks of product recalls had materially increased and already manifested due to continued incidents of fires involving RZR and other products, the increasing number of defective products that had been sold, the recalls of the RZR XP Turbo, RZR 1000, RZR 900 and other products, the inability of Polaris to

---

[28]   Dee DePass, *Polaris issues another ATV recall because of fire hazards*, Star Tribune (Sept. 1, 2016), https://tinyurl.com/j287d7n.

effectively repair the products that had already been recalled and the unavailability of parts to do so, the risk of recalls on other similarly-designed-and-manufactured products, the reputational harm that had already reduced demand for Polaris' products, and the reduced sales and increased warranty, product liability and promotional expenses that had resulted from these conditions.   The warning in Polaris' FY15 report on Form 10-K that was incorporated into the 2Q16 quarterly report continued to be misleading and ineffective for the reasons previously alleged, including that it portrayed the recall risk as uncertain and contingent when in fact Polaris had already suffered recall-related financial and reputational harm that had negatively impacted its business beyond what had been disclosed to investors, omitted to disclose the defects or describe the fire-related incidents and reputational harm that had already occurred, and falsely assured investors that Polaris had adequate quality control procedures in place.

199.   Based on the facts and circumstances alleged herein it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks, including because:

(a)   The fact that Polaris' recall-related risk warning had not changed in over four years, along with the fact that Polaris had reported in every quarter during the Class Period that there had been "no material change" in recall-related risks even as the number and nature of recalls was increasing, supports the inference that defendants ignored their obligations under  the securities laws and recklessly disregarded that the use of the same risk warning would be, and was, materially misleading to investors;

(b)   The RZR and RANGER ORVs with persistent design and manufacturing defects causing fires and eventual recalls accounted for approximately two-thirds of Polaris' 2Q16 revenue, and were highly important to the Company's success;

(c)   As Wine later admitted in October 2015, RZR recalls "have now passed the 50% penetration rate for both the 900/1000 recall and the

- 92 -

more recent Turbo recall," defendants were aware in July that there would still be significant additional warranty-related costs in connection with the RZR recalls;

(d)     Polaris' sales team was expressing concerns over the lack of products to sell and their ability to meet sales targets, and in fact had to cut sales forecasts well before July, and July sales had fallen precipitously, as defendants admitted on the 3Q16 earnings call;

(e)     Defendants knew that its slightly reduced guidance did not include all "probable" costs, as the Company admitted only a few weeks later that estimable costs for the year were approximately $120 million – with Speetzen also later admitting on October 12, 2015, that virtually all of this amount was for warranty and legal costs;

(f)     By virtue of social media posts, lawsuits, warranty claims, communications with the CPMC and the recalls of other products with similar defects, as well as its in-depth investigations into fire-related incidents, and the number and nature of those incidents, defendants knew or recklessly disregarded that the defects were more widespread and more difficult to fix than represented at the conference;

(g)     Polaris' employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that.  In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred.  Because the RZR Turbo stop-ride/stop-sale took place just 5 days after the statements alleged above and the RZR Turbo recall was formally announced only a month after that, it may be inferred that Wine and other executives were aware of the need for recall and the events giving rise to the recall at the time of those statements;

(h)     Defendants knew the stop-ride/stop-sale was imminent when they issued the July 20 press release and earnings, but specifically did not mention it, instead issuing it five days later—the same day as the July 25, 2015 dealer show, where they knew the introduction of Polaris' new product line would easily overshadow the negative news of the stop-ride/stop-sale;

- 93 -

(i)     Polaris continued to monitor and respond to numerous complaints of RZR vehicles catching fire by consumers on social media sites including Facebook;

(j)     Warranty costs were steadily increasing and bound to increase even higher based on both the upcoming known stop-ride/stop-sale and known recall of its flagship RZR Turbo vehicles;

(k)     Given the ongoing and recurring defects leading to fires and recalls, and therefore increased warranty, legal and promotional costs, defendants had no reasonable basis for their 2016 guidance or the same risk warnings they had been issuing for years when these myriad problems did not exist;

(l)     Defendants were aware of the number and nature of claims leading to increased warranty costs, and the relationship of actual and anticipated claims to the recently announced recall of approximately 160,000 RZR 900 and 1000 vehicles and the upcoming recall of more than 43,000 RANGERs in June 2016; and

(m)     Given the ongoing and recurring defects leading to fires and recalls, and therefore increased warranty, legal and promotional costs, defendants had no reasonable basis for their 2016 guidance.

