UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re Polaris Industries, Inc.  Civ. No. 16-3108 (PAM/SER)
Securities Litigation,

**ORDER**

_____

This matter is before the Court on Defendant Polaris Industries, Inc.'s Motion to Dismiss. For the following reasons, the Motion is granted.

**BACKGROUND**

Plaintiffs in this putative class action are several individual investors and one institutional investor, Lead Plaintiff City of Atlanta Police Officers' Pension Fund. (Am. Compl. (Docket No. 64) ¶¶ 11-12.) Plaintiffs seek to represent a class of investors who invested in the common stock of Defendant Polaris Industries, Inc. between February 20, 2015, and September 11, 2016. (Id. ¶ 1.) Plaintiffs claim that Polaris made false and misleading public statements about defects in its off-road vehicles ("ORV"). Polaris recalled hundreds of thousands of ORVs during the class period after well-publicized incidents in which Polaris ORVs caught fire, resulting in more than one fatality. According to Plaintiffs, when Polaris finally revealed the truth about the extent and effect of the defects, Polaris was forced to adjust its stock guidance—which tells investors how much the stock might earn in a given time period—to cut the company's earnings prediction by nearly 50 percent. (Id. ¶ 7.) Plaintiffs allege that they either bought Polaris stock at an inflated price or retained it through declines in market prices because of Defendants' allegedly false and misleading statements. (Id. ¶ 214.)

Polaris first issued a recall for some of its ORVs in July 2015, when it recalled 4,300 Youth RZR model-year 2015 vehicles. (Id. ¶ 48.) But according to Plaintiffs, consumers had complained of fire problems with Polaris's ORVs going back to 2012. (Id. ¶¶ 43-44.) Indeed, several individuals posted videos on YouTube showing their Polaris RZR models on fire. (Id.) The Amended Complaint lists nine instances of YouTube videos of RZR fires, and two instances of another model, the Ranger, catching fire, before the July 2015 Youth RZR recall. (Id.)

In October 2015, Polaris issued another recall for two models of the 2015 RZR, comprising 53,000 vehicles. (Id. ¶ 48.) In December 2015, Polaris recalled more than 2,000 RZR XP Turbo vehicles. (Id.) In April and June 2016, Polaris recalled more than 200,000 additional RZR and Ranger vehicles. (Id.) On July 25, 2016, Polaris issued a stop ride/stop sale advisory for 2016 models of the RZR XP Turbo, and recalled all of those vehicles on September 1, 2016, ten days before the end of the class period here. (Id.)

On September 12, 2016, Polaris announced that it was cutting its 2016 earnings predictions because of the "thermal-related issues" in the RZR model and the damage those issues were causing to sales of all Polaris ORVs. (Id. ¶ 89.) Polaris estimated that earnings per share for 2016 would be $3.30 to $3.80, when it had previously predicted earnings at $5.80 to $6.50 per share, and announced that sales were expected to be down more than previously anticipated. (Id.) Polaris ultimately had to recall another 56,000 ORVs in September 2016 and March 2017. (Id. ¶ 48.) The September 12, 2016,

2

announcement caused Polaris stock to decline 5%, although more serious stock-price declines happened after the July 2015 recall.

Plaintiffs do not list the price of Polaris shares in the Amended Complaint, but rather chart the dollar amount of declines and percentage declines for the various company announcements. (Id. ¶ 216.) An Internet search reveals that at the beginning of the class period, February 20, 2015, Polaris stock had a per-share price of $155.57. This was near the all-time high price for Polaris's shares. By the end of July 2015, the price was down to $137.06, and at the end of January 2016 Polaris's shares were trading at $73.84. Although the price rose to around $100 per share during parts of 2016, the price fell to $70.50 on September 16, 2016. By late November 2016, however, the share price had rebounded to around $90 and is currently trading at around $104 per share. See N.Y. Stock Exch., Polaris Industries Inc. (PII), https://www.nyse.com/quote/XNYS:PII (last visited October 13, 2017).

The Amended Complaint alleges that Defendants violated §§ 10(b) and 20, and Rule 10b-5, of the Securities and Exchange Act of 1934. 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . .[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b-5 quantifies the conduct proscribed by section 10(b), making it illegal

(a) To employ any device, scheme, or artifice to defraud,

3

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Section 20 imposes liability on a person who controls an entity that engages in the practices proscribed by section 10(b) and rule 10b-5. Plaintiffs have named several individual Defendants in addition to corporate Defendant Polaris. Defendant Scott W. Wine is the company's Chairman and Chief Executive Officer. (Am. Compl. ¶ 14.) Defendant Michael T. Speetzen is Polaris's Chief Financial Officer. (Id. ¶ 15.) Defendant Kenneth J. Pucel was Polaris's Executive Vice President of Operations, Engineering, and Lean. (Id. ¶ 16.) Defendant Matthew J. Homan is Polaris's President of Off-Road Vehicles. (Id. ¶ 17.) Defendant Bennett J. Morgan was Polaris's President and Chief Operating Officer from 2005 until May 2016. (Id. ¶ 18.) Defendant David C. Longren was Polaris's Senior Vice President of Enterprise Cost from January 2016 until September 2016. (Id. ¶ 19.) Plaintiffs claim both individual liability and "control person" liability against the individual Defendants.