## K.     2016 Analyst Day and Dealer Show

200.    Immediately after its 2Q16 earnings report was issued, defendants Wine, Speetzen and Pucel, along with OR President Homan and other members of Polaris' management, went to Nashville, Tennessee for the Company's annual 2016 Analyst & Investor Meeting and dealer show, at which its new ORV products were rolled out. Numerous analysts and journalists attended and reported on the dealer show and investor meeting.   In addition, a transcript of the analyst day presentations was published by Bloomberg.  As a result of the significant attention, the information discussed at the dealer show and analyst meetings became widely disseminated and by these mechanisms became available to, and was acted upon by, investors in Polaris' securities.

201.    At the outset of the dealer show on July 25, 2016, Wine announced that Polaris had issued a "stop-ride/stop-sale advisory" on the 2016 RZR Turbo, pending a formal recall, due to a potential fire hazard.

202.    The Company issued a press release to that effect the same day, which stated:

> Polaris Industries  is issuing a stop-ride/stop-sale advisory, pending a formal recall, for MY2016 RZR Turbo off-road vehicles, due to a potential fire hazard.

> Polaris is currently evaluating a comprehensive repair solution.  Once validated, repair instructions will be issued to Polaris dealers and vehicle owners will be notified that they can contact their dealer about scheduling a free repair. Until then, owners should not ride, and dealers should not sell, MY2016 RZR Turbo models.

> All owners of affected vehicles are being contacted directly. In addition, updates will be posted on the RZR Recall page: http://www.polaris.com/en-us/company/rzr-recall.

> Owners can also contact Polaris at 800-765-2747 or online at www.polaris.com.

203.    As reflected in contemporaneous analyst reports describing the meeting, Wine and other Polaris executives then sought to temper the announcement by assuring participants that the problems were limited and could be quickly addressed, the financial impact of the new recall had been incorporated into the newly reduced guidance announced in the 2Q16 earnings release, and touting the quality, safety and competitive aspects of the new ORV products then being rolled out.  *See, e.g.,*:

(a)    "PII notes that sales through the quarter improved, despite the recall impact, suggesting to them that April declines were more weather driven."  UBS Report, 7/25/16;

(b)    "It would appear that much of the incremental costs associated with the current recall were already built into the guidance given last week."  Wedbush Report, 7/26/16;

(c)    "[W]e think that any impact will be minimal and there should not be a guidance revision during the company's analyst meeting this morning (this amounts to <15k units)."  Northcoast Research Report, 7/26/16; and

- 95 -

(d)   "[W]e believe a certain impact has already been factored into its current sales guidance."  KeyBanc Capital Markets Report, 7/26/16.

204.   Polaris' executives continued their damage control at the Company's Analyst & Investor Meeting the next day (July 26, 2016), where they continued to assure investors that they had addressed the issues leading to the RZR recalls, and had a firm understanding of the cause of the defects, how to fix them, the time and expense of doing so, and how the recalls had affected product demand, consumer confidence and brand loyalty.   In his prepared remarks at the analyst day presentations, ORV President Homan assured investors that the recall issues were well under control:

> I know this has been covered in earnings calls, et cetera, but really what I wanted to communicate, I think this is kind of a good news, bad news slide. The bad news is, is that most of what's happened has been in our control.  But it's also the good news, right?  So if you look at recalls, right, we're going to those behind us.  If you look at inventory reductions as we took more inventory out of the channel in the first half of the year, which we needed to do, we can talk more about that, we needed to go do that, right?  And then market share, we'll improve that in the second half of the year.
>
> So the biggest two issues we have were the recall, the inventory reductions.  As we work through those and move those behind us, we've got opportunities to improve our performance.  So I look at this as an opportunity for us to do better here moving forward because it's in our control.

205.   In response to questions at the meeting, Homan told investors that the Company was closely monitoring its promotional spending in the wake of the recalls, the recall-related expenses were already included in the Company's guidance and the Company had investigated and understood the root causes of the quality issues:

> Yeah.  So question is we're being aggressive on promotions, makes sense to do that.  How do we know that we're not going to start some price war or something like that out there.  Okay.  We keep a very, very close eye on that.  Our goal in our promotion spending isn't to go out there and way outspend the competition and do ludicrous promotions.  That's not what we're doing.  What we do is we look at literally by product line, by segment, by region, by market in some cases, and we tailor our promotions to be competitive.  So we'll look at the pricing, we'll look at the market share trends, we'll look at where the competitive promotions are weekly, we look at this, and we look and adjust to make sure we're competitive.  And so that's what we're doing right now.  So I would tell you, I don't think we're in any

- 96 -

danger of starting any sort of price war or anything like that, but I will also tell you that what we're doing is we're going to defend our space and we're going to be aggressive and that's what we're doing here in the second half.