Plaintiffs' 114-page Amended Complaint takes issue with nearly every statement Polaris and the individual Defendants made during the class period. These statements can be divided generally into five categories.

First are the generic warnings Polaris included in its submissions to the Securities Exchange Commission ("SEC"). In its annual Form 10K, issued in February 2015,

Polaris stated that product repairs and replacement due to warranty claims or product recalls "could have a material adverse impact on our results of operations" and that "product recalls could harm our reputation and cause us to lose customers, particularly if recalls cause consumers to question the safety or reliability of our products." (Id. ¶ 104.) In all of its quarterly reports during the class period, however, Polaris stated that there were "no material changes or additions to our risk factors" from the Form 10-K. (E.g., id. ¶¶ 108. 122.) According to Plaintiffs, these statements were false and misleading because Polaris did not disclose in these statements the manufacturing defects in its ORVs or the risks those defects posed to Polaris's business.

The second category of allegedly false and misleading statements are those Polaris made in its earnings reports, including the timing of those statements. For example, during a conference call to discuss Polaris's second-quarter 2015 earnings report, Defendants Morgan and Wine talked about the coming week's launch of the 2016 model year, stating that Polaris would have "excellent product news" and that they were "very comfortable with [Polaris's] product pipeline." (Id. ¶ 117.) The next day, however, Polaris announced the recall of 4,300 Youth RZR 2015 models because of a fire risk from a faulty fuel pump retaining ring. (Id. ¶ 118.) In addition, at the dealer show the following week at which Polaris unveiled its 2016 ORV models, Defendant Longren told investors and analysts that Polaris's products were in "great shape," that a new model had "industry-leading performance." (Id. ¶¶ 127-28.) Plaintiffs assert that these statements were false and misleading because in fact the new 2016 products "had been rushed to the market without adequate testing" and contained defects that would cause the vehicles to

5

suddenly catch fire, thus jeopardizing Polaris's financial condition. (Id. ¶ 129.) Plaintiffs also argue that the timing of the statements was intentional, to obscure bad news with new product releases and the like, allegedly further misleading investors.

Next, Plaintiffs contend that Polaris's warranty reserve disclosures were false and misleading. According to Plaintiffs, the disclosures "failed to reflect the true extent of the financial risks facing the Company as a result of the defects in Polaris's products . . . ." (Id. ¶ 121.)

The fourth category comprises statements Polaris made regarding the safety of its products. For example, Defendant Wine stated that the "safety of our customers [is] at the highest priority," while Defendant Pucel told investors that Polaris would "continue to be at world class safety levels." (Id. ¶¶ 131-32.) In a press release, Polaris stated that it was "committed to the safety and quality of its products." (Id. ¶ 136.) Plaintiffs assert that these statements were false and misleading because Polaris was allegedly not committed to safety, and the statements did not disclose the risks to Polaris's finances from the defects in Polaris's products. (Id. ¶ 134.)

Finally, Plaintiffs take issue with statements Polaris made in its product recalls. In an October 5, 2015, recall announcement, Polaris told customers that "very few units are believed to be affected" and that dealers would be able to address the issue easily. (Id. ¶ 138.) In another recall announcement in April 2016, Polaris stated that it had conducted a "thorough investigation" and had a "comprehensive solution" to fix the problems in its ORVs. (Id. ¶ 165.) According to Plaintiffs, these statements were false because the issue giving rise to the October 2015 recall did not affect only a few vehicles,

6

and in April 2016 Polaris had not thoroughly investigated the "systemic thermal risks" affecting its products and did not have a solution to fix the issues.

To support their allegations, Plaintiffs rely in part on the statements of five former Polaris employees, identified as confidential witnesses, or CWs, in the Amended Complaint. These employees were a buyer, a project engineer, two quality engineers, and a customer experience manager. (Id. ¶ 37 nn. 3-5; ¶ 42 nn. 6,-7.) The witnesses, however, offer only very general allegations, such as one witness's statement that Polaris did not always follow its own internal parts approval process which required that parts be reviewed for compliance with Polaris's design specifications. (Id. ¶ 39.) According to this witness, shipment of non-conforming or defective parts "could cause problems with parts that did not fit, leading to assembly errors or other problems." (Id. ¶ 40.) The witness does not say that any of the problems Polaris experienced could be tied to these problems. And none of the witnesses offers a specific allegations regarding a cover-up, for example, or indeed any evidence that the company knew that its ORVs were fundamentally defective in the same way and yet continued to market and sell those ORVs.