*      *      *

Well, first of all, everything we plan here and everything I've shown you of the second half is in the guidance we've given. So I would tell you that you've kind of got the numbers, okay. And I'll also say, well, of course, we look at that. That's one of the reasons the VIP stuff Ken is working on is so important and that's also why when I talk about spending it smartly that – if we did a national program exactly the same way everywhere, it would be very expensive and it would be challenging. We don't need to do that. The Southwest, for example, where RZRs are the market, doesn't need the same ATV support as the Midwest. And so, we tailor it and manage it through that way. So I'd tell you again. It's in the guidance and we're being very prudent in what we do.

*      *      *

So the question is on root cause of the quality issues, what are the root causes of the quality issues and are we confident that we've got those addressed. The short answer is yes. I'm confident we've got this addressed and we're moving forward in the right direction.

When you look at the root cause, again, one thing I want to talk about is quality. When you talk about quality, and we've got a RZR recall, which is significant. I do not want to understate that. But when you look at the overall quality of our vehicles and you compare to the competition, we're in a really good place, okay. That's kind of where we're coming from. That's the starting point, right. So we've got the RZR issue that we've been working through. And I would tell you, it's a combination of things. It's not one root cause. And so, when you look at what we're doing to address that, Ken will talk about that, but it starts in design and goes into validation improvements, as we go to market improvements and being closer to the customer, how they're using a product, and then post sale surveillance. Those are the four areas we've got opportunities to improve in all of them.

206.   Following Homan's presentation, Speetzen reiterated in response to analyst questions that the financial impact of the recalls had been identified and addressed:

Yeah. I mean, we – we obviously didn't know exactly where things were going to fly with the announcement last night, but we had a pretty good indication when we came into announcing the second quarter earnings. And we booked about $12 million in the first quarter. We booked another $15 million in the second quarter. The second quarter was a combination of things. It was recalls underway, as well, as we indicated in the call, we increased the reserve for the 900 and 1000 recall that we had announced in Q1, primarily to assume we're going to get to a higher penetration rate as well as

- 97 -

the incentives that we think we're going to have to do to make sure customers are bringing those vehicles in. So based on what we had knowledge over the time, we think we're adequately reserved for that.

207.    In his prepared remarks, Pucel assured investors that the Company was focused on safety, and had identified and was implementing the measures needed to correct the recall problems and prevent their recurrence:

> First and foremost, this is about quality and safety. This is our highest priority right now because this is what we have to get right. People ask what happened and what are you trying to fix. I'd boil it down into three focus areas, and Matt was talking about these, too. First and foremost, I'll start with post-sale surveillance. This is about knowing what signals you're getting from the field. It's about looking at your warranty data, your safety claims data, and even social media and saying how are these products performing and then taking that information and say, what can we learn from a new product development standpoint and what we need to go improve on, or if we've got to do any safety field action, let's do them early so there's less scope. And we had work to do. We've really doubled down on making this a more robust process.

> The next three: supplier controls, design controls, and manufacturing controls is about designing and making the product. So if you look at our design controls, there are areas we need to be better on. Risk management. We need to be better at things like FMEAs, Failure Modes and Effect Analysis. That's a fancy way of saying how can you anticipate a defect you've never even had before. Our on-road business does that pretty well. We're moving those methodologies into off-road. That's just an example of something that we're working on, on the design control side. We've got supplier controls and we've got manufacturing controls also that we're working on. So these are all about designing and making the product physically.

> The last two quality systems that we're focused on is about management reporting within company. So we've got clear visibility to our quality performance. And then last but not least, the preventive and corrective action system, which is, if you have a problem, you fix it permanently in your quality system so that organization doesn't do that again. And so, these six things are what we're working on and in some industries, this would be a 23 long list. In our industry our quality system can survive on just six very, very fundamental quality systems and that's what we're putting in place.