Plaintiffs' overarching theory of the case is that Polaris rushed its products through research, development, and manufacturing in order to retain market share, overlooking manufacturing or design defects in the pursuit of profits. Plaintiffs insist that the same or similar problem plagued all Polaris vehicles, and thus that all of the recalls and incidents arose out of the same defect. But Plaintiffs' own allegations are that the fire hazard resulted from different mechanical or design issues in different ORV models. In one

7

model, a fuel pump might leak. In another, fuel tank vent lines were faulty. In still another, the engine's heat shield was ineffective, and so on. (Id. ¶ 46.) The fundamental differences in the problems various ORVs faced during the class period makes Plaintiffs' theory of a company-wide blindness to similar defects implausible.

# DISCUSSION

## A. Standard of Review

Generally, a Rule 12(b)(6) motion requires the court to assume all factual allegations in the complaint as true, and grant plaintiffs all reasonable inferences that may be drawn from the complaint. Fed. R. Civ. P. 12(b)(6); In re Navarre Corp. Sec. Litig., 299 F.3d 735, 741 (8th Cir. 2002). However, when Congress adopted the Private Securities Litigation Reform Act ("PSLRA"), it heightened the pleading standards for securities fraud class action claims. Navarre, 299 F.3d at 741; see 15. U.S.C. §§ 78j, 78t(a); 17 C.F.R. § 240.10b-5. The PSLRA was designed to encompass at the very least the heightened pleading standards under Rule 9(b). Kushner v. Beverly Enters., Inc., 317 F.3d 820, 826 (8th Cir. 2003).

In order to proceed on claims brought under 10(b) and Rule 10b-5, Plaintiffs are required to allege four elements:

> (1) misrepresentations or omissions of material fact or acts that operated as fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security.

In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 888 (8th Cir. 2002) (citations omitted). The Complaint must specify each misleading statement or omission and specify why the

statement or omission was misleading. 15 U.S.C. § 78u-4(b)(1); Kushner, 317 F.3d at 826. It must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); Navarre, 299 F.3d at 741 ("[I]nferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences."). The ultimate issue before the Court is not whether Plaintiffs will prevail at trial, but rather whether Plaintiffs are entitled to proceed with their claim. In re Digi Int'l, Inc. Sec. Litig., 6 F. Supp. 2d 1089, 1095 (D. Minn. 1998) (Tunheim, J.).

**B.     Section 10(b) and Rule 10b-5 Claims**

Defendants claim that Plaintiffs have failed to comply with the PSLRA in several ways. First, they contend that Plaintiffs' allegations regarding the alleged misleading statements are insufficient. Second, they assert that Plaintiffs have not sufficiently alleged scienter. Finally, they contend that Plaintiffs' loss causation allegations are insufficient.

1.     Misrepresentations/Omissions

The Complaint must specify each false statement or misleading omission and explain why the statement was misleading. 15 U.S.C. § 78u-4(b)(1). Moreover, any misleading statement or omission must be material, that is, there must be "a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). A statement or omission is not material if it "present[s] or conceal[s] such insignificant data that, in the total mix of

9

information, it simply would not matter to a reasonable investor." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997).

As Polaris argues, Plaintiffs' allegations with respect to the company's commitment to safety are not actionable. At most, these statements are mere puffery, and in any event they are not verifiable and thus are not representations within the purview of § 10(b). See id. ("[S]ome statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them."). Plaintiffs cannot plausibly allege that they relied on Polaris's statements that it was committed to safety when deciding to purchase or retain Polaris stock, and this aspect of their claim fails.

Nor are the statements in Polaris's SEC filings actionable. First, Plaintiffs misconstrue the generic warning in Polaris's quarterly reports; that warning is not that Polaris faced no new risks, but that there were no new risk factors. Polaris had disclosed risks posed by recalls and warranty repairs; what eventually came to pass with Polaris ORVs is one of those risks. And even if Polaris was bound specifically to disclose the ORV defects in an SEC filing, Plaintiffs have no evidence or even allegation that the statements in the 2014 10K were false when they were made. It is just as likely that Polaris was not aware of the widespread nature of the ORV defects when the 10K issued in February 2015, as it is that Polaris was aware; this is not sufficient to overcome the PSLRA's heightened pleading requirements.