208.    The foregoing statements were materially false and misleading because: (i) the impact of the RZR Turbo stop-ride/stop-sale advisory was far more significant than represented on the call, and the Company's understanding of and ability to address the

- 98 -

problems from that and the prior recalls was far worse than represented; (ii) the anticipated cost of the recalls had not been reflected in the Company's guidance; (iii) the Company had neither fully investigated the defects nor identified their root cause, as represented to investors; (iv) Polaris did not have a fix for the defects, or any reasonable basis to believe that their anticipated solution would work, or could resolve the matters quickly and with a minimum of cost, as represented to investors; (v) defendants omitted to disclose the recall-related sales declines in April and July, or the impact of the recalls on consumer demand or dealer inventories; (vi) the Company's commitment to safety and quality was not as strong as represented at the conference, nor was its safety spent in excess of what was required to assure the safety of its products; and (vii) defendants omitted to disclose the systematic problems in Polaris manufacturing practices or the heightened risks to product safety and product quality that resulted from those practices.

209.   Based on Polaris' and the Individual Defendants' misrepresentations regarding the core of the Company's business and the facts and circumstances alleged herein, it may be strongly inferred that each of the defendants knew or recklessly disregarded that the misleading statements alleged herein would be misleading to investors in the absence of disclosures about the defects and their associated risks including, because:

(a)   As Polaris later announced in August 2016, it had assembled a quality assurance team to investigate the cause of the fires affecting the safety of its vehicles and Wine admitted in October 2016 that Polaris had "upgraded our thermal engineering team" giving it a "better grasp of how we design our vehicles," defendants were aware in July that it did not have "an entire organization working to eliminate risk from our vehicles" as they told investors;

(b)   Defendants did not know or have under control the root causes of the issues affecting the safety of its vehicles in July, as Wine admitted in October 2016 that earlier the Company "didn't have the processes and tools to get the information from the field as quickly as we could and manage the information flow and, ultimately, it took us a while to recognize the trend and, ultimately these are very complex issues";

- 99 -

(c)    Polaris' employees generally knew of the recalls one to two weeks before they were publicly announced and it may be strongly inferred that the Individual Defendants and other senior management involved in investigating fire-related incidents or reporting those incidents to the CPSC would have known of the recalls, and the defects and incidents leading to them, much sooner than that. In addition, under CPSC regulations, it may be inferred that Wine and other senior executives knew of the need for recall no later than 5 days after a reportable event had occurred. Because the Ranger recall took place just 8 weeks after the statements alleged above, it may be inferred that Wine and other executives were aware of the need for recall and the events giving rise to the recall at the time of those statements;

(d)    Polaris' "speed-to-market" strategy led the Company to ship products quickly and without proper vetting of safety, supporting the inference that defendants recklessly disregarding the issues affecting the safety of its vehicles; and

(e)    By virtue of social media posts, lawsuits, warranty claims, communications with the CPMC and the recalls of other products with similar defects, as well as its in-depth investigations into fire-related incidents, and the number and nature of those incidents, defendants knew or recklessly disregarded that the defects were more widespread and more difficult to fix than represented at the conference.

## VI. ADDITIONAL ALLEGATIONS OF RELIANCE, MATERIALITY, LOSS CAUSATION & DAMAGES

### A. Presumption of Reliance (Fraud on the Market Allegations)

210.    Through the efficient operation of the markets in which Polaris securities were publicly traded, plaintiffs and the other members of the proposed Class may be presumed to have relied upon each of the false and misleading statements alleged herein.

211.    At all relevant times, the market for Polaris' securities was an efficient market. The existence of an efficient market for Polaris' stock can be proven by the following facts and circumstances, among others:

(a)    Polaris' stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

- 100 -

(b)     As a regulated issuer, Polaris filed periodic public reports with the SEC and the NYSE and was, at all times alleged herein, eligible to file a Form S-3 with the SEC;

(c)     Polaris regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, press reports and social media, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press and other similar reporting services;

(d)     During the Class Period, Polaris was followed by securities analysts employed by major brokerage firms including Wedbush, SunTrust Robinson Humphrey, Wells Fargo Securities, Morningstar, Northcoast and others.  Analysts employed by each of these firms regularly wrote reports based upon the publicly available information disseminated by defendants about Polaris.  These reports were distributed to the sales force and certain customers of their respective brokerage firms;

(e)     Institutional investors (including, but not limited to, Vanguard Group, Inc., The Manufacturers Life Insurance Company, State Street Corp, Wells Fargo & Co., FMR LLC, BlackRock, SoutherSun Asset Management LLC, Capital Research Global Investors, and Janus Capital Management LLC) collectively owned more than 84% of Polaris's outstanding shares.  Each of these institutions regularly analyzed and reported on the publicly available information about Polaris and its operations;

(f)     During the Class Period, the average daily trading volume of Polaris common stock traded on the NYSE was greater than 1.1 million shares; and

(g)     A cause and effect relationship exists between the publication of material information about the Company, such as quarterly earnings reports, and the price of Polaris stock traded on the NYSE.

212.   Through the operation of the efficient market for Polaris' securities, the information publicly disseminated by defendants about the Company and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace such that, as a result of their transactions in Polaris stock, the information

disseminated by defendants, including the false and misleading statements alleged herein, became incorporated into and were reflected by the market price of Polaris' securities.

213.   Because Polaris' securities traded in an efficient market, all Class members may be presumed to have relied upon the false and misleading statements and material omissions alleged herein in connection with their Class Period purchases of Polaris' securities.

### B.   Theory of Loss Causation and Damages

214.   Each member of the proposed Class suffered economic losses as a direct and proximate result of the fraud alleged herein.  Each Class member suffered similar injury as a result of: (i) their purchase of Polaris' securities at prices that were higher than they would have been had defendants made truthful and complete disclosures of information about the Company as necessary to prevent the statements, omissions and course of business alleged herein from being materially false or misleading to investors; and (ii) their retention of those shares through the date of one or more declines in the market price of those shares that was caused by the revelation of business conditions and risks concealed from investors by defendants' scheme to defraud, or the financial consequences of their concealed actions.

215.   The facts, transactions and occurrences concealed from investors by defendants' scheme to defraud reached the market through a series of partial disclosures which revealed the risks and conditions concealed by defendants' fraud scheme or their financial consequences, leading to price declines that caused damages to Class members who purchased their securities prior to the event.  Although these events individually and collectively concealed and mischaracterized the causes of Polaris' weakening performance and the risks the Company faced due to the fire dangers and ongoing recalls, the events still partially eliminated fraud-caused inflation in its stock price because they revealed, in part, the financial impact of the conditions that were omitted and concealed from investors.

- 102 -

Defendants' contemporaneous (and subsequent) false assurances that the impact of the recalls was limited or the problems had been corrected partially maintained (or increased) the artificial inflation in PII's stock price.

216.    The disclosures which partially corrected the market price to eliminate some of the fraud-induced inflation include those identified in the chart below, which identifies each corrective event, the price decline resulting from the event, and, for purposes of comparison, the percentage change in the SP Midcap 400 Index (as reflected by the price of the Vanguard tracking fund traded under the ticker symbol "IVOG") during the same time period.

| Date[29] | Event[30] | PII | | IVOG |
|---|---|---|---|---|
| | | $ | % | % |
| 10/21/15 | Deteriorating Margins, High Inventory | ($12.27) | (10.22%) | (1.1%) |
| 12/17/15 | Reduced FY15 ORV Sales | ($10.28) | (10.8%) | (2.1%) |
| 1/26/16 | Weak FY16 Guidance | ($7.35) | (9.2%) | 1.8% |
| 7/26/16 | RZR Turbo stop ride announcement | ($1.89) | (1.9%) | 0.4% |
| 9/12/16 | Lowering Guidance on Recall Expense | ($4.05) | (5.0%) | 1.1% |

217.    On October 21, 2015, Polaris reported its 3Q15 financial results reflecting slowing growth in ORV sales, deteriorating gross margins, and higher-than-expected dealer inventory levels.   Although the Company claimed its results had been impacted by weakening macro-economic conditions, sluggish oil and agricultural markets, capacity constraints and increasing competition, in fact the slowing growth, high dealer inventory and declining gross margins were due in substantial part to the difficulties and expenses resulting

---

[29]   The date indicated is the date of the stock price movements reflected by the data in the chart.  In some instances, the described event may have occurred after the close of trading on the prior trading day, which in most cases would be one day earlier than the date indicated but could be longer if there are intervening weekends or holidays when the NYSE was closed.

[30]   The list of corrective events identified herein is necessarily preliminary, and based upon plaintiffs' analysis and investigation to date.  Upon further investigation and discovery and additional analysis, including expert analyses, plaintiffs may change, alter or amend their theory of damages, including by identifying additional corrective events that caused or contributed to the damages claimed in this action.

from PII's prior recall announcements, including the CPSC's announcement two weeks earlier (on October 15, 2015) that all 2015 RZR 900s and 1000s would be recalled due to fire hazards, as well as the July 23, 2015 recall of the 2015 Youth RZR, and the reputational harm to Polaris' brand, as previously alleged.   The October 21st announcement caused Polaris stock price to decline by more than 10% as reflected in the chart above, thereby eliminating some of the artificial inflation in Polaris' shares.   Nevertheless, substantial inflation remained due to defendants' omission to disclose the product recalls contribution to the disappointing results, or to disclose the risks of continued slowing demand or weakening performance resulting from the fire risks affecting additional products and model years. Inflation was also maintained by defendants' affirmation that FY15 sales growth would increase 10%-11% over the prior year, and their increase in Polaris' FY15 earnings guidance to a range of $7.37-$7.42, an increase of $0.03/share at the midpoint.

218.   On December 17, 2015, just weeks before the end of the fiscal year, Polaris unexpectedly slashed its FY15 full-year sales and earnings guidance by more than half, lowering its sales growth projections to a range of 4%-5% and cutting its earnings growth projection to 1%-2% versus its prior guidance of 11%-12%.   The Company blamed the reduction on weaker than expected North American ORV sales, and also warned that it had reduced shipments of high margin side-by-side ORVs to reduce dealer inventory levels.   The December 17 announcement omitted and concealed from investors the extent to which the previously-announced and anticipated product recalls and associated increases in warranty and legal expenses, promotional spending, and other costs and reputational harm had contributed to the reduced 4Q15 sales and high dealer inventory levels.   The December 17 announcement of the financial impact of these conditions caused Polaris' stock price to decline by more than 10% as reflected in the chart above, thereby eliminating some of the fraud-caused inflation in Polaris' stock price by revealing some of the financial impact of the

- 104 -

concealed conditions, while the omissions to disclose the full extent of the recall-related contributions and risks maintained artificial inflation in Polaris' stock price.

219.    On January 26, 2016, Polaris announced its FY16 guidance earnings of $6.20 to $6.80 per share on expected sales that would fall within the range of 2% below to 3% above FY15 sales.  The Company also reported FY15 earnings of $6.75/share on sales growth of 5% over FY14, which was in line with the reduced expectations announced on December 17, 2015.  The FY16 guidance was below even the poor performance in FY15 – sales growth was projected to be just 0.5% at the midpoint (4.5% less than in FY15) and EPS that were $0.25 less at the midpoint ($6.50) than the full year FY15 results ($6.75). Although Polaris attributed the guidance to market conditions and competition, the projected sales reduction also reflected lost sales, lower demand and higher expenses related to the recalls.  The weak guidance caused an immediate decline in Polaris' stock price of more than 10% net of the market, as reflected in the chart above, and partially reducing the fraud-caused inflation in the Company's stock price. *See, e.g.*, J.P. Morgan Report, 1/26/16 ("The focus for investors will be PII's 2016 guidance, which is likely below what we would characterize as already low expectations for 2016.  EPS of $6.20-6.80 are 2% to 11% below the Street's $6.95 estimate (which was reset following PII's earnings warning on 12/17/15).").  Again, the failure to disclose or fully account for recall-related risks maintained the artificial inflation in Polaris' stock price.

220.    On July 25, 2016, Polaris issued a stop-ride/stop-sale advisory for its 2016 RZR Turbo ORVs.  Polaris timed the announcement to coincide with its 2016 new product introductions and annual dealer show and analyst meeting in Nashville, Tennessee. Although that event had historically led to increases in Polaris' stock price resulting from expectations of new product sales and market share capture, Polaris' stock price declined by

nearly 2% following the stop ride/stop sale announcement, as reflected in the chart above.[31] But for the timing of the announcement to coincide with the annual dealer show, the overall stock price decline would have been significantly greater, as the new product introductions were viewed with favor by market observers and industry analysts.  The positive impact of the new product announcements, together with defendants' continued false assurances regarding the Company's limited exposure from recall-related risks, counteracted the negative news and buoying Polaris' stock price.[32]

221.    On September 12, 2016, Polaris cut its FY16 full year guidance nearly in half, telling investors to expect earnings of $3.30-$3.70 per share, which was $2.50-$2.70 per share below the guidance range provided by the Company when its 2Q16 earnings were announced on July 20, 2016.  The Company also announced that FY16 sales would be "down in the mid to high-single digit percent range" versus FY15, well below its prior guidance of sales that were flat to down 2% over FY15.  The Company admitted in its press release that the lowered expectations resulted from circumstances and conditions related to the ongoing recalls and fire-related problems with its ORVs, including delayed shipments of vehicles awaiting recall-related repairs or redesigns, higher promotional spending required to

---

[31]    *See, e.g.*, Stephens Inc. Report, 7/27/16 ("Quality and safety has always been something Polaris paid a lot of lip service to in the past, though it's clear these recent recalls have brought a high-degree of real attention to the quality of the product and we hope this issue will be put to bed in the next few weeks.").

[32]    *See, e.g.*, Northcoast Research Report, 7/26/16 ("[W]e view last night's dealer meeting in Nashville, TN as a modest success.  Specifically, PII [] introduced some new models that will tactically fight back against its peers in segments of the market that are under the most pressure . . . .  Indeed, were it not for the news of yet another recall tied to thermal events, the event would have been very successful."); *see also* UBS Report, 7/25/16 ("PII believes its market share loss is not as much recall related as it is due to not having competitive product in the utility segment in SSV and in the value ATV segment, suggesting we could see both of those issues addressed at this week's dealer show and model year launch."); KeyBanc Capital Markets Report, 7/26/16 ("After speaking with the Company, we believe a certain impact [from the recall] has already been factored into its sales guidance . . . any incremental charge [in guidance] would not likely be material given the relatively small scale of the recall.").

rebuild customer confidence and brand credibility, and increased warranty and legal expenses due to the recalls.[33]  On this news, Polaris' stock price declined by 5%, eliminating additional fraud-caused inflation in the share price, as reflected in the chart above

## VII.   CLASS ACTION ALLEGATIONS

222.   Plaintiffs bring this action as a Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Polaris common stock during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

223.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a Class action will provide substantial benefits to the parties and the Court.  During the Class Period, Polaris had over 67 million shares of stock outstanding, owned by tens or hundreds of thousands of persons.

224.   The market for Polaris securities is efficient.  Public information regarding the Company is rapidly incorporated into and reflected by the market price for the Company's securities.  Investors who purchased Polaris common stock at the prices prevailing in the market during the Class Period therefore presumptively did so in reliance upon each of the false and misleading statements and material omissions alleged herein.

225.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

---

[33]   *See, e.g.*, BMO Capital Markets Report, 9/13/16 (lowering EPS estimates and price targets; "[t]he reduction in guidance is the result of complications and delays in executing several recalls in its RZR off-road vehicle business . . . [t]he RZR Turbo is on fire (but not in a good way)").

(a)   Whether the 1934 Act was violated by defendants;

(b)   Whether defendants omitted and/or misrepresented material facts;

(c)   Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)   Whether and to what extent the price of Polaris securities was affected by the alleged misrepresentations; and

(f)   The extent of damage sustained by Class members and the appropriate measure of damages.

226.   Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

227.   Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

228.   A Class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.  CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**(Violation of §10(b) of the 1934 Act & Rule 10b-5)**
**(Against All Defendants)**

229.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

230.   By engaging in the acts, practices and omissions previously alleged, each of the defendants violated §10(b) of the 1934 Act and Rule 10b-5 by:

- 108 -

(a)     Employing devices, schemes and artifices to defraud;

(b)     Making untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaging in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Polaris common stock during the Class Period.

231.    During the Class Period, defendants made, disseminated and/or approved each of the statements specified in §V, *supra*.

232.    Each of the statements specified in §V, *supra*, were materially false or misleading at the time they were made, in that they contained misrepresentations of fact or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

233.    The statutory safe harbor conditionally provided by 15 U.S.C. §78u-5 for certain forward-looking statements does not apply to any of the statements alleged herein to be materially false or misleading because:

(a)     The statements were not forward-looking, or identified as such when made;

(b)     The statements were not accompanied by meaningful cautionary language that sufficiently identified the specific, important factors that could cause actual results to differ materially from those in the statement;

(c)     The statements were included in a financial statement prepared in accordance with generally accepted accounting principles; or

(d)     The statements were made by defendants with actual knowledge that the statements were false or misleading.

- 109 -

234.    Defendants made, disseminated or approved the statements specified in §V, *supra*, while knowing or recklessly disregarding that the statements were false or misleading, or omitted to disclose facts necessary to prevent the statements from misleading investors in light of the circumstances under which they were made.

235.    Plaintiffs purchased shares of Polaris common stock in reliance upon the truth and accuracy of the statements specified in §V, *supra*, and the other information that was publicly reported by defendants about Polaris and its operations, and without knowledge of the facts, transactions, circumstances and conditions fraudulently misrepresented to or concealed from the market during the Class Period, as specified above.

236.    Plaintiffs and the Class have suffered damages in that they:

(a)     Paid artificially inflated prices for publicly-issued shares of Polaris common stock;

(b)     Purchased their Polaris common stock on an open, developed and efficient public market; and

(c)     Incurred economic losses when the price of those securities declined as the direct and proximate result of the public dissemination of information that was inconsistent with defendants' prior public statements or otherwise alerted the market to the facts, transactions, circumstances and conditions concealed by defendants' misrepresentations and omissions, or the economic consequences thereof.

237.    Plaintiffs and the Class would not have purchased Polaris common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions specified above.

## SECOND CLAIM FOR RELIEF
### (Violation of §20(a) of the 1934 Act & Rule 10b-5)
### (Against All Defendants)

238.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

239.   Defendants and/or persons under their control violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to plaintiffs and the other members of the Class.

240.   By virtue of their positions as controlling persons, defendants are each liable pursuant to §20(a) of the 1934 Act for the acts and omissions of their co-defendants in violation of the Exchange Act.

241.   Each of the defendants acted as a controlling person of some or all of their co-defendants, as set forth in the chart below, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws:

| Defendant | Controlled Defendants | By virtue of |
|---|---|---|
| Wine | Polaris, Speetzen, Pucel, Homan, Morgan and Longren | his position of power and control and his responsibilities as Polaris' CEO and Chairman; his power to hire and fire and his supervisory authority over the Individual Defendants and other senior managers; his day-to-day involvement in and control over Polaris' operations; and his ability to control the contents of press releases, SEC filings and other public statements during the Class Period. |
| Speetzen | Polaris | his position of power and control and his responsibilities as Polaris' CFO; his power to hire and fire and his supervisory authority over Polaris senior managers; his day-to-day involvement in and control over Polaris' financial operations; and his ability to control the contents of press releases, SEC filings and other public statements during the Class Period. |
| Pucel | Polaris | his position of power and control and his |

- 111 -

| Defendant | Controlled Defendants | By virtue of |
|---|---|---|
| | | responsibilities as Polaris' EVP of Operations, Engineering, and Lean; his power to hire and fire and his supervisory authority over Polaris senior managers; his day-to-day involvement in and control over Polaris' financial operations; and his ability to control the contents of press releases, SEC filings and other public statements during the Class Period. |
| Homan | Polaris | his position of power and control and his responsibilities as Polaris' President of ORV; his power to hire and fire and his supervisory authority over Polaris senior managers; his day-to-day involvement in and control over Polaris' financial operations; and his ability to control the contents of press releases, SEC filings and other public statements during the Class Period. |
| Morgan | Polaris | his position of power and control and his responsibilities as Polaris' President and COO; his power to hire and fire and his supervisory authority over Polaris senior managers; his day-to-day involvement in and control over Polaris' financial operations; and his ability to control the contents of press releases, SEC filings and other public statements during the Class Period. |
| Longren | Polaris | his position of power and control and his responsibilities as Polaris' Senior VP of Enterprise Cost, President of ORV and ORV Engineering, and EVP of ORV and ORV Engineering; his power to hire and fire and his supervisory authority over Polaris senior managers; his day-to-day involvement in and control over Polaris' financial operations; and his ability to control the contents of press releases, SEC filings and other public statements during the Class Period. |
| Polaris | Wine, Speetzen, Pucel, Homan, Morgan and Longren | its power to hire, fire, supervise and otherwise control the actions of its employees, including the Individual Defendants, and the salaries, bonuses, incentive compensation and other employment consideration and arrangements provided to the Individual Defendants. |

- 112 -

242.    Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above.  By virtue of their high-level positions and contractual rights with Polaris, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

243.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Polaris' quarterly reports, press releases, quarterly conference calls and other presentations to securities analysts, money and portfolio managers and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing in an amount to be proven at trial, including interest;

- 113 -

C.      Awarding plaintiffs and the Class reasonable costs and expenses incurred in
this action, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just
and proper.

## IX.    JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

DATED:  March 14, 2017            ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                 DENNIS J. HERMAN
                                 AMANDA M. FRAME
                                 JOHN H. GEORGE


                                 _____s/ Dennis J. Herman_____
                                      DENNIS J. HERMAN

                                 Post Montgomery Center
                                 One Montgomery Street, Suite 1800
                                 San Francisco, CA  94104
                                 Telephone:  415/288-4545
                                 415/288-4534 (fax)

                                 ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                 MARIO ALBA JR.
                                 58 South Service Road, Suite 200
                                 Melville, NY  11747
                                 Telephone:  631/367-7100
                                 631/367-1173 (fax)

                                 Lead Counsel for Plaintiff

                                 HELLMUTH & JOHNSON, PLLC
                                 ANNE T. REGAN (MN 333852)
                                 8050 West 78th Street
                                 Minneapolis, MN 55439
                                 Telephone: 952/941-4005
                                 952/941-2332 (fax)

                                 Local Counsel

- 114 -

1243585_1