Plaintiffs' allegations regarding Polaris's alleged failure to increase its warranty reserves are nonsensical. Plaintiffs contend that that Polaris should have set aside more money earlier for warranty repairs, and its failure to do so amounted to an intentional

10

cover-up of the fire issue. But if Polaris knew that it would be forced to pay millions of dollars in warranty claims that it did not account for in its warranty reserves, then its officers are bad businesspeople, not fraudsters. Moreover, there is no dispute that Polaris increased its warranty reserves during the class period, thus establishing that the company was attempting to account for recalls. Plaintiffs' claim on this point fails.

Nor are the statements Polaris made when recalling its vehicles actionable. There is no evidence that the October 2015 recall's statement that the issue was limited to a very few vehicles was false when it was made or that Polaris knew it was false at the time it was made. Hindsight is 20/20, and is not an appropriate basis for securities fraud liability. Nor are Polaris's claims to have conducted a "thorough investigation" and to have developed a "comprehensive solution" actionable misrepresentations. Plaintiffs have no evidence regarding any investigation, and they do not allege that Polaris knew at the time these statements were made that Polaris did not believe it was able to solve the problems with its vehicles.

Finally, Plaintiffs' allegations that Polaris's statements in earnings reports and analyst phone calls were securities fraud is similarly unsupported. But these statements are not the sort of concrete misrepresentation that can support a securities fraud claim. For example, Plaintiffs contend that Morgan's statements in an October 25, 2015 analyst call that the 2016 new models "are bolstering our broad and growing ORV armada" and that he was "very comfortable" that Polaris would hit or even exceed its earnings guidance for ORVs in the last quarter of 2015 were false and misleading. But there is no evidence that Polaris knew, even after the recall of 53,000 RZR vehicles earlier that

11

month, that there was any systemic defect in all RZR models that would severely impact Polaris's business. A statement is actionable only if it is false or materially misleading when it was made; Plaintiffs ask the Court to infer knowledge from the few publicized fire incidents. But especially in light of the differences in the problems each model experienced, those inferences are simply not warranted.

2. Scienter

To plausibly allege scienter, Plaintiffs must set forth facts that give a strong reason to believe that there was reckless or intentional wrongdoing. Navarre, 299 F.3d at 745. Scienter may be established by: (1) facts demonstrating a conscious intent to deceive, manipulate, or defraud; (2) allegations of severe recklessness; or (3) allegations of opportunity or motive. In re Pemstar, Inc. Sec. Litig., No. 02-1821, 2003 WL 21975563, at *6 (D. Minn. Aug. 15, 2003) (Frank, J.); K-Tel, 300 F.3d at 893. Allegations of motivation or opportunity alone are insufficient to establish scienter, but coupled with actual knowledge or recklessness, such allegations bolster a plaintiff's showing of scienter. See Pemstar, 2003 WL 21975563, at *6-7.

Plaintiffs allege throughout the Amended Complaint that Defendants knew about the defects in the various ORVs long before those defects resulted in recalls, or that Defendants knew about recalls long before those recalls were announced. (E.g., Am. Compl. ¶ 41.) But a company cannot recall a product merely because a few customers have experienced issues with that product. Plaintiffs themselves agree that a recall must be coordinated with the Consumer Product Safety Commission (CPSC). More importantly, though, there is no indication that the defects in Polaris's ORVs were either

12

so widespread as to make imputing knowledge of the seriousness of the defects appropriate, or so immediate and urgent to warrant a recall without some investigation. Polaris issued six recalls in the 18-month-long class period. Plaintiffs' allegations do not establish that Defendants knew about the serious safety issues and concealed that knowledge from investors. Thus, even if Plaintiffs have alleged any actionable false and misleading representations, they have failed to establish scienter and their claims fail.

3. Causation

Having determined that Plaintiffs have failed to sufficiently allege false or misleading representations and scienter, the Court need not address Plaintiffs' allegations with respect to loss causation.

C. Section 20

To prevail on a claim for control-person liability under section 20, Plaintiffs "must first establish a separate underlying violation of the [Securities and Exchange] Act." In re Stratasys Ltd. S'holder Sec. Litig., No. 15cv455, 2016 WL 3636992, at *6 (D. Minn. June 30, 2016) (Schiltz, J.). Because Plaintiffs have failed to allege any actionable statements and have no evidence regarding scienter, Plaintiffs cannot establish control-person liability.

**CONCLUSION**

Plaintiffs' allegations fail to meet the high standard for success under the PSLRA. Accordingly, **IT IS HEREBY ORDERED that** Defendants' Motion to Dismiss (Docket No. 73) is **GRANTED** and the Amended Complaint (Docket No. 64) is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 13, 2017

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge